UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JAMES CASTELLUCCIO, | : | |
| Plaintiff | : | CIVIL ACTION NO. 3:09 CV 1145 (DJS) |
| | : | |
| VS. | : | |
| | : | |
| INTERNATIONAL BUSINESS | : | |
| MACHINES CORPORATION | : | |
| Defendant. | : | NOVEMBER 15, 2010 |

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

TABLE OF CONTENTS

Page

I.    INTRODUCTION ....................................................................................................... 1

II.   RELEVANT FACTS ................................................................................................... 2

III.  LEGAL STANDARD ............................................................................................... 18

IV.   ARGUMENT ............................................................................................................ 20

      A.    The Elements of a Claim Under the ADEA ................................................... 20

      B.    A Reasonable Jury Could Conclude That Mr. Castelluccio Has .................... 22
            Established a *Prima Facie* Case of Age Discrimination

            1.    Mr. Castelluccio Suffered Three Adverse Employment Actions .................... 23

            2.    A Reasonable Jury Could Conclude That the Adverse Employment ............. 25
                  Actions Mr. Castelluccio Suffered Occurred Under Circumstances
                  Giving Rise to an Inference of Discrimination

                  a.    Replacement by a Substantially Younger Employee ........................... 26

                  b.    Suggestion of Retirement by Ms. Collins-Smee .................................. 28

                  c.    Disparate Treatment Regarding Job Placement ................................... 30

                  d.    Ms. Collins-Smee's Attempt to Lower Mr. Castelluccio's Rating ...... 33

      C.    A Reasonable Jury Could Conclude that IBM's Alleged Non-Discriminatory
            Reasons for Its Adverse Employment Actions Constituted Pretext for Illegal
            Age Discrimination ......................................................................................... 33

            1.    The Reasons Provided by IBM Are False .......................................................... 34

                  a.    Mr. Castelluccio's Removal as VP of Public Sector and ................... 34
                        Assignment to WellPoint

                  b.    Removal From the WellPoint Account .................................................. 38

                  c.    Termination of Employment .................................................................. 43

            2.    IBM's Actions Support Conclusion of Age Discrimination ............................ 47

      V.    CONCLUSION ........................................................................................................ 50

## I.     INTRODUCTION

The Plaintiff, James G. Castelluccio ("Mr. Castelluccio"), respectfully submits this Memorandum of Law in Opposition to the Motion for Summary Judgment and supporting Memorandum of Law ("D.Br.") filed by the Defendant, his former employer, International Business Machines Corporation ("IBM").  As set forth in detail below, several genuine disputed issues of material fact exist in this age discrimination case that preclude an award of summary judgment.[1]

At the outset, it should be noted that, upon careful scrutiny, a number of IBM's positions in its Motion for Summary Judgment are riddled with inconsistencies. For example, IBM maintains in is Memorandum of Law that Mr. Castelluccio's performance had no bearing on his ultimate dismissal and that he was dismissed solely "because he was unable to find a position within IBM." (D. Br. 20).  Although it now maintains there "is absolutely no question why Plaintiff was terminated from IBM," this position is directly contrary to the position IBM took in its Response to Mr. Castelluccio's complaint with the New York State Division of Human Rights ("Response").  As described in further detail below, IBM is equally adamant in its Response that Mr. Castelluccio was terminated on the basis of his poor job performance.

Even within its current memorandum, IBM takes highly inconsistent positions. For example, IBM argues strenuously that Mr. Castelluccio had "a long history of unacceptable performance." (D. Br. 31).  Indeed, without even speaking to Mr. Castelluccio's prior manager or troubling to review his performance review for 2006 that had been completed only 30 days earlier, Mr. Castelluccio's new manager, Ms. Collins-Smee, made an independent assessment in less than one month that he needed to be removed from his position as VP of Public Sector. The problem with this position is

---

[1] Mr. Castelluccio voluntarily withdraws the retaliation claims set forth in Courts Two and Four of his Complaint, as he is unable to establish that his complaints of age discrimination made to Garrett Walker were communicated to the decisionmaker, Ms. Collins-Smee.

that it leaves IBM hard-pressed to explain why it subsequently assigned Mr. Castelluccio to one of its most troubled accounts, while still requiring him to discharge his VP of Public Sector responsibilities. IBM unsuccessfully tries to vault over the gap in its logic by asserting that Mr. Castelluccio "had a reputation as a person who comes in and fixes troubled accounts." (D. Br., 8). Yet, IBM cannot explain how Mr. Castelluccio could simultaneously be a poor performer who needed to be replaced as VP of Public Sector *and* a highly skilled troubleshooter appointed to fix the troubled account. Finally, IBM's argument that it assigned Mr. Castelluccio to the troubled account as an opportunity to improve his performance strains credulity, in that his manager was informed that Mr. Castelluccio would likely "implode" from the strain of performing two full-time positions. IBM's failure to explain these significant inconsistencies prevent it from prevailing on its Motion for Summary Judgment.

## II.    RELEVANT FACTS

Mr. Castelluccio was terminated by IBM after 40 years of employment—his entire professional career—in June 2008, when he was 61 years old. (Plaintiff's Local Rule 56(a)(2) Statement of Disputed Material Facts ["Pl. Facts"], at ¶1).[2] The path to Mr. Castelluccio's termination began in February 2007, however, with the arrival of his new younger manager, Joanne Collins-Smee ("Ms. Collins-Smee"). Beginning from Mr. Castelluccio's first face-to-face meeting with Ms. Collins-Smee, through his eventual termination the following year, she repeatedly discriminated against him on the basis of his age. Ms. Collins-Smee was the decisionmaker for all three adverse employment actions suffered by Mr. Castelluccio between February 2007 and June 2008. Her overt conduct – and failure to act – towards Mr. Castelluccio after he declined to retire from IBM supports an inference that age discrimination was the true reason for his termination.

---

[2] All evidence cited in support of each paragraph in the Plaintiff's Local Rule 56(a)(2) Statement of Disputed Material Facts incorporated by reference to said paragraph, unless otherwise stated.

**Mr. Castelluccio's Performance and Replacement as VP of Public Sector**

During his career at IBM, Mr. Castelluccio received a series of promotions and rose through the ranks to attain a position at the Executive Vice President level (known as "Band C") in August of 2000. (Pl. Facts, ¶2). In January of 2005, Mr. Castelluccio attained the position of Vice President of Public Sector Delivery ("VP of Public Sector") for IBM's Integrated Technology Division ("ITD"). (Id., ¶3). His duties included overall management of the day-to-day performance of over 30 contracts in IBM's Public Sector division. (Id., ¶4).

Mr. Castelluccio's direct supervisor in his position as VP of Public Sector was Arthur "Kelton" Jones ("Mr. Jones"), who was Vice President and Senior Services Delivery Executive for the ITD Americas organization until his retirement in early 2007. (Id., ¶¶6-8). All IBM employees receive a formal, comprehensive annual evaluation known as a PBC. (Id., ¶127; Affidavit of James Castelluccio, dated November 15, 2010, filed in support of Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment ["Pl. Aff."], at ¶12). Mr. Jones gave Mr. Castelluccio positive PBC's for 2005 and 2006 and never indicated to him that his performance was unsatisfactory.[3] (Pl. Facts, ¶¶9, 11, 13, 53). Mr. Jones assessed Mr. Castelluccio's performance as VP of Public Sector in 2005 as "2+," which means "above average contributor." (Id., ¶13). He completed Mr. Castelluccio's 2006 performance review on January 25, 2007 and rated Mr. Castelluccio a "2" ("solid contributor"). (Id., ¶¶9, 11). In his written assessment of Mr. Castelluccio's performance for 2006, Mr. Jones specifically praised Mr. Castelluccio's solid leadership and people management skills. (Id., ¶53). During 2007, Mr. Castelluccio attained several important goals and made substantial improvements as VP of Public Sector. (Id., ¶¶16-18).

Upon Mr. Jones' retirement at the end of January 2007, his position was assumed by Ms. Collins-Smee, who was ten years younger than Mr. Castelluccio. (Id., ¶¶8, 19). On or around

---

[3] Mr. Castelluccio's consistently earned performance ratings of satisfactory or above average throughout his career at IBM. (Pl. Facts, ¶15).

3

February 22, 200, in Mr. Castelluccio's first face-to-face meeting with Ms. Collins-Smee as his manager, prior to even introducing herself, Ms. Collins-Smee began by asking Mr. Castelluccio his age. Ms. Collins-Smee specifically said to Mr. Castelluccio, "How old--", then stopped mid-sentence and said, "You're old enough to bridge to retirement, right?" (Id., ¶¶20-22). Mr. Castelluccio strongly replied that he had no desire to retire, and Ms. Collins-Smee did not respond. (Id., ¶¶24-25).

At the time of Ms. Collins-Smee's statement, Mr. Castelluccio had not considered retirement or discussed retirement with his prior supervisors. (Id., ¶26). It is undisputed that under IBM's own practices and procedures, it was inappropriate for Ms. Collins-Smee to ask Mr. Castelluccio his age. (Id., ¶27). Indeed, Mr. Castelluccio testified that Ms. Collins-Smee's conduct implied to him that she believed he was too old to do his job. (Id.). At the time of Ms. Collins-Smee's statement, Mr. Castelluccio was approximately one week shy of his 60th birthday. (Id., ¶28). Pursuant to IBM's Pension Plan, Mr. Castelluccio became eligible to retire with full pension benefits on his 60th birthday. (Id., ¶29). At the time of Ms. Collins-Smee's statement, Mr. Castelluccio was the oldest out of all of the Vice Presidents who directly reported to Ms. Collins-Smee. (Id., ¶30).

Ms. Collins-Smee did not raise this inquiry in the context of a casual discussion of Mr. Castelluccio's future plans at IBM. (Id., ¶31). Rather, this inquiry was the first statement made to Mr. Castelluccio in a meeting convened to discuss the status of the accounts for which he was responsible. (Id., ¶¶31-32). At no point during their meeting did Ms. Collins-Smee bring to Mr. Castelluccio's attention any alleged problems with his job performance or inform him that she intended to remove him from his position as VP of Public Sector. (Id., ¶33).

In contrast to Mr. Castelluccio's clear recollection of his first meeting with Ms. Collins-Smee, she has no specific recollection of the meeting. (Id., ¶35). Through discovery in this lawsuit, Mr. Castelluccio learned that approximately **six days** after their initial meeting, on February 28, 2007,

Ms. Collins-Smee sent an email to the IBM Human Resources Executive assigned to work with her indicating that she had determined that Mr. Castelluccio needed to be replaced as VP of Public Sector. (Id., ¶36).   IBM has identified no conduct attributable to Mr. Castelluccio between the time Ms. Collins-Smee became Mr. Castelluccio's supervisor in early February and her email of February 28, 2007 warranting her precipitous decision to replace Mr. Castelluccio.  (See Defendant's Local Rule 52(a)(1) Statement, dated September 20, 2010).

Although Mr. Castelluccio is certain that Ms. Collins-Smee never made her intentions known to him, she stated to her HR executive that she had spoken with Mr. Castelluccio, and "he understands and also wants to move, he knew for a while that is was not working." (Pl. Facts, ¶¶37-38). Ms. Collins-Smee's statement was patently false.  (Id., ¶39).  Mr. Castelluccio would not have agreed to be replaced as Vice President unless an open position had been identified for him and there was an agreement in place for him to assume that position. (Id., ¶40).  At no time in February, March, April or May of 2007 did Ms. Collins-Smee inform Mr. Castelluccio that his performance as VP of Public Sector was sub-par, nor did she bring to his attention any complaints about his performance.  (Id., ¶¶41, 51).

In March 2007, a somewhat similar incident occurred between Ms. Collins-Smee and Mr. Castelluccio.  Without any reason to do so, Ms. Collins-Smee commented to Mr. Castelluccio that one of his direct reports, Ken Wisse, was "old enough to retire."  (Id., ¶42).  It was only after Ms. Collins-Smee commented on Mr. Wisse's retirement eligibility that she inquired about his job function.  (Id., ¶43).   At this time, Mr. Wisse was 59 years old.[4]  (Id., ¶42).

In March of 2007, Ms. Collins-Smee selected Miguel Echavarria, 11 years junior to Mr. Castelluccio, to replace him in his VP of Public Sector position.  (Id., ¶44).    Her articulated

---

[4] All references made to individuals' ages in this Memorandum refer to the individual's age at the time that the employment decision went into effect, rather than the individual's current age.

subjective basis for removing Mr. Castelluccio from his position was that he "was not working out" and "wasn't exhibiting the proper leadership of the accounts in the public sector." (Id., ¶50). Although Ms. Collins-Smee had received complaints about Mr. Castelluccio's performance from two of her colleagues at IBM,[5] she did not fully rely on their assessments, but claims she made her own independent observations. (Id.). Notably, IBM contends that some of these same complaints were made to Mr. Castelluccio's former manager, Mr. Jones. In contrast to Ms. Collins-Smee, Mr. Jones did not find these complaints to be indicative of poor performance, as he specifically praised Mr. Castelluccio's solid leadership and people management skills in Mr. Castelluccio's 2006 PBC and did not make mention of the complaints. (Id., ¶53).

Furthermore, Ms. Collins-Smee admits she did not review Mr. Castelluccio's 2006 comprehensive, annual evaluation prior to making her decision, despite the facts that she had access to it and it had been completed approximately one month earlier by Mr. Castelluccio's prior supervisor, Mr. Jones. (Id., ¶¶45-46). Ms. Collins-Smee claims, however, that after she assumed Mr. Jones' position, she spoke with him regarding Mr. Castelluccio's job performance and other personnel matters as part of the transition process. (Id., ¶47). Specifically, Ms. Collins-Smee testified that Mr. Jones told her that Mr. Castelluccio's appointment as VP of Public Sector "hadn't worked well previously," and that there had been "issues" in the role relating to "leadership on the accounts." (Id.). Mr. Jones directly and unequivocally contradicts Ms. Collins-Smee's testimony on these points. (Id.). Mr. Jones averred not only that he **never** discussed Mr. Castelluccio's performance with her, but also that he never had **any** conversation with her regarding the transition

---

[5] Specifically, IBM alleges that Ms. Collins-Smee received complaints regarding Mr. Castelluccio from David Liederbach ("Mr. Liederbach"), who was General Manager, Public Sector, IBM Global Technology Services, in 2007 and was a peer of Ms. Collins-Smee. (Pl. Facts ¶¶48-49). Ms. Collins-Smee testified that she had no occasion to seek advice from Mr. Liederbach. (Id., ¶49). IBM also alleges that Keenie McDonald purportedly complained to Ms. Collins-Smee about Mr. Castelluccio. Ms. McDonald was Managing Director for IBM's WellPoint account in 2007, which was just one of nearly *30 accounts* managed by Mr. Castelluccio. (Id., ¶52). Notably, the complaints made by Mr. Liederbach and Ms. McDonald were neither shared with Mr. Castelluccio, nor documented in his PBC. (Id., ¶51).

of his duties, despite his attempts to do so.  (Id.).  Mr. Jones' testimony casts a sizeable shadow of doubt on the truthfulness of Ms. Collins-Smee's testimony and her veracity in general.

**Mr. Castelluccio's Assignment to the WellPoint Account and Subsequent Removal**

The WellPoint service contract was universally regarded as a deeply troubled contract on which IBM was losing millions of dollars.  (Id., ¶¶55-59).  Ms. Collins-Smee immediately became aware of the problems with WellPoint when she assumed her role as General Manager of ITD Americas. (Id., ¶¶54, 68-72).   Mr. Liederbach described the WellPoint contract to Ms. Collins-Smee as his "largest, most important and most challenged client/contract." (Id., ¶54).    The CIO of WellPoint, Mark Boxer ("Mr. Boxer") was also reputed to be hard to work with and difficult to please. (Id., ¶73).

Michael Morin ("Mr. Morin"), the Delivery Project Executive ("DPE") assigned to the WellPoint account, had raised significant concerns about the handling of the WellPoint account and expressed his frustration with IBM's failure to address the delivery issues with the WellPoint account.   (Id., ¶61).  As a result of the overwhelming strain that the position placed on him, Mr. Morin resigned on March 20, 2007.  (Id., ¶62).  Ms. Collins-Smee instructed Mr. Castelluccio to temporarily assume Mr. Morin's duties immediately while the search for his replacement ensued.[6] (Id., ¶63).

In addition to continuing to serve as VP of Public Sector, Ms. Collins-Smee formally designated Mr. Castelluccio as "acting DPE" for WellPoint on March 31, 2007. (Id., ¶64).  This was intended as a two-week assignment until the candidate previously selected for the position, Kenneth

---

[6] Immediately following Mr. Morin's resignation, Ms. Collins-Smee stated that the WellPoint account "was way too much for [Mr. Morin], he has been very frustrated and been unsuccessful turning this difficult situation around." (Pl. Facts, ¶74). Despite Mr. Morin's resignation from the WellPoint account and apparent lack of success, IBM retained him and he is now serving in the same capacity (i.e., as a DPE) at a comparably sized IBM account. (Id., ¶75).  Mr. Morin was 55 years old in March of 2007. (Id., ¶76).

Weiss, age 47, would be available to assume responsibility for the role.[7]  (Id., ¶¶64, 67).  However, Mr. Weiss did not assume the role of DPE of WellPoint as scheduled because his candidacy was rejected by Mr. Boxer.  (Id., ¶77).  Accordingly, Mr. Castelluccio continued to perform two full-time positions as VP of Public Sector and DPE of WellPoint throughout April, May and part of June 2007.  (Id., ¶78).  In his role as VP of Public Sector, in addition to work on other Public Sector accounts, Mr. Castelluccio was required to perform substantial work on a "Resource Action," and a "LEAN" initiative.  (Id., ¶¶78-80, 84).  These two companywide initiatives were complex and required a great deal of his time and energy during April and May of 2007.  (Id., ¶81).  Ms. Collins-Smee was certainly aware of the extraordinary demands these two assignments placed upon Mr. Castelluccio.  (Id., ¶82).  Indeed, there is strong suggestion that the assignment of Mr. Castelluccio to these dual roles was a calculated attempt to compel him to retire.  This view is bolstered by a candid email sent by Mr. Liederbach to Ms. Collins-Smee in which he stated that between working on the WellPoint account and the Resource Action, Mr. Castelluccio will "**implode**." (Id., ¶83).

In June of 2007, Ms. Collins-Smee informed Mr. Castelluccio that she had replaced him as VP of Public Sector with Miguel Echavarria and that he would be working on the WellPoint account as DPE on a full-time basis.  (Id., ¶85).  Prior to this date, Mr. Castelluccio had been unaware that he was being replaced in his VP of Public Sector position, despite the fact that Ms. Collins-Smee had made the decision in late February.  (Id., ¶86).

Although Mr. Castelluccio believed that he had been assigned as the new DPE of WellPoint as of June 2007, discovery revealed that his assignment was viewed as "temporary" by Ms. Collins-Smee, IBM and WellPoint.  (Id., ¶87).  Ms. Collins-Smee continued to lead a search for a permanent

---

[7] Notably, IBM's commentary to the job posting for the WellPoint DPE position on April 5, 2007, stated that Robert Zapfel, Ms. Collins-Smee's manager, was concerned that "customer issues" might arise if Mr. Weiss's responsibilities were split between WellPoint and another account. (Pl. Facts, ¶66).  Mr. Zapfel gave conditional approval to Mr. Weiss's assignment to WellPoint provided that IBM disclosed that he would be performing another role in addition to his role at WellPoint. (Id.).

candidate for the WellPoint DPE job continuously between April and September 2007, when Mr. Castelluccio's replacement ultimately was approved.  (Id., ¶89).  Mr. Castelluccio was never formally presented to Mr. Boxer or interviewed as IBM's candidate for the DPE position. (Id., ¶90).  Rather, Mr. Boxer always viewed Mr. Castelluccio as an "interim DPE" and a temporary leader. (Id., ¶91). Several other younger candidates (ages 46, 48, 55, and 44) were vetted for the WellPoint DPE position between April and September of 2007. (Id., ¶¶92-94, 96, 98).  Three of those candidates were rejected and one was rendered unavailable by his supervisor. (Id., ¶¶93, 95, 97, 99).  In early September 2007, IBM considered Gordon Crawford, then 59 years old, for the WellPoint DPE position. (Id., ¶100).  Mr. Boxer approved the selection of Mr. Crawford as WellPoint DPE in mid-September 2007.  (Id., ¶101).

On or about November 21, 2007, Ms. Collins-Smee scheduled a meeting with Mr. Castelluccio, during which she informed him that he was being replaced as DPE of WellPoint by Mr. Crawford beginning in January of 2008.  (Id., ¶103).  Prior to that time, Mr. Castelluccio did not know that he was being replaced as DPE of WellPoint or that Mr. Crawford was being considered for the position. (Id., ¶104).  When Mr. Castelluccio asked Ms. Collins-Smee about his future with IBM during this meeting, she *again* told him that he was eligible to bridge to retirement.[8]  (Id., ¶105). Mr. Castelluccio *again* informed Ms. Collins-Smee that he had no interest in retiring, to which Ms. Collins-Smee responded that she would assist him in finding a new position at IBM.  (Id., ¶106).

Mr. Castelluccio was not informed of any specific "complaints" made by WellPoint regarding his performance until after he filed this lawsuit. (Id., ¶109).  The majority of "complaints" made by WellPoint related either to IBM's failure to assign a *permanent* DPE to its account, or to Mr. Castelluccio's inability to devote sufficient time to WellPoint due to his assignment to two full-time

---

[8] Ms. Collins-Smee has admitted discussing retirement with Mr. Castelluccio in the context of a discussion of "new roles" for him at IBM, but could not recall specific details of the conversation.  (Pl. Facts, ¶107). Ms. Collins-Smee recalls that Mr. Castelluccio was very interested in continuing to work and made it absolutely clear that he was not interested in retirement. (Id., ¶¶108, 255).

jobs.  (Id., ¶110).  Mr. Boxer also complained about Mr. Castelluccio not being on a "crit sit" or "SWAT" call, only to be informed either that Mr. Castelluccio was, in fact, on the call or was away on vacation.  (Id., ¶111).  Ms. Collins-Smee could not recall any document wherein any WellPoint representative complained about Mr. Castelluccio's performance on the account. (Id., ¶112).  Mr. Castelluccio was never placed on a "performance improvement plan," nor was he given an interim PBC review with amended performance goals, in contravention of IBM's PBC policy applicable to all full-time employees.  (Id., ¶¶113, 127).  He was not even afforded an informal performance review.  (Id., ¶113).

The objective evidence demonstrates that the WellPoint account *improved* under Mr. Castelluccio's management.  (Id., ¶¶114-120).  A client satisfaction survey completed by WellPoint in February 2008 for work performed in 2007 revealed an overall satisfaction rating of 8 out of 10, and it was noted that "the pace of improvement in the last six months is probably faster than the previous eighteen by far."[9]  (Id., ¶¶115, 118).

Significantly, it is not uncommon at IBM for customers on highly troubled contracts to complain about services or individuals or request that particular individuals be removed from the account. (Id., ¶121).  Because these complaints usually pertain to faults within the contract itself or to personality conflicts, such complaints generally are not viewed as indicative of poor job performance.[10]  (Id., ¶122).  If the conflict between the customer and the IBM employee cannot be

---

[9] Mr. Castelluccio's positive performance as DPE of WellPoint is also substantiated by notes of appreciation regarding both his individual performance and the successful performance of his team.  (Pl. Facts, ¶119).  Further, a chart of "performance highlights" on the account documented that the number of outages on the account decreased dramatically in April of 2007 and remained consistently lower for the rest of the year.  (Id., ¶120).  The monthly losses also significantly decreased during Mr. Castelluccio's tenure. (Id.).

[10] For example, Mr. Boxer specifically requested that Mr. Liederbach—the IBM employee who negotiated the WellPoint contract—no longer be involved with the account, stating that he "would be personally disappointed if [he] found that [Mr. Liederbach] was still somehow directly in the mix on wellpoint even albeit behind the scenes and not visible to me directly." (Pl. Facts, ¶124).  Despite Mr. Boxer's dissatisfaction with Mr. Liederbach, this did not negatively impact on his career at IBM.  (Id., ¶125).  WellPoint also

10

resolved, then the IBM employee typically is moved to an alternate account.  (Id., ¶123).

At the end of January, 2008, Ms. Collins-Smee contacted Mr. Castelluccio and informed him that she was "thinking of" lowering his PBC rating for 2007.  (Id., ¶128).  Mr. Castelluccio was surprised to learn this because he previously sent her a summary of all of the accomplishments he had achieved in his dual roles during 2007.  (Id.).  During the conversation, it became evident to Mr. Castelluccio that Ms. Collins-Smee had not read his summary, as she did not argue or contest any of his points. (Id., ¶129).  Rather, Ms. Collins-Smee asked him to provide an expanded summary, which he did.  (Id., ¶¶129-130).  Ms. Collins-Smee contacted Mr. Castelluccio after reviewing the summary and agreed that he deserved a "2" PBC rating for 2007. (Id., ¶131).   While IBM now takes great pains to distance itself from this document, the operative fact remains that in Ms. Collins-Smee's final, year-end evaluation, she rated Mr. Castelluccio as a "solid contributor." (Id.).  Furthermore, this official rating was approved by Ms. Collins-Smee's manager, Robert Zapfel. (Id., ¶132).

The optional comments Ms. Collins-Smee made in Mr. Castelluccio's 2007 PBC did not indicate that his performance in 2007 was unsatisfactory or that he had been removed from his position for performance-based reasons.  (Id., ¶134).  Rather, the comments were positive overall and noted that the team led by Mr. Castelluccio on the troubled WellPoint account "made significant progress on programs to improve service quality and reduce cost…"  (Id., ¶135).  Ms. Collins-Smee did not inform Mr. Castelluccio at any point orally or in writing that she viewed his performance as unsatisfactory and gave no indication that his job was in jeopardy.  (Id., ¶136). Given IBM's well-established protocol for managers to identify performance goals and provide feedback to employees on how to achieve those goals (id., ¶¶140-144), the absence of any remediation measures or documented criticism of Mr. Castelluccio, casts grave doubt on her revisionist portrayal of Mr. Castelluccio as a sub-par performer.

---

specifically requested that other IBM employees be removed from its account at various times. (Id., ¶126). Those employees were placed in alternate positions at IBM. (Id.).

**Ms. Collins-Smee's Failure to Follow IBM's Job Placement Procedures**

It is common practice at IBM for employees to be transferred between positions and departments as needed, for various reasons. (Id., ¶146). An IBM employee who is not assigned to a specific role and does not have a defined full-time responsibility is deemed "benched." (Id., ¶147). IBM employees typically do not spend a long time "on the bench" before being assigned to a new position or temporary work. (Id., ¶148). One of IBM's "promotion principles" in 2008 was to ensure placement of senior executives "on the bench" before promoting new executives. (Id., ¶149). It is also typical at IBM to inform executives as soon as possible that they are going to become available for a new position so they can work with their supervisor to find a new role at IBM and avoid being benched. (Id., ¶154). For the same reason, it is customary to inform an employee if he or she is working in a "temporary" role. (Id., ¶155). It is unusual for an IBM executive to be removed from a position without first arranging for a temporary or permanent assignment to an alternate account. (Id., ¶156). After Mr. Castelluccio was removed from the WellPoint account, however, he was essentially "benched," although he continued to work on the transition of the WellPoint account for several weeks through January and February of 2008. (Id., ¶161).

Contrary to IBM's practices, Ms. Collins-Smee did not give Mr. Castelluccio any temporary assignments or projects in 2008, despite her presumed knowledge of such assignments. (Id., ¶¶162-167). If Mr. Castelluccio had been assigned to a special project or temporary assignment, it would have assisted him in finding an alternate position at IBM because it would have provided him with continued access to co-workers and allowed him to increase his skills and capabilities. (Id., ¶168).

Mr. Castelluccio needed Ms. Collins-Smee's assistance in locating a new position within IBM, particularly because executive positions at IBM are not posted. (Id., ¶170). The support of an employee's immediate supervisor is "one of the major support structures" at IBM and such support

was an "important avenue" for getting onto a slate of candidates for an open position. (Id., ¶171). If a manager or executive "sponsor" does not advocate for an executive during a Five Minute Drill, it impacts that executive's ability to find a new position at IBM. (Id., ¶173).

Executive positions are identified in documents known as "Five Minute Drills."[11] (Id., ¶150). These documents are distributed among IBM management and discussed on a monthly basis in meetings also referred to as "Five Minute Drills." (Id., ¶152). It is IBM protocol for executives without jobs to be identified on Five Minute Drills. (Id., ¶174). It is also the primary responsibility of the executive's General Manager to make the executive visible to others and to place the executive on the Five Minute Drill as soon as possible. (Id., ¶¶172, 174). The participants of the Drill are the only individuals who are authorized to view the Five Minute Drill Report. (Id., ¶177).

The participants of each Drill include the direct reports of the General Manager who is running the Drill. (Id., ¶178). When Ms. Collins-Smee removed Mr. Castelluccio from his position as VP of Public Sector, he was not given access to her Five Minute Drills, or any other IBM Five Minute Drills. (Id., ¶180). Ms. Collins-Smee approved all executive and customer-facing roles filled within the ITD Americas organization and had control over which employees were submitted for consideration as candidates on her Five Minute Drills. (Id., ¶¶183-184). Ms. Collins-Smee also participated in the Five Minute Drills of other groups and could have advanced Mr. Castelluccio as a

---

[11] Generally, each Five Minute Drill contains a section announcing personnel changes, a section listing open job opportunities and the candidates being considered for each job, and a section listing executives who are ready to be moved. (Pl. Facts, ¶153). There are several different iterations of the Five Minute Drills. (Id., ¶175). Various organizations within IBM conducted their own Five Minute Drills and the contents of the documents generated in the drills are deemed "confidential." (Id.). The ITD Americas Five Minute Drill was related to Ms. Collins-Smee's organization, ITD Americas, and facilitated by Mr. Holmes. (Id., ¶176). Other Five Minute Drills at IBM in 2007-2008 included those identified as "ITD," "IT Delivery," "IO for ITD" and "IO ITD Zapfel" (collectively "Zapfel Drills") were run by Robert Zapfel and identified executive openings and tracked executive movement in the entire IO ITD organization, including ITD Americas. (Id., ¶181). The Five Minute Drills identified as "GTS" were run by Patrick Kerin and identified executive openings and tracked executive movement in the Global Technology Services organization. (Id., ¶182).

candidate for positions in other organizations.[12] (Id., ¶¶185-186).

Although Ms. Collins-Smee had determined in February of 2007 to replace Mr. Castelluccio as her VP of Public Sector and it would have been appropriate for her to place him on her Five Minute Drill at that time, he was not placed on the "ITD Americas" until January 2008, nearly one year later.  (Id., ¶192).  Moreover, the January 2008 ITD Americas drill was the *only* time Mr. Castelluccio ever appeared on any of her monthly drills. (Id., ¶193).

Mr. Castelluccio was treated less favorably than similarly situated younger executives with respect to job placement.[13]  Ms. Collins-Smee announced seven personnel changes within her organization in May 2008.  (Id., ¶200).  Mr. Castelluccio was qualified for all of the positions described in the email, but Ms. Collins-Smee did not inform him of these job openings. (Id., ¶201). All of the individuals who filled those positions were younger than Mr. Castelluccio. (Id., ¶202). One position filled by Tim Smith, age 51, was described as a "special assignment" reporting to Ms. Collins-Smee.[14] (Id., ¶¶203-204).   Various other positions in Ms. Collins-Smee's organization for which Mr. Castelluccio was qualified, but not considered as a candidate, were awarded to executives with less experience who were at least 10 years younger than Mr. Castelluccio.  (Id., ¶¶232-240). These included Ed Fung, age 38; Ed Tidik, age 50; Donald Woodward, age 50; Ron Atkins, age 46; Richard DeLeo, age 50; Jim Carrubba, age 50; Douglas Farris, age 50; and Bettina Hines, age 50.

---

[12] An employee cannot choose to be included on a "short list" of candidates for a position on his own initiative.  (Id., ¶187).

[13] Although Mr. Castelluccio was a Band C executive, he is similarly situated to Band D executives with respect to job placement.. The commentary to the posting of Mr. Castelluccio's VP of Public Sector position specifically noted that there was a "very small pool" of Band C jobs and Mr. Castelluccio needed to "consider D roles." (Pl. Facts, ¶198). Mr. Castelluccio informed Ms. Collins-Smee that he was willing to consider Band D positions in addition to Band C positions. (Id., ¶196). Where Mr. Castelluccio's name appeared on Five Minute Drills, it typically stated that he was "available for C or D jobs." (Id., ¶197).  Band C IBM executives are often considered for Band D roles. (Id., ¶199).

[14] In total, six newly created positions were filled in May 2008, including five in the Integrated Operations organization, over which Ms. Collins-Smee had direct input or control.  (Id., ¶207).  Mr. Castelluccio was considered for only one of those positions, which was the position outside of Integrated Operations. (Id.).

(Id.).

Mr. Castelluccio was also qualified but not considered for temporary executive assignments available in 2008.  (Id., ¶¶208-09, 214-17).  One temporary assignment was granted to an executive named William Ireland, age 53, who had a negative performance history.  (Id., ¶¶209-10).  Notably, Mr. Ireland was described by Garrett Walker, the IBM Human Resources VP for ITD, as "an average performer at best," and "a guy who wants to sit in the back seat." (Id., ¶210).   Mr. Walker said he was "not impressed" by Mr. Ireland and stated that, "[w]e should not be pushing hard to place a US assignee into highly key positions in growth regions who is [sic] average performer or less *and has indicated he wants to bridge to retirement.*"  (Emphasis added).  (Id., ¶¶210, 212).   Mr. Walker further stated that Mr. Ireland was "less then 2 years from retirement . . . and we should NOT be puttin [sic] him in play for international assignments because it is convenient." (Id., ¶213).   Yet, Mr. Ireland was assigned to a temporary international executive assignment in lieu of Mr. Castelluccio. (Id., ¶209).

Remarkably, Mr. Castelluccio was considered for only **3** out of **106** positions at IBM for which he was qualified over the course of fifteen months, as determined on the basis of the Five Minute Drills provided in discovery, and listed as a potential candidate for just one position. (Id., ¶¶2218, 220, 231).   Mr. Castelluccio was not informed of his candidacy for that one position and did not receive an interview. (Id., ¶¶221-23).  The position was filled by Kevin Hassett, who was a Band 10 non-executive in May 2008, two levels lower than Mr. Castelluccio's Band C status, and approximately ten years younger than Mr. Castelluccio.  (Id., ¶¶224-25).

The evidence demonstrates that Ms. Collins-Smee raised Mr. Castelluccio as a candidate for only two positions.  (Id., ¶227).  Mr. Castelluccio was interviewed for one of these positions as a result of his own initiative. (Id., ¶228).  With respect the second position, Ms. Collins-Smee merely asked that Mr. Castelluccio's name be added to the slate in a Five Minute Drill "for the record." (Id.,

¶229). This second position was too little, too late as it occurred approximately two weeks before Ms. Collins-Smee presented Mr. Castelluccio with his separation papers and informed him that he had until June 30, 2008 to find a new job or else be terminated from IBM. (Id., ¶¶258-59).

Further, at least six younger executives in the ITD Americas organization whose assignments ended or who were removed from their positions were added to Ms. Collins-Smee's Five Minute Drill and quickly placed in new roles in lieu of Mr. Castelluccio. (Id., ¶¶241-47). The ages of those executives were 43, 44, 56, 45, 44, and 47. (Id., ¶¶242-47). Notably, the average age of the Vice Presidents who reported to Ms. Collins-Smee in 2009, one year after his termination, is *eleven* years younger than Mr. Castelluccio. (Id., ¶268).

## Mr. Castelluccio's Termination

Mr. Castelluccio contacted Garrett Walker, then a Vice President of Human Resources in the ITD organization at IBM, on February 15, 2007, to discuss his concern that Ms. Collins-Smee had threatened to lower his PBC rating in an effort to jeopardize his future career and to pressure him to retire. (Id., ¶248). He further expressed his frustration with Ms. Collins-Smee's failure to assist him to find a new role or assign him any temporary work. (Id.). Mr. Walker counseled Mr. Castelluccio to meet with Ms. Collins-Smee and urge her to assist him in locating a position or to provide him with work assignments. (Id., ¶250). Subsequently, Mr. Castelluccio scheduled a meeting with Ms. Collins-Smee in March of 2008. (Id., ¶251).

In that meeting, Ms. Collins-Smee glibly responded to Mr. Castelluccio's request for her assistance that if no meaningful work could be found for him, he should look at retiring from IBM. (Id., ¶253). Mr. Castelluccio again stated - for the third time - that he did not want to retire and wanted to continue his career at IBM. (Id., ¶254). Ms. Collins-Smee conceded that it would have been inappropriate to raise the issue of retirement with Mr. Castelluccio repeatedly where he had made clear his lack of interest in retirement. (Id., ¶256). Ms. Collins-Smee's repeated references to

16

retirement, after Mr. Castelluccio clearly indicated his lack of interest in retirement, telegraphed to Mr. Castelluccio that she believed he should retire from IBM.  (Id., ¶257).

On or about May 20, 2008, Mr. Castelluccio met with Ms. Collins-Smee at her request, and she informed him that he would be given until June 30, 2008 to find a new position or else his employment with IBM would be terminated.   (Id., ¶¶258-59). She did not indicate that his termination was due to poor job performance.   (Id., ¶260). In this meeting, Ms. Collins-Smee mentioned once again that Mr. Castelluccio was eligible to retire.  (Id., ¶261).  Following this meeting, Ms. Collins-Smee made a handful of perfunctory inquiries into potential job leads for Mr. Castelluccio.  (Id., ¶262).  Mr. Castelluccio was presented with a severance package on June 2, 2008 and given 21 days to review and accept it.  (Id., ¶¶263, 266).   On June 30, 2008, Mr. Castelluccio's employment with IBM was terminated and he commenced his involuntary retirement.  (Id., 264).

Prior to his termination, Mr. Castelluccio made another complaint of age discrimination to IBM's Human Resources Department.  (Id., ¶269).  A Human Resources representative for IBM, Russell Mandel, initiated an "Open Door" investigation pursuant to IBM's policies and procedures. (Id., ¶270).  In an email to Mr. Holmes dated June 30, 2008, Mr. Mandel noted that if Mr. Castelluccio accepted the severance agreement, the Open Door investigation would be terminated, thereby putting into question the true objective of the investigation.  (Id., ¶272).  Mr. Castelluccio did not accept the severance agreement within the time allotted.  (Id., ¶¶266-67).

 At the time of Mr. Castelluccio's termination, the Open Door investigation was still pending.  (Id., ¶271).  Mr. Castelluccio was informed in writing by Mr. Mandel on August 11, 2008—well after the expiration of his severance consideration period—of Mr. Mandel's conclusion that management treated him fairly regarding his termination.  (Id., ¶273).  Mr. Castelluccio was not provided with a copy of Mr. Mandel's Open Door Report, nor was he given an opportunity to rebut any of the statements made therein, despite his request to do so.  (Id., ¶275).

17

It is telling that, although Mr. Mandel was a Consulting HR Professional for IBM and had no expertise in Mr. Castelluccio's field, he expressed his opinion in the Open Door report that Ms. Collins-Smee had "confused issues" in assessing Mr. Castelluccio with a "2" rating for 2007, and should have given Mr. Castelluccio a "3" rating.  (Id., ¶276).  Mr. Mandel authored an instructive memorandum to Ms. Collins-Smee's supervisor, Timothy Shaughnessy, Vice President of IT Delivery, counseling him to reprimand her for her "mistake."  (Id., ¶277).

In his investigation, Mr. Mandel did not ask Ms. Collins-Smee any questions related to her alleged age bias, although it would have been proper to do so.  (Id., ¶279).  Rather, Mr. Mandel questioned Ms. Collins-Smee only as to Mr. Castelluccio's job performance.  (Id., ¶280).  The Open Door Report also contradicts Ms. Collins-Smee's testimony identifying at least one conversation she had with Mr. Castelluccio wherein retirement was discussed.  (Id., ¶281).

Although IBM now maintains that Mr. Castelluccio was not terminated for poor job performance, but rather from his inability to locate alternate employment within IBM, IBM refused to hire him for a temporary position that became available in July 2010.  (Id., ¶282).  Mr. Castelluccio was notified that a "select group" of retired IBM Vice Presidents were being contacted due to IBM's need for experienced Vice Presidents to work on various temporary assignments and was asked to let IBM know if he was interested.  (Id., ¶¶283-84).  Mr. Castelluccio immediately indicated his interest in returning to IBM, but never heard back from IBM.  (Id., ¶¶285-86).

## III.   LEGAL STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute."  (Internal quotation marks omitted.)  <u>Williams v.</u>

_____, 456 F.Supp.2d 372, 382 (D. Conn. 2006). A "material fact" is one whose resolution will affect the ultimate determination of the case. <u>Anderson v. Liberty Lobby Inc.</u>, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). A dispute concerning a material fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Id.</u>

The role of a district court in considering such a motion "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." <u>Edwards v. William Raveis Real Estate, Inc.</u>, 3:08-CV-1907 JCH, 2010 WL 3829060, at *3 (D. Conn. Sept. 22, 2010). Thus, in assessing the record, the Court is to view all inferences and ambiguities in a light most favorable to the nonmoving party. <u>Williams</u>, <u>supra</u>, at 382. "If there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." <u>Howley v. Town of Stratford</u>, 217 F.3d 141, 151 (2d Cir. 2000). Further, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." <u>Reeves v. Sanderson Plumbing Prod. Inc.</u>, 530 U.S. 133, 150, 120 S.Ct. 2097 (2000).

Summary judgment is sparingly used in discrimination cases, where intent and state of mind are at issue, in that "careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination." <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 38 (2d Cir. 2000).[15] In the instant case, numerous genuine disputed issues of material fact exist that preclude the granting of summary judgment.

_____

[15]See also, <u>Chertkova v. Connecticut Gen. Life Ins. Co.</u>, 92 F.3d 81, 87 (2d Cir. 1996) ("Since it is rare indeed to find in an employer's records proof that a personnel decision was made for a discriminatory reason, whatever other relevant depositions, affidavits and materials are before the district court must be carefully scrutinized for circumstantial evidence that could support an inference of discrimination").

## IV.    ARGUMENT

### A.    <u>The Elements of a Claim Under the ADEA</u>

The ADEA seeks to "promote employment of older persons based on their ability rather than age ... [and] to prohibit arbitrary age discrimination in employment...." 29 U.S.C. § 621(b). The ADEA further makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).[16]

Proof of a violation of the ADEA may be established through either direct or circumstantial evidence. <u>Carlton v. Mystic Transp. Inc.</u>, 202 F.3d 129, 135 (2d Cir. 2000). "Direct evidence" of discrimination typically consists of a "smoking gun," such as "an admission by the defendant through a facially discriminatory policy or in an official piece of writing." <u>Edwards</u>, <u>supra</u>, at *5. The Second Circuit has aptly noted that, "[d]irect evidence of discrimination is not necessary . . . because proof is seldom available with respect to an employer's mental processes. Instead, plaintiffs in discrimination suits often must rely on the cumulative weight of circumstantial evidence, since an employer who discriminates against its employee is unlikely to leave a well-marked trail. . . ." <u>Carlton</u>, <u>supra</u>, at 135. The Supreme Court likewise has noted that, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." <u>Michalic. v. Cleveland Tankers, Inc.</u>, 364 U.S. 325, 330, 81 S.Ct. 6 (1960).

It should be noted at the outset that IBM's interpretation of <u>Gross v. FBL Financial Services, Inc.</u>, 555 U.S. ___, 129 S. Ct. 2343 (2009), is exaggerated and incorrect. In <u>Gross</u>, the Supreme Court determined that burden shift in "mixed-motives" cases, as articulated in <u>Price</u>

---

[16] "[I]t is important for a court when reviewing this kind of case to bear in mind the findings Congress made at the time of the ADEA's enactment. Among those findings was that older workers are disadvantaged in retaining employment and regaining it after being discharged, and that unemployment among older workers, relative to younger ones, was high." <u>Carlton v. Mystic Transp. Inc.</u>, 202 F.3d 129, 134 (2d Cir. 2000).

Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775 (1989), is not available in age discrimination cases under a strict reading of the ADEA.[17]  Gross, supra, at 2350.  Significantly, the Supreme Court explicitly recognized that "[t]here is no heightened evidentiary requirement for ADEA plaintiffs to satisfy their burden of persuasion that age was the 'but for' cause of their employer's adverse action . . . and we will imply none."  Gross, supra, at 2351, n.4.  Despite the Supreme Court's clear elucidation of its holding, IBM nevertheless incorrectly argues that "a plaintiff in an age case must shoulder a *heightened burden* in proving discrimination." (Emphasis added) (D.Br., 18).  Notably, the Supreme Court held that, going forward, "the burden of persuasion necessary to establish employer liability is the same in alleged mixed-motives cases as in any other ADEA disparate-treatment action."  Id., at 2351.  Therefore, the Court did not hold that mixed motives cases may not be brought under the ADEA, only that the burden of persuasion does not shift to the employer.[18]

The analysis of Mr. Castelluccio's claims is governed by the McDonnell Douglas burden shifting test, which is well-settled:

> First, a plaintiff must establish a *prima facie* case of age discrimination. . . . To establish a *prima facie* case of age discrimination, a plaintiff must show four things: (1) he is a member of the protected class; (2) he is qualified for [his] position; (3) he has suffered an adverse employment action; and (4) the circumstances surrounding that action give rise to an inference of age discrimination. . . . The burden of establishing a *prima facie* case is not a heavy one.  One might characterize it as minimal. . . . Once the plaintiff has established a *prima facie* case of age discrimination, 'the employer is required to offer a legitimate, nondiscriminatory business rationale for its actions'. . . . If, however, the employer articulates such a legitimate, nondiscriminatory business rationale, 'the plaintiff has the burden of proving that [her] age was the real reason for [her] discharge'. . . . That is, 'the final burden rests on the plaintiff to prove not

---

[17] Moreover, IBM's argument may be rendered moot in light of legislation currently pending before Congress (H.R. 3721; S. 1756), which would amend the ADEA and essentially overturn Gross by permitting a "mixed motives" burden shift in age discrimination cases, as was similarly achieved through the Civil Rights Act of 1991's amendment of Title VII.

[18] See Jones v. Oklahoma City Pub. Sch., 617 F.3d 1273, 1277-78 (10th Cir. 2010), wherein the Tenth Circuit refused to apply a heightened evidentiary requirement on an ADEA plaintiff to "prove that age was the *sole* cause of the adverse employment action" pursuant to Gross. (Emphasis added.)  The Court explained that its precedent had long established that an employer may be held liable under the ADEA if "age was the factor that made a difference." Id.

only that the proffered nondiscriminatory reason was pretextual but also that the
defendant discriminated against the plaintiff.'

(Citations omitted.) Kelley v. Sun Microsystems, Inc. 520 F.Supp.2d 388, 401 (D. Conn. 2007).

To defeat IBM's Motion for Summary Judgment, Mr. Castelluccio may rely "on the evidence
constituting the *prima facie* case, together with supportable inferences to be drawn from the false or
erroneous character of the employer's proffered reason for the adverse action." Carlton, supra, 202
F.3d at 135.   In Reeves, supra, the Supreme Court explained that proof that the employer's
proffered explanation for its decision is unworthy of credence constitutes "circumstantial evidence
that is probative of intentional discrimination. . . ." Reeves, supra, 530 U.S. at 147.  Evidence that
the employer's reason is false, in addition to the establishment of the *prima facie* case, usually is
sufficient to permit the issue to be decided by the jury. Id., at 148.[19]

## B.      A Reasonable Jury Could Conclude That Mr. Castelluccio Has Established a *Prima Facie* Case of Age Discrimination

IBM's argument that Mr. Castelluccio cannot raise a credible claim of age discrimination
with respect to the employment actions taken against him at IBM must fail in light of the evidence
presented by Mr. Castelluccio in support of his *prima facie* case.  Mr. Castelluccio easily satisfies the
requirements of a *prima facie* case of discrimination with respect to the adverse employment actions
made by IBM, which burden may be satisfied by "minimal" and "*de minimus*" evidence. Pleau v.
Centrix, Inc., 3:06-CV-01626 DJS, 2008 WL 4380515, at *4 (D. Conn. Sept. 24, 2008).

The evidence in this case demonstrates the following:  (1) Mr. Castelluccio was terminated at
the age of 61 and thus falls within the protected class; (2) he was undoubtedly qualified[20] for both

---

[19] Age discrimination claims brought under the New York State Human Rights Law are governed by the same
standards as those brought under the ADEA.  Wanamaker v. Columbian Rope Co., 108 F.3d 462, 467 (2d
Cir. 1997).

[20] To establish this prong of his *prima facie* case, Mr. Castelluccio need only make a "minimal showing" that he
possessed the basic skills necessary for the performance of the job.  Gregory v. Daly, 243 F.3d 687, 696 (2d
Cir. 2001).

positions from which he was removed in 2007 and for nearly 100 other positions at IBM for which he was not considered as a candidate for transfer; (3) he suffered multiple adverse employment actions, including: (a) removal from a permanent position to an "acting" role on a troubled account; (b) removal from the "acting" position to a "bench" position with no job responsibilities; and (c) eventual discharge from employment at IBM; and (4) the actions occurred under circumstances giving rise to an inference of discrimination.

### 1.    Mr. Castelluccio Suffered Three Adverse Employment Actions

IBM argues that the only actionable claim of discrimination properly before this Court is Mr. Castelluccio's termination, due to the applicable 180-day and 300-day statutes of limitations.  (D.Br. 29).  IBM's argument, however, fails to countenance the doctrine of equitable tolling.

The Second Circuit has recognized that "in appropriate circumstances the time periods governing filing of an age discrimination charge with the EEOC may be 'tolled or delayed.'" Cerbone v. International Ladies' Garment Workers' Union, 768 F.2d 45, 48 (2d Cir. 1985).  In Cerbone the Second Circuit noted that, although the applicable period typically begins to run as of the employer's commission of the unlawful act, "court[s] might in some cases permit tolling as a matter of fairness." Id.  The Court identified examples where the doctrine might apply, including: "to relieve a plaintiff who was actively misled by his employer, or who was prevented in some extraordinary way from exercising his rights," and where, "it would have been impossible for a reasonably prudent person to learn that [an employment decision] was discriminatory." Id., at 49.

In this case, until he obtained documents produced by IBM in response to discovery propounded in this lawsuit, Mr. Castelluccio had no idea that Ms. Collins-Smee had decided to remove him as VP of Public Sector immediately after becoming his supervisor.  Similarly, while he knew his initial assignment to the WellPoint account was a stopgap measure, once he was replaced in his VP position, he was led to understand that his new position was to serve as the DPE on the

WellPoint account.  Only through discovery did Mr. Castelluccio learn Ms. Collins-Smee always viewed him as "temporary" in the WellPoint position and had presented multiple younger candidates for the job he was performing while he was performing it.  Ms. Collins-Smee's actions were deceptive and actively misled Mr. Castelluccio regarding her intentions and his job security at IBM.  If Ms. Collins-Smee had not actively misled Mr. Castelluccio, he would have been on notice that these transfers were detrimental, and he might have been alerted to Ms. Collins-Smee's discriminatory animus.  Instead, he only acquired actual knowledge of facts comprising his cause of action when Ms. Collins-Smee informed him that she was thinking of lowering his PBC rating at the end of January 2008.  It was not until that time that Mr. Castelluccio reasonably could have determined that his replacement as VP of Public Sector and later his removal as DPE of WellPoint were discriminatory.

IBM also incorrectly argues that these "lateral transfers" do not constitute adverse employment actions because Mr. Castelluccio's title and salary were unchanged.  (D.Br. 30-31).  There is no "bright line rule" regarding which employment action qualifies as sufficiently "adverse," and courts must make this determination on a case-by-case basis.  Nakis v. Potter, 422 F.Supp.2d 398, 419 (S.D.N.Y. 2006).   As this Court noted in Gallo v. Second Taxing Dist. of City of Norwalk Operating Under Name of S. Norwalk Elec. & Water, 507 F. Supp. 2d 164, 174 (D. Conn. 2007), a transfer qualifies as an adverse employment action "if the reassignment is, in truth, a demotion." Further, "a transfer that arguably alter[s] the terms and conditions of his employment in a negative way, is sufficient to satisfy the *McDonnell Douglas prima facie* test." Id.; see also, Nakis, supra, at 420.

Mr. Castelluccio's "lateral transfers" may not have lowered his salary, but they were clearly demotions that negatively altered the terms and conditions of his employment.  His removal as VP of Public Sector in which he managed 30 accounts and his assignment as DPE of WellPoint which just was one of these accounts was clearly a demotion. This demotion was also adverse in that Mr.

24

Castelluccio was removed from a permanent position to "acting" DPE on one of IBM's most troubled accounts. Mr. Castelluccio's subsequent transfer from acting DPE of WellPoint to a "benched" role with no work assignments was indisputably a demotion. In its own Memorandum, IBM characterized this benched position as "paid leave." (D.Br. 20). Thereafter, his opportunities for advancement were severely curtailed. IBM's so-called "lateral transfers" were the first steps in a three-step process that ultimately led to his termination.

At the very least, however - as this Court has recognized - IBM's prior actions may be considered as evidence of IBM's discriminatory intent and in support of Mr. Castelluccio's claim that his termination was due to age discrimination. Wilks v. Elizabeth Arden, Inc., 507 F.Supp.2d 179, 192 (2007). Although IBM attempts to argue that "the facts surrounding" Mr. Castelluccio's transfers are not material to this case (D.Br. 3, n.1), it is well-settled that Mr. Castelluccio is not barred from using prior acts as "background evidence" to support any claim of discrimination that this Court determines to be timely. Id., at 193; see also, Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 102, 122 S.Ct. 2061 (2002).

> ## 2.     A Reasonable Jury Could Conclude That the Adverse Employment Actions Mr. Castelluccio Suffered Occurred Under Circumstances Giving Rise to an Inference of Discrimination

Mr. Castelluccio has produced sufficient evidence to establish a genuine disputed issue of material fact as to whether his transfers and termination occurred under circumstances giving rise to an inference of discrimination. IBM improperly analyzes the evidence in this case as discrete, isolated acts, rather than on a cumulative basis. Schnabel v. Abramson, 232 F.3d 83, 90 (2d Cir. 2000).[21]   Rather, Mr. Castelluccio's claim must be assessed on the basis of the totality of the

---

[21] In Byrne v. Town of Cromwell Board of Education, 243 F. 3d 93, 102 (2d Cir. 2001), the Court explained, "[a]t summary judgment in an employment discrimination case, a court should examine the record as a whole, just as a jury would, to determine whether a jury could reasonably find an invidious discriminatory purpose on the part of an employer. See Howley, 217 F.3d at 151; Stern v. Trustees of Columbia Univ., 131 F.3d 305, 314 (2d Cir.1997); cf. Washington v. Davis, 426 U.S. 229, 242, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (holding that an

evidence, not on each fact standing alone.  See id.  It is also improper for Mr. Castelluccio's termination to be viewed separately from the prior transfers orchestrated by Ms. Collins-Smee, as those transfers resulted in his being benched and his ultimate termination.  As such, the evidence must be viewed collectively.[22]

### a.     Replacement by a Substantially Younger Employee

Mr. Castelluccio was replaced in his position as VP of Public Sector by an employee eleven years younger.  This age difference is presumptively "substantial" under the ADEA and establishes an inference of age discrimination.[23]  See Tarshis v. Riese Org., 211 F.3d 30, 38 (2d Cir. 2000); Hartley v. Wisconsin Bell, 124 F.3d 887, 893 (7th Cir. 1997).  At the time of this replacement, Mr. Castelluccio was the oldest of all of Ms. Collins-Smee's direct reports.  Notably, the average age of Ms. Collins-Smee's direct reports in 2009, one year after Mr. Castelluccio's termination, was eleven years younger than Mr. Castelluccio.

Despite IBM's characterization of this employment action as a "hiring decision," this was *not* an instance where Mr. Castelluccio and Mr. Echavarria applied for the same job and Mr. Castelluccio

---

invidious discriminatory purpose may often be inferred from the totality of the relevant facts)." (Internal quotation marks omitted).

[22] Although Mr. Castelluccio submits that IBM engaged in three discrete discriminatory adverse employment actions, the analysis of Mr. Castelluccio's *prima facie* case and establishment of pretext will be discussed collectively, particularly as the prior transfers led to his eventual termination.

[23] IBM's assertion that a replacement employee who falls within the same protected class negates an inference of discrimination is plainly inapplicable here.  It is well-settled that "*McDonnell Douglas's* fourth *prima facie* factor, as applied to ADEA cases, is properly modified to require replacement not by a person outside the protected class, but merely replacement by a significantly younger person." Pleau v. Centrix, Inc., supra, 2008 WL 4380515, at *5, n.3.  See also, Keathley v. Ameritech Corp., 187 F.3d 915, 920 (8th Cir. 1999) ("[I]t is considered 'hornbook law' that the ADEA action can be based on discrimination between older and younger members of the protected class"); Whittington v. Nordam Group Inc., 429 F.3d 986 (10th Cir. 2005) ("[t]he replacement of a 45-year-old by a 40-year-old would be less suspicious than the replacement of a 62-year-old by a 57-year-old. Comparing a 62-year-old worker with one who is 57, an employer may think it better to retain someone who will stay with the company another eight years . . . rather than one who would be retiring in three years"); and Edwards, supra, 2010 WL 3829060, at *7 ("difference between someone 'in their forties' and someone 'in their fifties' could appear much more pronounced to a decision-maker").

was not selected, as in <u>Byrnie v. Town of Cromwell Bd. Of Educ.</u>, 243 F.3d 93, 103 (2d Cir. 2001). Rather, Mr. Castelluccio was cast out of his position as VP of Public Sector to make way for Mr. Echavarria, a substantially younger employee.[24]

Mr. Castelluccio's subsequent "replacement" by an individual close to his age in the WellPoint position does not impact his *prima facie* case. *First*, the record is clear that Mr. Castelluccio was never presented as a candidate for the WellPoint position and was viewed by IBM and by the client as the "interim" DPE. In that he never actually *had* the job, he could not actually be *replaced* in that job. Rather, his temporary assignment to WellPoint was a mere pit-stop along the road to his eventual termination, and a reasonable jury could conclude that this assignment was intended either to coerce his voluntary retirement, or to set him up for failure to support his termination.

*Second*, Mr. Crawford's age does not preclude Mr. Castelluccio from prevailing on his claim that he was discriminated because of his age. See <u>Hodges v. Rensselaer Hartford Graduate Ctr., Inc.</u>, 3:06-CV-850 (PCD), 2008 WL 793594, at *6 (D. Conn. Mar. 20, 2008) ("[b]ecause the purpose of federal statutes such as the ADEA is 'protecting individuals, rather than a protected class as a whole,'" the failure of a decision-maker to discriminate against other members of the protected class did not "give rise to an inference that the decision-maker did not discriminate against Plaintiff' or "cast doubt on the sufficiency of Plaintiff's *prima facie* case"). Accordingly, IBM cannot escape liability for discriminating against Mr. Castelluccio even if it proves favorable treatment of other members of his protected class. See <u>id.</u>; see also <u>Vancour v. Bozzuto's Inc.</u>, No. 03-CV-2088 (JBA), 2006 WL 758636, at *7 n. 6 (D.Conn. Mar. 24, 2006).

*Third*, Mr. Crawford's age is insignificant in light of the fact that several other candidates previously were considered or presented to WellPoint for the DPE position instead of Mr.

---

[24] IBM's argument that this fact "alone" cannot defeat summary judgment (D.Br. 27, n. 21) is correct, but improper in light of the fact that Mr. Castelluccio has produced a wealth of additional evidence to support his claim. IBM again fails to address the evidence cumulatively.

Castelluccio, all of whom were significantly younger than Mr. Castelluccio (ages 46, 48, 55 and 44). Essentially, therefore, Mr. Crawford was chosen by *WellPoint*, not IBM. The proper focus with respect to IBM's discriminatory actions relating to this transfer is on Ms. Collins-Smee's conduct: (a) in failing to submit Mr. Castelluccio as a candidate to WellPoint; (b) misleading him and then failing to inform Mr. Castelluccio of her intentions with respect to his future at IBM; and (c) in failing to consider him for available positions in her organization for which he was qualified during 2007. It is well settled in this jurisdiction that, "[a]n inference of discriminatory intent may be established by, *inter alia,* ... 'the sequence of events leading to the plaintiff's discharge.'" Miller v. Hartford Fire Ins. Co., 652 F.Supp. 2d 220, 231 (2009) (citing Sassaman v. Gamache, 566 F.3d 307, 312 (2d Cir. 2009)).

### b.     Suggestions of Retirement by Ms. Collins-Smee

An inference of age discrimination can also be drawn from Ms. Collins-Smee's repeated references to retirement when making decisions affecting Mr. Castelluccio's future at IBM, despite the fact that he made it "absolutely clear" to her he had no interest in retiring. Ms. Collins-Smee raised age and retirement in her very first meeting with Mr. Castelluccio.[25] Moreover, this inquiry was the *first sentence* Ms. Collins-Smee spoke to Mr. Castelluccio while acting as his manager. This inquiry was not made with respect to Mr. Castelluccio's future at IBM, but rather was brought up in a meeting to discuss Mr. Castelluccio's accounts. Therefore, this case is analogous to cases in which

---

[25] The fact that Ms. Collins-Smee was a member of the protected class under the ADEA does not support an adverse inference against age discrimination, as IBM argues. (D.Br. 28). In Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998), the Supreme Court rejected the presumption that one member of a protected class cannot discriminate against another member of the same class, noting that "[b]ecause of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group." In Hodges, supra, 2008 WL 793594, at *6, Judge Dorsey declined to make an inference against discrimination where the decision-maker was over the age of 40, noting: "Several courts have held that there is no reason why the . . . reasoning [in Oncale] should not apply to age discrimination cases," citing, *inter alia*, Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 574 (6th Cir.2003) (en banc); and Kadas v. MCI Systemhouse Corp., 255 F.3d 359, 361 (7th Cir.2001).

an inference of discrimination was made on the basis of references to retirement made by a supervisor contemporaneously with decisions about the employee's future.  See, e.g., Williams, supra 456 F.Supp.2d at 385.[26]  Tellingly, there is documentary evidence that Ms. Collins-Smee decided to remove Mr. Castelluccio from his position as VP of Public Sector within *six days* after this first meeting.  This decision was made after Ms. Collins-Smee had supervised Mr. Castelluccio's for barely one month, without reviewing Mr. Castelluccio's 2006 PBC prepared one month earlier, and despite the absence of any conduct by Mr. Castelluccio in this short period warranting her derailing of his 40-year career at IBM.[27]  IBM also cannot colorably claim that Ms. Collins-Smee's conduct in this initial meeting (which must be taken as true in deciding this Motion) was reasonable, in that they conceded that such conduct would be "severe misconduct in flagrant violation" of IBM rules. (D.Br. 25, n.19).

Ms. Collins-Smee raised retirement to Mr. Castelluccio twice more, despite his clear statement to her in February 2007 that he was not interested in retiring and wanted to continue working at IBM.  In November 2007, Ms. Collins-Smee informed Mr. Castelluccio that he was being replaced as DPE of WellPoint and relegated to the "bench" and brought up his eligibility for retirement a second time.  Mr. Castelluccio again strongly stated that he was not interested in retirement.  Subsequently, in March 2008, Mr. Castelluccio convened a meeting with Ms. Collins-Smee to discuss her failure to assist him in finding a new position at IBM as she had promised.  In

---

[26] See also, *e.g.*, Carlton, supra, 202 F.3d at 136; Calhoun v. Acme Cleveland Corp., 798 F.2d 559, 564 (1st Cir. 1986); Guthrie v. J.C. Penney, Inc., 803 F.2d 202, 208 (5th Cir. 1986); Schug v. Pyne-Davidson Co., 3:99-cv-1493 (CFD), 2001 WL 34312877, at *4-5 (D.Conn. Dec. 10, 2001); Sciola v. Quattro Piu, Inc., 361 F.Supp.2d 61, 68-69 (E.D.N.Y. 2005); and Rottersman v. CBS, 726 F.Supp. 484, 492 (S.D.N.Y. 1989).

[27] IBM claims these remarks are "negated" on the basis of Mr. Castelluccio's failure to report them to Human Resources. (D.Br. 25, n.19).  Mr. Castelluccio's failure to report the "flagrant violation" is certainly understandable based on his version of the meeting, wherein he had no idea that his performance was being questioned or that his job was in jeopardy, and the comments cannot be "negated" for his failure to report them.  The significance of the comments is heightened by the facts that were revealed in discovery, namely that Ms. Collins-Smee surreptitiously decided to remove from his position shortly after this meeting, without informing him of her intent.

that meeting, Ms. Collins-Smee made with her third unsolicited invitation.  She told Mr. Castelluccio

that if no "meaningful work" could be found for him, he should consider retirement.  Ms. Collins-

Smee's conduct demonstrates an improper bias against Mr. Castelluccio due to his age.  See, e.g.,

Calhoun v. Acme Cleveland Corp., 798 F.2d 559, 564 (1st Cir. 1986) (repeated retirement inquiries

could be interpreted as harassment or "a broad hint" that Plaintiff should retire, particularly since he

previously expressed clear intention not to retire).  In that Ms. Collins-Smee was the decision-maker

with respect to the adverse employment actions taken against Mr. Castelluccio here and had an

instrumental role in Mr. Castelluccio's attainment of "meaningful work" and an alternate position at

IBM, her comments are particularly invidious and supportive of an inference of discrimination.  See

Sciola v. Quattro Piu, Inc., 361 F.Supp.2d 61, 68-69 (E.D.N.Y. 2005); Rottersman v. CBS, 726

F.Supp. 484, 492 (S.D.N.Y. 1989).

   Further indicative of Ms. Collins-Smee's age bias is a remark she made to Mr. Castelluccio in

March 2007, regarding Kenneth Wisse.  Ms. Collins-Smee asked Mr. Castelluccio about Mr. Wisse's

age and also noted that he was "old enough" to retire. Only after referencing his age did she ask

about his job duties.

   c.   **Disparate Treatment Regarding Job Placement**

   Ms. Collins-Smee's actions in failing to make any legitimate efforts to place Mr. Castelluccio

in an alternate position, while actively placing younger, similarly situated employees, supports a

strong inference of discrimination.  Landwehr v. Grey Advertising, Inc., 211 A.D.2d 583, 583-84

(N.Y. App. Div., 1st Dep't, Jan. 31, 1995) (evidence that plaintiff was qualified for positions awarded

to younger employees in reduction in force established prima facie case and raised material questions

of fact regarding pretext); see also, Rottersman, supra, 726 F.Supp. at 489, 492 (failed attempts to

relocate employee after reorganization despite relocation of younger employees supported prima

facie case of age discrimination; and Vaughn v. Mobil Oil Corp., 708 F. Supp. 595, 600-01 (S.D.N.Y.

30

1989) (evidence of discrimination existed where employer located new positions only for employees outside of protected class).

Ms. Collins-Smee did not place Mr. Castelluccio on her Five Minute Drills for nearly a year after she determined to remove him from his VP position, until January of 2008. And, even then he was inexplicably removed after one month, although his greatest chance to find a new position was within ITD Americas. Mr. Castelluccio was listed on various other Five Minute Drills during 2007, but was completely unaware of that fact. Further, Mr. Castelluccio was not considered as a candidate for *any jobs* whatsoever in 2007, despite the fact that he was highly qualified for dozens of jobs available during that time, including jobs within Ms. Collins-Smee's organization over which she had control that were awarded to substantially younger, less qualified employees.

The objective evidence demonstrates that Ms. Collins-Smee did not advocate on behalf of Mr. Castelluccio and a reasonable jury could conclude that she did not do so because of his age.[28] It is telling that out of **95** separate available positions for which he was qualified between March 2007 and June 2008, Mr. Castelluccio was considered for only **three** and listed as a candidate for only **one**. Ms. Collins-Smee acted as Mr. Castelluccio's executive sponsor at various Five Minute Drills, and had the ability to recommend him as a candidate for available positions or request his addition to the Drill as a "person to discuss." With Mr. Castelluccio's impressive record of service and loyalty to IBM and "Band C" skill level, it can be inferred that if Ms. Collins-Smee had advocated for him as IBM alleges that she did, he would have been named an official candidate for much more than just one position.

---

[28] IBM argues that it was not legally obligated to find Mr. Castelluccio another position after he was replaced as DPE of WellPoint and that Ms. Collins-Smee did no less for him than was required under IBM policies. (D.Br. 21). While it is true that IBM had no "legal duty" to find Mr. Castelluccio an alternate position, it is equally true that if an employer engages in a practice of transferring employees to other positions rather than terminate them, as IBM does by virtue of its Five Minute Drill process, then the employer cannot engage in that activity in a discriminatory manner. See, e.g., Binder v. Long Island Lighting Co., 57 F.3d 193, 200-01 (2d Cir. 1995), abrogated on other grounds by the holding in Reeves, supra, 530 U.S. 133, at 148.

By contrast, various younger executives in Ms. Collins-Smee's organization whose assignments ended or were removed from their positions in 2007 were added to her Five Minute Drill and quickly placed in new roles or "lined up" for new positions in lieu of Mr. Castelluccio. Five of these employees were at least fifteen years younger than Mr. Castelluccio. Ms. Collins-Smee also transferred and promoted younger, less experienced executives into available positions in her organization for which Mr. Castelluccio was qualified during 2007 and 2008. One placement was a described as a "special assignment," which was given to a 51 year-old executive with a background and performance history similar to that of Mr. Castelluccio with 17 years less service to IBM. (Pl. Facts, ¶¶203-06).

Mr. Castelluccio was also passed over for temporary executive assignments that were awarded to younger, less qualified executives, including a temporary executive assignment given to William Ireland, age 53. Mr. Ireland received this temporary executive assignment in lieu of Mr. Castelluccio despite the fact that, prior to his placement, Mr. Walker (the Human Resources VP who facilitated the Five Minute Drills for Ms. Collins-Smee's supervisor) had noted deficiencies with his performance. With respect to Mr. Ireland's general reassignment in IBM (not his eventual placement), Mr. Walker conveyed his opinion that IBM should not "push hard" to place Mr. Ireland because he indicated his intention to "bridge to retirement" and was less than two years from retirement.

Mr. Walker's comments demonstrate a negative attitude toward placement of retirement-age employees and reflect a stereotype that employees nearing retirement are not as diligent or motivated as younger employees. His comments also support a reasonable inference that Mr. Castelluccio was not considered for the temporary position awarded to Mr. Ireland because he had reached retirement age already, particularly as Mr. Walker seriously questioned Mr. Ireland's job performance. See Kelley v. Airborne Freight Corp., 140 F.3d 335, 347 (1st Cir. 1998) (statements by

non-decisionmakers can be evidence that discriminatory atmosphere pervades the workplace and infects personnel decisions). Notably, Mr. Castelluccio never indicated his intent to retire and continuously avowed his commitment to keep working.

### d. Ms. Collins-Smee's Attempt to Lower Mr. Castelluccio's Rating

An inference of discrimination is also demonstrated by Ms. Collins-Smee's attempt to lower Mr. Castelluccio's 2007 PBC rating to a "3," without sufficient basis. Ms. Collins-Smee informed Mr. Castelluccio that she was "thinking of" rating him a "3," but did not provide him with any explanation for her decision and could not defend any of the points that he raised to her about his performance. After reviewing Mr. Castelluccio's summary of accomplishments in 2007, Ms. Collins-Smee agreed that his performance warranted a "2" rating. Ms. Collins-Smee's attempt to lower Mr. Castelluccio's performance rating without justification, in conjunction with her failure to assist him to find meaningful work and prior comments regarding retirement, further supports an inference that she discriminated against him on the basis of his age. See Miller, supra, 652 F.Supp. 2d at 231-32 (Jury could reasonably infer discrimination on basis of references to eligibility for retirement occurring close in time to discipline and find that employer's actions were part of an extended effort to end plaintiff's employment).

### C. A Reasonable Jury Could Conclude that IBM's Alleged Non-Discriminatory Reasons for Its Adverse Employment Actions Constituted Pretext for Illegal Age Discrimination.

IBM has proffered legitimate, non-discriminatory reasons for its adverse employment decisions against Mr. Castelluccio. Specifically, IBM contends that Mr. Castelluccio was removed as VP of Public Sector and DPE of WellPoint due to his "long history" of "unacceptable performance" and internal and external complaints about his performance that precipitated Ms. Collins-Smee's decisions. (D.Br., 31-32). As set forth below, however, Mr. Castelluccio has provided evidence creating a genuine disputed issue of material fact as to

whether Mr. Castelluccio's performance was actually "unacceptable" and whether the decisions were made upon that basis. As to Mr. Castelluccio's termination, IBM contends that he was separated "because he was unable to find a position within IBM" after six months. (D.Br., 20). Mr. Castelluccio also has provided evidence that substantially challenges the veracity of this reason, including evidence that other younger executives were treated more favorably. Notably, Mr. Castelluccio is not required to *prove* that these reasons were pretext - that is the province of the jury. Rather, the Plaintiff is required only to adduce evidence from which a reasonable factfinder could determine that the employer's reason was false or upon which discrimination could be inferred.

A plaintiff can show pretext by "revealing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action [such] that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reason." Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1217 (10th Cir. 2002). "The pretext inquiry thus normally focuses upon factual questions such as whether the asserted reason for the challenged action comports with the defendant's policies and rules, whether the rule applied to the plaintiff has been applied uniformly, and whether the putative non-discriminatory purpose was stated only after the allegation of discrimination." DeMarco v. Holy Cross High Sch., 4 F.3d 166, 171 (2d Cir. 1993)

1.   **The Reasons Provided by IBM Are False**

   a.   **Mr. Castelluccio's Removal as VP of Public Sector and Assignment to WellPoint**

The objective evidence demonstrates that Mr. Castelluccio's performance as VP of Public Sector was positive and did not justify his removal from the position and replacement with Mr. Echavarria. This is not a case where the fact finder is required to piece together informal notes and comments about Mr. Castelluccio's performance. IBM conducts annual, formal and comprehensive

evaluations of its employees in the form of PBC's.  Significantly, Mr. Castelluccio's positive PBC for 2006 was completed by Mr. Jones only one month prior to his removal from his position by Ms. Collins-Smee.   Notably, Mr. Jones specifically praised the very same leadership and people management skills that Ms. Collins-Smee claims she found wanting in less than 30 days.

A finding of pretext is further supported by Mr. Jones' striking repudiation of Ms. Collins-Smee's sworn statement that she spoke with him regarding Mr. Castelluccio's job performance.  As Mr. Jones made clear in his affidavit, he never discussed Mr. Castelluccio's job performance with Ms. Collins-Smee, nor did he discuss with her *any* personnel matters, contrary to her testimony. This readily supports a finding of pretext, in that the jury could conclude that Ms. Collins-Smee was untruthful regarding her discussion with Mr. Jones and that she fabricated this conversation as an "after the fact" justification for her decision, particularly as she admitted to failing to review Mr. Castelluccio's 2006 PBC assessment prior to deciding to replace him. See Maschka v. Genuine Auto Parts Co., 122 F.3d 566, 570-71 (8th Cir. 1997).

Ms. Collins-Smee's failure to review Mr. Castelluccio's' 2006 PBC also supports a finding of pretext.   Notably, IBM has not cited any evidence whatsoever showing that Mr. Castelluccio's performance declined during the brief window of time between Mr. Jones' assessment and Ms. Collins-Smee's decision.   See Fast v. Southern Union Co., Inc., 149 F.3d 885 (8th Cir. 1998) (reasonable jury could find that decisionmaker's termination of plaintiff with 30 years of service without reviewing performance reviews was motivated by discrimination), and Zimmitti v. Aenta Life Ins. Co., 64 F.Supp.2d 69, 82-83 (D.Conn. 1999) (significant downturn in performance evaluation over short period of time coincided with arrival of new, younger manager).[29]

---

[29] See also, Nembhard v. Mem'l Sloan Kettering Cancer Ctr., 104 F.3d 353, at *4-5 (2d Cir. 1996) (affirming age discrimination verdict where 41-year-old plaintiff was replaced by 40-year-old, noting that although age difference alone did not necessarily support inference of discrimination, a reasonable jury could make that inference in light of other evidence, including "harsh treatment of a veteran employee with a near-unblemished employment record").

Ms. Collins-Smee's alleged reason for removing Mr. Castelluccio as Public Sector VP is also questionable. Specifically, Ms. Collins-Smee stated that she removed Mr. Castelluccio because he "was not working out" and was not "exhibiting the proper leadership of the accounts in the public sector." Her subjective evaluation is plainly contradicted, however, by Mr. Jones' assessment of Mr. Castelluccio only weeks earlier. In addition, "[a]n employer's subjective evaluations are not adequate [justification] by themselves because they may mask prohibited prejudice." Williams, supra, 456 F.Supp.2d at 384. An employer may not use completely subjective and unarticulated standards to judge employee performance. Id. Rather, the evidence produced by the employer "should be [both] objective and competent." Id. Significantly, Ms. Collins-Smee never informed Mr. Castelluccio that his performance as VP of Public Sector was deficient. Although she now claims she orally indicated her dissatisfaction to Mr. Castelluccio concerning his performance, the record is void of any contemporaneous written support of her claim. Rather, the operative fact that IBM would have the Court ignore is that at the conclusion of 2007, in her January 2008 formal PBC evaluation, she rated Mr. Castelluccio a "2" for his 2007 performance and noted that, "[i]n the Public Secor [sic] role Jim's team reduced headcount significantly and we were able to continue to meet our service level objectives." (Pl. Facts, ¶135).

IBM's purported reliance on complaints made to Ms. Collins-Smee regarding Mr. Castelluccio's performance is misplaced. First, Ms. Collins-Smee does not claim that she expressly relied on these complaints in making her decision. Rather, she claims that she appraised his performance independently during the month of February and determined that he was "not working out." (See D.Br. 5). Notably, Ms. Collins-Smee did not discuss these complaints with Mr. Castelluccio to obtain his version of events. Second, although Mr. Liederbach[30] alleges that he

---

[30] IBM's argument that Mr. Castelluccio admitted that he knew complaints had been made about his performance is overblown. Notably, the meeting held between Mr. Castelluccio and Mr. Liederbach in 2006 was not a discussion of Mr. Castelluccio's performance problems, as argued by IBM. Rather, it was a

previously raised the same complaints to Mr. Jones, Mr. Castelluccio's prior supervisor, Mr. Jones never even mentioned these complaints to Mr. Castelluccio or alluded to them in his 2006 PBC, which supports an inference that they were not significant.[31]

IBM's alleged claim of poor performance is further negated by Ms. Collins-Smee's subsequent actions toward Mr. Castelluccio and the credence of IBM's explanation for these actions. In its Motion for Summary Judgment, IBM contends that Ms. Collins-Smee "expected" Mr. Castelluccio's performance to improve on the WellPoint account and that he was "well suited" to take over for Mr. Morin. (D.Br. 7-8). IBM further states that if he had performed well in the role, IBM would have considered retaining him in the position.

The evidence belies IBM's statements, however. Mr. Castelluccio was appointed "acting DPE" only until a permanent candidate was accepted by the client. He was never presented as a candidate to WellPoint or interviewed for the position. IBM's argument that assignment to WellPoint was intended to "improve" Mr. Castelluccio's performance is also untenable, given that the WellPoint account was one of IBM's most troubled accounts and the client's CIO, Mark Boxer, was notoriously difficult to work with. It is further questionable why IBM would assign Mr. Castelluccio to one of its most high profile troubled accounts if his performance as VP of Public Sector was unsatisfactory. Significantly, WellPoint was Mr. Liederbach's "largest, most important and most challenged client/contract," and Ms. McDonald was WellPoint's Managing Director. If Ms. Collins-Smee had in fact taken their complaints about Mr. Castelluccio's performance seriously, it begs the question as to why she would assign Mr. Castelluccio to be directly responsible for

---

discussion as to how the two teams could better communicate with each other. Indeed, it would have been inappropriate for Mr. Liederbach to discuss performance issues with Mr. Castelluccio, who was not his supervisor.

[31] Significantly, in Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 107 (2d Cir. 2010), the Second Circuit recognized that although criticisms from other employees may support an employer's actions against an employee, minimal weight may be afforded to those complaints where, as here, the complaints were not recorded independently as part of a formal disciplinary process.

WellPoint.

A reasonable jury could conclude that Ms. Collins-Smee assigned Mr. Castelluccio to take on this difficult position after he refused to retire, knowing that the former DPE at WellPoint had resigned due to the overwhelming stress of the position.  This is especially true in view of the fact that at the time of his initial assignment to WellPoint, he was also expected to continue to discharge is responsibilities as VP.  In a striking admission concerning the situation in which Mr. Castelluccio was being placed, Mr. Liederbach volunteered that the strain of performing two jobs would likely cause Mr. Castelluccio to "implode."   This inference is also supported by evidence that Ms. Collins-Smee had no future plan for Mr. Castelluccio when she decided to remove him as VP of Public Sector, despite IBM's typical practice of attempting to find new roles for executives who are displaced.  Further, Ms. Collins-Smee's actions all but ensured that Mr. Castelluccio would be unable to devote sufficient time to the WellPoint account to please the client.   By designating Mr. Castelluccio as the "temporary" DPE to the client, he was inherently viewed as a lame duck.

b.      **Removal From the WellPoint Account**

IBM's proffered non-discriminatory reason for Mr. Castelluccio's removal from the WellPoint account also lacks credence.  (D.Br. 7-9).  At the outset, it is clear that Mr. Castelluccio was never seriously considered as a candidate for the position, nor was he ever assigned to the role on a permanent basis.  Mr. Castelluccio was removed from the account as part of a plan that was set in motion before he was even assigned as the "acting" DPE.  Regardless of his performance, IBM had always planned to remove Mr. Castelluccio from the position.   Significantly, despite his 40 years of service, that plan did not provide at all for Mr. Castelluccio's future at IBM.

Even if the jury believed that IBM and Ms. Collins-Smee had considered Mr. Castelluccio as a contender for the permanent DPE role, however, additional evidence of pretext exists.  In its Memorandum, IBM claims that WellPoint made a specific "request" that Mr. Castelluccio be

removed from the account.   (D.Br., 1).   Yet, IBM's 100,000-plus page document production revealed no such request. [32]   Even if WellPoint had made such a request, however, those requests were common on troubled accounts and are not conclusive of an employee's performance. WellPoint had requested that Mr. Liederbach no longer be involved in its account, and yet he suffered no negative repercussions. Other employees removed from WellPoint also were relocated. Accordingly, if WellPoint made such a request or was dissatisfied, the proper protocol would have been to reassign Mr. Castelluccio to another account or begin an active search for a new position for him.  Neither of these actions was taken.

Regarding the "complaints" made by WellPoint (specifically Mr. Boxer) regarding Mr. Castelluccio's performance, the majority either express his dissatisfaction with IBM's failure to assign a *permanent* DPE to the account, or with Mr. Castelluccio's inability to devote his full attention to the account prior to June 2007, when he was still performing responsibilities as VP of Public Sector.  Mr. Castelluccio's assignment to two full-time positions also counters IBM's claim that his job performance was unsatisfactory.  <u>Peyton v. Kellermeyer Co.</u>, 115 Fed. Appx. 825, 831 (6th Cir. 2004) (employee's assignment to additional accounts causing him to be "spread too thin" refuted claim of poor performance).

Notably, Mr. Boxer repeatedly referred to Mr. Castelluccio as the temporary or interim DPE, demonstrating that he never viewed him as a permanent candidate for the role.  For example, in a May 15, 2007 email from Mr. Boxer to Ms. McDonald (attached as Exhibit D to Ms. McDonald's affidavit), he stated that "working with an *interim leader* is not an ideal situation" (emphasis added) and noted that Mr. Castelluccio "may not be able to devote enough time to [WellPoint]."   Ms.

---

[32] If IBM's portrait of Mr. Castelluccio's "long history of unacceptable performance" (D. Br. At 31) were accepted, then it would be expected that at least one document could be produced in which WellPoint requested that Mr. Castelluccio be removed from its account.  Mr. Boxer was anything but timid in his demand that Mr. Liederbach be removed from the WellPoint account, and protested loudly when he learned Mr. Liederbach might still be involved "behind-the-scenes." (Pl. Facts, ¶124).

McDonald forwarded Mr. Boxer's email to Ms. Collins-Smee, noting that Mr. Castelluccio "has not been able to devote enough time to wellpoint."[33] Significantly, one of the "complaints" from Mr. Boxer regarding Mr. Castelluccio's unavailability for "crit sit" relied on by IBM in support of its Motion was explained in a subsequent email, where Mr. Boxer was informed that Mr. Castelluccio was on vacation in Europe. (See Exs. L and M to Ms. McDonald's affidavit).

Finally, several of the "complaints" alleged in Ms. McDonald's affidavit constitute inadmissible hearsay and should not be considered by this Court. Ms. McDonald repeatedly references statements purportedly made to her by Mr. Boxer, and IBM improperly relies in part on these statements to demonstrate that Mr. Castelluccio's performance was unsatisfactory to the client. (See Exs. E, F, H, and J attached to Ms. McDonald's Affidavit).[34]

IBM cannot rely on any of these "complaints" to conclusively demonstrate that they influenced Ms. Collins-Smee in her decision to remove Mr. Castelluccio as he adduced evidence that would allow a reasonable jury to disbelieve her claim. Specifically, Ms. Collins-Smee *continually* searched for a permanent candidate for the position during Mr. Castelluccio's tenure in the role and never presented him as a candidate to WellPoint. Moreover, Ms. Collins-Smee could not recall any specific complaint about Mr. Castelluccio's performance made in writing by WellPoint. There is also evidence that she never specifically raised any of these purported complaints with Mr. Castelluccio,

---

[33]Juxtaposed to Mr. Castelluccio's formal PBC for 2007 are a series of emails which either contain generic complaints about IBM's staffing of WellPoint or specific complaints about IBM's failure to assign a permanent DPE to its account. IBM places considerable "spin" on these emails. For example, during a period of time in which IBM presented three candidates to WellPoint for the DPE position and each one in turn was rejected by Mr. Boxer, IBM argues that Mr. Boxer's statement that IBM is "out of time on delivery leadership" is an indictment of Mr. Castelluccio's performance rather than an expression of frustration with IBM's parade of candidates. (See Exhibit M to Ms. McDonald's Affidavit). A reasonable jury could conclude that this complaint regarded the manner in which IBM staffed the account and its failure to locate a permanent DPE, rather than any deficiency in Mr. Castelluccio's performance.

[34] References to hearsay evidence in Ms. McDonald's affidavit should be stricken as improper. Additionally, Ms. McDonald's statement in Paragraph 7 of her affidavit regarding Ms. Collins-Smee's state of mind in assigning Mr. Castelluccio to the WellPoint account should be stricken as she cannot attest to personal knowledge of Ms. Collins-Smee's actual intentions.

nor did she mention them in his 2007 PBC.[35]   Further, Mr. Castelluccio was not given an "interim" PBC reflecting his alleged poor performance, nor placed on a performance improvement plan, which is contrary to IBM's PBC policy applicable to all IBM employees.[36]

Additionally probative of pretext is the objective evidence demonstrating that service to WellPoint *improved* under Mr. Castelluccio's eight-month tenure as acting DPE.  While relying heavily on its selective emails, IBM apparently hopes the Court will overlook WellPoint's client satisfaction survey completed in February 2008 for work performed in 2007.   In this contemporaneous document completed by WellPoint, Mr. Castelluccio's delivery team earned an overall satisfaction rating of 8 out of 10, and it was noted that "the pace of improvement in the last six months is probably faster than the previous eighteen by far." (Pl. Facts, ¶¶115, 118).[37]  Mr. Castelluccio respectfully invites the Court to consider the opposite fact pattern.  How persuasively could Mr. Castelluccio argue that he was a "solid contributor" based entirely on a series of carefully selected emails if the formal, comprehensive evaluations of his performance completed by his past two managers expressly stated that he needed to be removed from his position and the operative client

---

[35] As is clear from the parties' respective Memoranda to this Court, there is a genuine disputed issue of material fact concerning Mr. Castelluccio's job performance.  IBM would have the Court ignore the compelling contemporaneous documentation of Mr. Castelluccio's performance as a "solid contributor." Not only did Mr. Castelluccio have a long history of earning this rating and better, but in 2007, the very time period in which IBM is now most critical of Mr. Castelluccio's performance, Ms. Collins Smee awarded Mr. Castelluccio a "2" PBC rating, and this rating was approved by Mr. Zapfel.

[36] See Stern v. Trustees of Columbia Univ., 131 F.3d 305, 313 (2d Cir. 1997) ("departures from procedural regularity . . . can raise a question as to the good faith of the process where the departure may reasonably affect the [employment] decision").  In that the PBC process applies to all full-time IBM employees and does not specifically exempt executives, these procedures should have been used if Mr. Castelluccio's performance was deemed deficient.  See Huff v. UARCO, Inc., 122 F.3d 374, 381 (7th Cir. 1997) (question of fact as to whether terms of employee manual applied to supervisors where language stated it applied to "employees," as supervisors are also employees).

[37] Similarly, given IBM's heavy reliance on WellPoint's alleged dissatisfaction with Mr. Castelluccio's performance, and the absence of a written request to remove Mr. Castelluccio, one would think the Court would at least be entitled to a Declaration from Mr. Boxer before being asked to summarily dismiss Mr. Castelluccio's claims.

satisfaction survey gave IBM an overall low rating under his management?  At the very least, the question of whether Mr. Castelluccio's performance warranted his removal from WellPoint and prior to that as VP of Public Sector, is a genuine issue of material fact barring summary judgment.

Pretext may also be inferred on the basis of factual inconsistencies in IBM's Open Door Report and evidence that IBM engaged in a post hoc attempt to denigrate his performance in anticipation of litigation.  Significantly, Mr. Castelluccio's employment was terminated while the Open Door Investigation was still pending.  The investigation did not conclude until after the time expired for Mr. Castelluccio to sign IBM's proposed severance agreement. If he had signed the severance agreement, the investigator admitted he would have ended the investigation thus casting doubt on the integrity of the investigation.   The Open Door report also states that Ms. Collins-Smee denied mentioning age or retirement to Mr. Castelluccio, other than in his termination meeting.  Yet, Ms. Collins-Smee's deposition testimony clearly refutes this statement in that she admits discussing retirement with Mr. Castelluccio on at least one other occasion and that he made it "absolutely clear" he did not want to retire.  Ms. Collins-Smee also admitted that the investigator made no inquiries as to any age bias she may have had, and focused only on Mr. Castelluccio's job performance.   Remarkably, the report makes no mention whatsoever of any steps taken to investigate whether Mr. Castelluccio was the subject of age discrimination.  Rather, the Open Door Report centered mostly on Mr. Castelluccio's alleged shortcomings, raising issues not mentioned in any of his performance reviews or discussions with his superiors.

Finally, pretext may be inferred by the investigator's conclusion that Ms. Collins-Smee "erred" in her assessment of Mr. Castelluccio, explaining that she "confused issues" in rating him with a "2."   The investigator authored an instructive memorandum to Ms. Collins-Smee's supervisor, Timothy Shaughnessy, counseling him to reprimand her for her "mistake," which he did. The investigator's conclusion and subsequent reprimand of Ms. Collins-Smee *after* Mr. Castelluccio's

termination "reek[s] of after-the-fact rationalization" sufficient to support pretext. Maschka, supra, 122 F.3d at 570-71; see also, Cartlon, supra, 202 F.3d at 137 (lack of negative performance review, warning or written criticism of job performance indicates reason for termination was an afterthought).[38]

### c.   **Termination of Employment**

IBM's alleged non-discriminatory reason for Mr. Castelluccio's termination from IBM—as explained in its Motion for Summary Judgment—is that he was unable to find an alternate position at IBM after remaining on the payroll with no "operational responsibilities."  IBM argues that there is no way that Mr. Castelluccio can claim this reason is false.  Yet, the evidence in this case presents many questions of fact regarding disparate treatment of Mr. Castelluccio concerning his job placement that call into question the legitimacy of this proffered reason.

At the outset, it is significant that IBM's proffered reason for Mr. Castelluccio's termination has not remained consistent.  It is true that Ms. Collins-Smee did not inform Mr. Castelluccio that he was being terminated on the basis of his performance.  However, at the first opportunity to legitimize its decision, at a time when it was acting through its legal counsel, IBM claimed Mr. Castelluccio's termination was performance based.  Specifically, in its Response to Mr. Castelluccio's complaint filed with the New York State Division of Human Rights ("Response"), IBM plainly

---

[38] The conclusions reached in the Open Door Report regarding Mr. Castelluccio's job performance cannot be relied upon by IBM as evidence of that fact, in that they rely entirely upon statements made to him by other individuals, not on the investigator's personal knowledge, and thus constitute hearsay.  Moreover, the Report is inherently unreliable in that it was prepared after Mr. Castelluccio's termination and failure to sign his severance agreement, in anticipation of litigation.  If IBM were permitted to rely on this document as a "business record," then employers could admit hearsay evidence documenting alleged performance problems after an employee's termination to support a defense to a discrimination complaint simply by following a regular recording system.  See Lewis v. Velez, 149 F.R.D. 474 (S.D.N.Y. May 19, 1993) ("incident reports" prepared by correctional facility in civil rights action did not constitute "business records" because they lacked trustworthiness and reliability).

declares that the nondiscriminatory reason for his termination was "poor performance."[39] (Response attached as Ex. 50 to the Affirmation of Mark Carta, November 15, 2010, filed in support of Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment, IBM00091574). Further, the "Open Door" report focuses almost entirely on his alleged performance issues, not his inability to locate a new position. It is well settled that "[i]nconsistent or. . .post-hoc explanations for a termination decision may suggest discriminatory motive." Weiss v. JPMorgan Chase & Co., 332 Fed. Appx. 659, 663 (2d Cir. 2009). Finally, Mr. Castelluccio's separation was classified by IBM as category "8J," which essentially translates to "involuntary retirement due to performance." (Pl. Facts, ¶265).

A finding of pretext is also supported by Ms. Collins-Smee's inaction toward Mr. Castelluccio regarding his job search and procedural irregularities committed by Ms. Collins-Smee. IBM argues that it was ultimately Mr. Castelluccio's responsibility to locate a new position. If this were true, then at the very least Mr. Castelluccio should have been informed as soon as possible that he should be looking for a new position, rather than being informed when he was placed on the bench. Placing this responsibility entirely on Mr. Castelluccio is also inconsistent with IBM's practices, particularly because executives have no access to executive job postings made in Five Minute Drills and cannot nominate themselves for these positions.

IBM's Human Resources employees testified to the importance of a supervisor's assistance in securing a new position at IBM. Ms. Collins-Smee's discriminatory animus toward Mr. Castelluccio impacted on her efforts to relocate him. The evidence reveals that she did not place him on her organization's "Five Minute Drill" until January 2008, and kept him on the Drill only for that one month, although she admitted that it would have been proper for her to have added him to

---

[39] See Maschka, supra, 122 F.3d at 570 (employer's response to administrative agency in age discrimination investigation properly admitted to demonstrate inconsistent explanation for termination decision in support of pretext).

her Drill if she was helping him find a new job.  She also failed to ensure that he was listed on Pat Kerin's GTS Drill, with the exception of one month.  Significantly, Ms. Collins-Smee was aware of open positions in these organizations and had the ability to advance Mr. Castelluccio as a candidate or make Mr. Castelluccio aware of these positions, which she clearly did not do.  She further admitted that she did not actively assist him in searching for a job in 2007 (Pl. Facts ¶190), despite the fact that she knew his position on WellPoint was temporary and several jobs for which he was qualified became available during that time.  A large number of the jobs in Ms. Collins-Smee's organization, as well as other IBM organizations, were assigned to younger, less experienced executives.[40]  Ms. Collins-Smee had ultimate control over which employees were added as candidates for jobs in her organization, and approved any selections made by her direct reports.

Pretext also may be inferred on the ground that the little assistance Ms. Collins-Smee did provide to Mr. Castelluccio was clearly *pro forma*.  Danville v. Regional Lab Corp., 292 F.3d 1246, 1251 (10th Cir. 2002), citing Stern v. Trustees of Columbia Univ., 131 F.3d 305, 310, 312-14 (2d Cir. 1997).  Ms. Collins-Smee made a handful of perfunctory email inquiries to her colleagues at IBM about possible placements for Mr. Castelluccio toward the end of May 2008, *after* she notified him that he would be receiving a severance package and would have until the end of June 2008 to find a new position or be terminated.  Notes reflecting activity at a May 2008 Five Minute Drill give a glimpse into the character of Ms. Collins-Smee's half-hearted support.  These notes indicate that Ms.

---

[40] Notably, IBM cannot argue that Mr. Castelluccio was "overqualified" for Band D positions or that he is not similarly situated to Band D executives.  Several IBM managers noted that Mr. Castelluccio would need to consider Band D positions in addition to Band C positions, and Mr. Castelluccio agreed to do so once he was notified of his need to find a new position.  Further, the evidence supports a conclusion that Band C executives are frequently considered for Band D roles.  Therefore, Mr. Castelluccio is similarly situated to Band D employees against whom he was competing for various jobs, per IBM's own instructions to him.  In addition, characterizing Mr. Castelluccio as "overqualified" defies common sense, in that "overqualified" cannot mean "unqualified," as noted by the Second Circuit in Taggart v. Time Inc., 924 F.2d 43, 47 (2d Cir. 1991) (noting that denial of employment to older job applicant because he has too much experience, training or education "is simply to employ a euphemism to mask the real reason for refusal, namely, in the eyes of the employer the applicant is too old").

45

Collins-Smee asked that Mr. Castelluccio be added as a candidate for a position "for the record." This supports an inference that her advocacy for Mr. Castelluccio was a "sham." A reasonable jury could also infer from the fact that Mr. Castelluccio was listed as a candidate for only *one* job out of 95 for which he was qualified, that Ms. Collins-Smee did not properly assist Mr. Castelluccio in his job search, and that this severely impacted his ability to find a new position at IBM. Placing Mr. Castelluccio on a Five Minute Drill, without any additional assistance, was also a "pro forma" action. At the very least, Ms. Collins-Smee should have provided Mr. Castelluccio with support in his job search that was equal to the support she provided to younger executives in her organization.

IBM's argument that Mr. Castelluccio cannot point to any other executive who received more time to look for a job while on the bench does not entitle it to judgment as a matter of law. This argument is a red herring, in that would have the Court ignore the facts that resulted in Mr. Castelluccio being relegated to the bench and to the fact that he clearly was treated differently from other executives. Most executives are not removed from their positions unless another position is arranged for them in advance. If those executives are removed and placed on the bench, they are generally given priority for job openings that arise, which was noted as a "promotion principle" in several GTS Drills. Moreover, Mr. Castelluccio has identified at least one executive, Akshay Parikh, who spent a significantly longer time "on the bench" than him. Unlike Mr. Castelluccio, Mr. Parikh was not terminated and, in fact, was placed in a new position after ten months without a permanent role. (Pl. Facts, ¶166).

IBM's Human Resources employees confirmed that executives on the bench also are typically given temporary assignments or projects to work on while they search for a permanent position and that such assignments could be beneficial. Unlike other IBM employees on the bench, such as Mr. Parikh, Mr. Castelluccio was not given any temporary assignments, despite his repeated requests to Ms. Collins-Smee. Ms. Collins-Smee's rationale that it would be "highly unusual" to

46

assign part-time work to a Vice President (Pl. Facts, ¶163), is refuted by the testimony of IBM's Human Resources employees and evidence of temporary assignments in Five Minute Drills. Indeed, Mr. Castelluccio's temporary assignment as DPE of WellPoint belies Ms. Collins-Smee's statement.

Although IBM characterizes Mr. Castelluccio's lack of assignments as positive, Mr. Castelluccio was eager to contribute to IBM, as he had done for the last 40 years. He also knew that his chances of locating a position would greatly improve if he were assigned to a temporary project, since that would give him exposure to other organizations that may offer him a position. Ms. Collins-Smee admitted that she gave Mr. Castelluccio no work assignments in 2008. Yet, by failing to assign him any work whatsoever, Mr. Castelluccio was disadvantaged in his job search.

Pretext is further supported by the fact that during the pendency of this suit, Mr. Castelluccio was contacted as part of a "select group" of retired VP's for temporary work at IBM, but was not hired back after he contacted IBM and conveyed his interest. If Mr. Castelluccio truly had been terminated due to his failure to find a job at IBM, then it begs the question as to why he would not be re-hired after IBM contacted him regarding temporary job openings for which he was deemed qualified.

## 2.     IBM's Actions Support Conclusion of Age Discrimination

Mr. Castelluccio has articulated multiple questions of fact from which IBM's discriminatory intent can be inferred and which establish his *prima facie* case. In addition, the evidence further demonstrates that IBM's articulated non-discriminatory reasons for its actions were pretext for unlawful age discrimination.

First, Ms. Collins-Smee created positions in her organization for younger executives while Mr. Castelluccio was searching for a job and also placed other younger executives in positions in lieu of Mr. Castelluccio soon after they became available. Mr. Castelluccio was not considered for dozens of positions for which he was qualified, which ultimately were awarded to younger

executives with less experience.  A reasonable jury could infer that Ms. Collins-Smee treated Mr. Castelluccio differently on account of his age.

Second, Ms. Collins-Smee made several inappropriate age-related comments to Mr. Castelluccio that could be interpreted by a reasonable jury as evidence of her discriminatory intent toward him on the basis of his age.  Although IBM attempts to dismiss Ms. Collins-Smee's discussion of retirement as either casual inquiries into Mr. Castelluccio's future plans or "stray remarks," the context in which the comments were made reveal they were neither.  Ms. Collins-Smee's statements clearly were not casual inquires as to future plans and were not made *after* a termination decision already had been made and the employer opted to provide an employee with an option to retire.  Cf. Young v. Gen. Foods Corp., 840 F.2d 825, 831 (11th Cir. 1988) (no evidence of discrimination where it was undisputed that employer decided to fire employee *before* offering him alternative choice of retirement).  Therefore, the cases cited by IBM in support of this argument are neither applicable nor persuasive.

Ms. Collins-Smee's repeated inquiries about Mr. Castelluccio's interest in retirement also were not "stray remarks."  Comments made by an employer reflecting a discriminatory motive are sufficient to raise a triable issue regarding whether the articulated reasons for the employer's conduct constituted pretext, and such comments must be viewed in light of all surrounding circumstances.  Williams, supra, 456 F.Supp. at 384-85.  The proper focus "is on whether there is a nexus between the comments and the decision to terminate the employee."  Id., at 385.  "When other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance."  Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir. 2001); see also, Carlton, supra, 202 F.3d at 136 (one comment suggesting retirement may bear a more ominous significance when considered within the totality of evidence).

Mr. Castelluccio has presented substantial evidence that would permit a jury to view Ms. Collins-Smee's comments as indicative of her discriminatory intent, as set forth in detail herein, including the fact that he was the oldest of her direct reports in 2007 and began to ask him his age within moments of their first meeting. Moreover, the context of the statements also indicates that Ms. Collins-Smee had discriminatory intent, in that she made contemporaneous adverse decisions regarding his employment. Although Ms. Collins-Smee may not have used the exact words, "I think you should retire," that sentiment was implied by her repeated statements following Mr. Castelluccio's unequivocal indications that he had no interest in retiring. See Guthrie, supra, 803 F.3d at 208.[41]

Pretext for age discrimination may also be inferred by Ms. Collins-Smee's inquiry as to the age and retirement status of another employee in her organization, Kenneth Wisse. A reasonable jury could infer that this inquiry demonstrated her fixation on the age of her employees rather than their qualifications, particularly when combined with all of the other circumstantial evidence of her discriminatory bias.

Additionally, Mr. Walker's comments regarding Mr. Ireland support an inference that Mr. Castelluccio was terminated on the basis of his age. Mr. Walker was responsible for running the Five Minute Drills for Mr. Zapfel, on which Mr. Castelluccio was listed as a "person to move" for several months with no activity. It is reasonable to infer that Mr. Castelluccio was not considered

---

[41] Defendant argues that Ms. Collins-Smee's statements were not improper on the basis that they were made "only" three times and twice occurred at times when Plaintiff's next steps at IBM were uncertain. (D.Br. 25). Yet, Mr. Castelluccio's future at IBM was only "uncertain" *because of* Ms. Collins-Smee's actions. Therefore, her comments are even more dubious because she made them at times when she made adverse employment decisions against Mr. Castelluccio. See Williams, supra, 456 F.Supp. at 385. IBM further argues these statements were not improper because they did not use any age-linked epithet or a statement that Mr. Castelluccio was "too old to do t he job." (D.Br. 25). Invidious comments regarding age are not required, however, to establish that Ms. Collins-Smee's comments were not "stray remarks," and the Defendant has not cited any authority to the contrary. Those types of comments would constitute direct evidence of discrimination in and of themselves, and have no bearing on the significance of Ms. Collins-Smee's statements here. Finally, IBM argues that Ms. Collins-Smee did not make any suggestion of retirement. (D.Br. 25). As noted above, however, even if Ms. Collins-Smee did not tell Mr. Castelluccio that she thought he should retire, the implication was clear under the circumstances.

49

for any new positions for which he was qualified because IBM negatively stereotyped older workers at or near retirement age as less diligent or motivated than younger employees and would not make similar efforts to find them new positions.

## V.   CONCLUSION

Mr. Castelluccio has provided a wealth of evidence supporting the existence of myriad genuine disputed issues of material fact that would preclude summary judgment from being granted in this case. Specifically, the following disputed issues of material fact support a conclusion that Mr. Castelluccio was ultimately terminated on the basis of his age: (1) whether Mr. Castelluccio's job performance as VP of Public Sector and acting DPE of WellPoint was positive; (2) whether Ms. Collins-Smee took certain actions regarding his removal from these positions and made comments regarding his age and retirement; (3) whether Mr. Castelluccio's assignment to the WellPoint account was intended to force him to retire; (4) whether Mr. Castelluccio was ever considered as a permanent candidate for the WellPoint account; (5) whether Ms. Collins-Smee treated younger executives more favorably with respect to job placement and failed to follow IBM protocol with respect to Mr. Castelluccio particularly after he was assigned to the "bench"; (6) whether Mr. Castelluccio complained to Human Resources about Ms. Collins-Smee's conduct prior to his termination; (7) whether Ms. Collins-Smee made additional comments regarding retirement in March 2008; (8) whether IBM's Open Door investigation was conducted in good faith or constituted an attempt to justify Mr. Castelluccio's wrongful termination; and (9) whether IBM's recent failure to hire Mr. Castelluccio contravened its articulated legitimate non-discriminatory reason for his termination.

On the basis of the foregoing issues of disputed material fact, and the arguments set forth herein, Mr. Castelluccio respectfully requests that the Court deny IBM's Motion for Summary Judgment, and allow Mr. Castelluccio to present his claims to a jury.

THE PLAINTIFF
JAMES CASTELLUCCIO

BY: _____/S/_____

MARK R. CARTA (ct06645)
KATHRYN A. SHERMAN (ct25641)
Rucci, Burnham, Carta, & Carello, LLP
30 Old Kings Highway South, Post Office Box 1107
Darien, Connecticut 06820
(203) 899-3300 (phone) - (203) 655-4302 (facsimile)
mcarta@rucciburnham.com
ksherman@rucciburnham.com

51