UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JAMES CASTELLUCCIO,                      :
          Plaintiff,                     :
                                         :
v.                                       :          CIVIL ACTION NO. 3:09CV1145 (DJS)
                                         :
INTERNATIONAL BUSINESS                   :
MACHINES CORPORATION,                    :
          Defendant.                     :

MEMORANDUM OF DECISION AND ORDER

The plaintiff, James Castelluccio ("Castelluccio"), brings this action against the

defendant, International Business Machines Corporation ("IBM"), alleging unlawful termination

on the basis of age in violation of the Age Discrimination in Employment Act of 1967

("ADEA"), 29 U.S.C. §621, *et seq.*, and the New York State Human Rights Law ("NYSHRL"),

NY CLS Exec § 296(a).[1] Castelluccio is a resident of Connecticut and IBM is a corporation

organized and existing under the laws of the State of Connecticut. Now pending before the Court

is the defendant's motion for summary judgment, in which the defendant contends that it is

entitled to summary judgment because the plaintiff has failed to set forth sufficient evidence that

would permit a reasonable juror to find that the defendant terminated the plaintiff on the basis of

his age. For the reasons stated below, the defendant's motion for summary judgment (**doc. # 47**)

is **DENIED** .

I. BACKGROUND

IBM hired Castelluccio in March 1968. In August 2000 Castelluccio was promoted to a

---

[1]The complaint had also included  claims of retaliatory termination in violation of the
ADEA, the federal Fair Labor Standards Act and the NYSHRL, but the plaintiff has conceded
that he cannot prove those claims. Consequently the retaliatory termination claims are deemed
abandoned.

Vice President position (referred to as a "Band C" executive position). In January 2005 Castelluccio was appointed Vice President of Public Sector Delivery ("VP PSD"). As VP PSD, Castelluccio led and managed the teams responsible for delivering IT services to more than thirty public sector IBM accounts.

At the time Castelluccio became VP PSD, his direct supervisor was Arthur "Kelton" Jones ("Jones") who was a Vice President and Senior Services Delivery Executive within IBM. On January 25, 2007, prior to his retirement, Jones assessed Castelluccio's performance for his work during the year 2006. By way of background, all IBM employees received an annual formal, comprehensive evaluation as part of IBM's Personal Business Commitments Program ("PBC"). For the year 2006, Jones rated Castelluccio a "2," or "solid contributor." A "2" rating was defined by IBM as "[c]onsistently meets job responsibilities; is reliable in doing job; demonstrates appropriate level of knowledge, skills, effectiveness and initiative." (Doc. # 74-3, at 8.) In the written assessment of Castelluccio's performance for 2006, Jones specifically noted that Castelluccio "provide[d] solid leadership to the team" and "also provided sound leadership across his team in dealing with the ongoing people management responsibilities." (Doc. # 74-2, at 20.) While noting that "the financials performance was way off the target and expected results of the business," the assessment also noted that "Jim and team have made changes that are pointed at improving the financials in 2007" and acknowledged that "this past year was difficult." (*Id.*) Jones never alerted Castelluccio to any concerns Jones had regarding Castellucio's performance in 2006 or at any other time.

Upon Jones' retirement, his position was assumed by Joanne Collins-Smee ("Collins-Smee"), who became Castelluccio's direct supervisor in February 2007. Collins-Smee was 50

years old at that time. Castelluccio's first face-to-face meeting with Collins-Smee took place on or around February 22, 2007. According to Castelluccio, Collins-Smee began her first meeting with him by asking his age. More specifically, Castelluccio contends that Collins-Smee said to him "'How old - - ,' then stopped mid-sentence and said, 'You're old enough to bridge to retirement, right?'" (Doc. 70-2, at 4, ¶ 28.) Castelluccio further contends that "[i]n response, [he] strongly replied that [he] had no desire to retire." (*Id*. at 4, ¶ 30.) Collins-Smee did not bring to his attention any alleged problems with his job performance or inform him that she intended to remove him from his position as VP PSD.

At the time of Castelluccio's first meeting with Collins-Smee, he was approximately one week shy of his 60th birthday and was the oldest of the Vice Presidents who reported directly to Collins-Smee. Under the terms of IBM's pension plan, Castelluccio became eligible to retire with full pension benefits on his 60th birthday. At the time of his first meeting with Collins-Smee, Castelluccio had not considered retirement or discussed retirement with his prior supervisors.

On February 28, 2007, Collins-Smee sent an email to the IBM Human Resources Executive assigned to work with her in which she stated: "We need to replace Jim Castellucio [sic] - I will fill you in tomorrow - Dave L has requested this, had asked months ago from Kelton but, no action. I spoke to Jim C today - he understands and also wants to move, he knew for a while that it was not working." (Doc. # 75-4, at 2.) At her deposition, Collins-Smee testified that she had said that Castelluccio needed to be replaced because "[h]e was not working out. He wasn't exhibiting the proper leadership of the accounts in the public sector." (Doc. # 47-5, at 14: 18-20.) According to Castelluccio, "I did not tell Ms. Collins-Smee during this [February 22, 2007] meeting, or at any time thereafter, that I knew my role as VP of Public Sector was not

working out. After working for IBM for 40 years, I would never have agreed to be replaced as Vice President unless an open position had been identified for me and there was an agreement in place for me to assume the new position." (Doc # 70-2, at 5, ¶¶ 37, 38.)

On March 31, 2007, Collins-Smee designated Castelluccio as the acting Delivery Project Executive ("DPE") for IBM's WellPoint account. According to Castelluccio, this responsibility was in addition to his duties as VP PSD and was a temporary assignment until the individual selected for the permanent WellPoint DPE position, Kenneth Weiss, became available on April 16, 2007. Castelluccio also contends that the WellPoint account "was one of the most problematic contracts that IBM had in the Global Services Division." (Doc. # 70-2, at 5, ¶ 34.) According to Castelluccio, it was not uncommon for customers on highly troubled accounts, like the WellPoint account, to register complaints about services or individuals. Because these complaints usually pertained to faults within the contract itself or to personality conflicts, they generally were not accepted as indicative of poor job performance.

When Mr. Weiss did not assume the role of DPE for the WellPoint account in April 2007, Castelluccio "continued to perform two full-time positions as VP of Public Sector and DPE of WellPoint throughout April, May and part of June 2007." (*Id.* at 6, ¶ 48.)   In June 2007 Collins-Smee informed Castelluccio that he was being replaced as VP PSD by Miguel Echavarria, who was 49 years old at that time, and that he would now be working as DPE of WellPoint on a full-time basis. In November 2007 Collins-Smee met with Castelluccio and informed him that he was being replaced as DPE of WellPoint by Gordon Crawford, who was 59 years old at that time, as of  January 1, 2008. Prior to that time, Castelluccio did not know that he was being replaced in his position as DPE of WellPoint or that Mr. Crawford was being considered for the position.

-4-

While he was employed by IBM, Castelluccio was not informed about any specific complaints made by WellPoint regarding his performance as WellPoint DPE and, according to Castelluccio, "[t]he majority of 'complaints' made by WellPoint raised by IBM [after he filed this lawsuit] related either to IBM's failure to assign a *permanent* DPE to its account or to [his] inability to devote sufficient time to WellPoint due to [his] assignment to two full-time jobs." (*Id.* at 8, ¶ 66.) Castelluccio further asserts that IBM's performance on the WellPoint account improved during the time in which he was the WellPoint DPE.

At his November 2007 meeting with Collins-Smee, Castelluccio asked her about his future with IBM and she initially responded by telling him that he was eligible to bridge to retirement. After Castelluccio informed Collins-Smee that he had no interest in retiring, she responded by telling him she would assist him in finding a new position at IBM. "Collins-Smee's assistance to [Castelluccio] in locating a new position within IBM was extremely important, particularly because executive positions at IBM are not posted to employees and are often kept confidential until a candidate is selected." (*Id.* at 10, ¶ 86.)

In January 2008, Castelluccio learned that Collins-Smee was considering lowering his PBC rating for the year 2007. After Castelluccio sent Collins-Smee additional information concerning his accomplishments during 2007, Collins-Smee agreed that he deserved a "2" PBC rating for 2007 and he was ultimately given the rating "PBC 2: solid contributor" for that year. (Doc. # 74-2, at 26.) Collins-Smee's overall assessment of Castelluccio for 2007 noted the following: "In the Public Sector role Jim's team reduced headcount significantly and we were able to continue to meet our service level objectives. On the Wellpoint account, Jim and the team has [sic] made significant progress on programs to improve service quality and reduce cost . . . .

Jim needs to continue to focus on those activities that would demonstrate effective leadership to both the IBM team as well as the client." (*Id.*)

From the time he learned he was being replaced as the DPE of WellPoint, which was in November 2007, until the time of his termination in June 2008, Castelluccio engaged in a job search for a position within IBM. During this period a number of executive positions at IBM for which Castelluccio was qualified were filled by younger candidates. Castelluccio was not considered for most of these executive positions, nor was he aware of them until after they had been filled. Collins-Smee was aware of various open positions within IBM for which Castelluccio was qualified and had the ability to advance him as a candidate for those positions but did not do so. Castelluccio continued to draw his full salary during this time period, but Collins-Smee did not give him any new work assignments or projects in 2008.

In March 2008 Castelluccio met with Collins-Smee to discuss his lack of meaningful work assignments and to request that she fulfill her earlier promise to assist him in finding another position at IBM. At that time, Collins-Smee told Castelluccio that if no meaningful work could be found for him, he should consider retiring from IBM. Castelluccio repeated that he had no interest in retiring and wanted to continue working at IBM. In May 2008 Collins-Smee informed Castelluccio that he would be given until June 30, 2008 to find a new position or else his employment with IBM would be terminated. Collins-Smee again mentioned that Castelluccio would be eligible to retire.

On June 2, 2008, Castelluccio was presented with a severance package, which contained a general release of IBM, by an IBM Human Resources representative and was told he had until June 23, 2008 to sign the severance agreement. Castelluccio did not sign the severance agreement

and his employment with IBM was terminated on June 30, 2008. At that time he began collecting

his pension under the IBM retirement plan.

On June 13, 2008, Castelluccio lodged a complaint of age discrimination with IBM. On

August 11, 2008, he was informed in writing by Russ Mandel, an IBM Human Resources

representative, that Mr. Mandel had concluded that management treated Castelluccio fairly with

regard to his termination.

## II. <u>DISCUSSION</u>

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). "[A]t the summary judgment stage the judge's function is not himself to weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial." *Redd v. N.Y. State Division of Parole*, 678 F.3d 166, 173-74 (2d Cir. 2012) (internal

quotation marks omitted). In making that determination, the Court must "construe the evidence in

the light most favorable to the non-moving party and . . . draw all reasonable inferences in its

favor." *Huminski v. Corsones*, 396 F.3d 53, 69-70 (2d Cir. 2004) (internal quotation marks

omitted).

"The moving party bears the burden of showing that he or she is entitled to summary

judgment." *Id.* at 69.  The movant can satisfy that burden by "point[ing] to an absence of

evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of*

*Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995). "If the party moving for

summary judgment demonstrates the absence of any genuine issue as to all material facts, the

nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." *Burt Rigid Box, Inc. v. Travelers Property Casualty Corp.*, 302 F.3d 83, 91 (2d Cir. 2002). "If there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." *American Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315 (2d Cir. 2006) (internal quotation marks omitted).

### B. Age Discrimination Claims Under the ADEA and the NYSHRL

The ADEA's purpose is to "promote employment of older persons based on their ability rather than age [and] to prohibit arbitrary age discrimination in employment . . . ." 29 U.S.C. § 621(b). Pursuant to the ADEA "[i]t shall be unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ." 29 U.S.C. § 623(a). The ADEA's prohibition against age discrimination protects "individuals who are at least 40 years of age." 29 U.S.C. § 631(a).

"Claims brought pursuant to the ADEA are analyzed under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), tripartite burden-shifting framework." *Timbie v. Eli Lilly & Co.*, 429 F. App'x 20, 21-22 (2d Cir. 2011). "In a nutshell, a plaintiff first bears the minimal burden of setting out a prima facie discrimination case, and is then aided by a presumption of discrimination unless the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment action, in which event, the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination." *McPherson v. N.Y. City Dept. of Education*, 457 F.3d 211, 215 (2d Cir. 2006)

(internal quotation marks omitted). In the context of an ADEA claim, once the defendant articulates a legitimate, nondiscriminatory reason for the adverse employment action, "the plaintiff must show that a reasonable jury could conclude by a preponderance of the evidence that [the plaintiff's age] was a 'but for' cause of [the adverse employment action]." *Timbie*, 429 F. App'x at 22 (internal quotation marks omitted). "Age discrimination claims brought under the New York State Human Rights Law, N.Y. Exec. Law §§ 290-301, are governed by the same standards as those brought under the ADEA." *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 467 (2d Cir. 1997).

Direct or circumstantial evidence may be used to prove a violation of the ADEA. *See Carlton v. Mystic Transportation, Inc.*, 202 F.3d 129, 135 (2d Cir. 2000). The Second Circuit has noted that "[d]irect evidence of discrimination is not necessary, because proof is seldom available with respect to an employer's mental processes. Instead, plaintiffs in discrimination suits often must rely on the cumulative weight of circumstantial evidence, since an employer who discriminates against its employees is unlikely to leave a well-marked trail, such as making a notation to that effect in the employee's personnel file." *Id.* (citation omitted).

### i. Prima Facie Case

"In order to establish a prima facie case of age discrimination, [Castelluccio] must show (1) that [he] was within the protected age group, (2) that [he] was qualified for the position, (3) that [he] experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010). A plaintiff's burden in establishing a prima facie case of discrimination is "de minimis." *Timbie*, 429 F. App'x at 22.

-9-

The evidence before the Court demonstrates that Castelluccio was terminated at the age of 61 and thus falls within the protected age group and that IBM evaluated Castelluccio's 2006 and 2007 job performance and rated him a "2," which is considered satisfactory. With regard to experiencing adverse employment action, Castelluccio's complaint explicitly alleges that "IBM's actions in terminating Mr. Castelluccio's employment were wilful, unlawful and discriminatory on account of his age in violation of the [ADEA and the NYSHRL]." (Doc. # 1, at 13, ¶ 49 and 17, ¶ 60.) Although Castelluccio's memorandum in opposition to IBM's motion for summary judgment asserts that he experienced two other adverse employment actions (removal as VP PSD and subsequent removal as WellPoint DPE) that constitute additional actionable claims, these claims may not be considered because "a plaintiff may not use a memorandum of law or similar paper to assert a claim that is not contained in the complaint." *Ribis v. Mike Barnard Chevrolet-Cadillac, Inc.*, 468 F. Supp. 2d 489, 495 (W.D.N.Y. 2007).

In terms of asserting additional claims, the two removal actions would be unavailing to Castelluccio in any event, since they would be in the nature of "[d]iscrete acts . . . which fall outside the limitations period [and] cannot be brought within it, even when undertaken pursuant to a general policy that results in other discrete acts occurring within the limitations period." *Chin v. Port Authority of New York & New Jersey*, Nos. 10-1904-cv (L), 10-2031-cv (XAP), 2012 U.S. App. LEXIS 14088,  at *53 (2d Cir. July 10, 2012). Pursuant to 29 U.S.C. § 626(d)(1), a charge alleging unlawful age discrimination in employment must be filed with the Equal Employment Opportunity Commission within 180 days, or in some circumstances within 300 days, after the occurrence of the alleged unlawful practice. In his complaint, Castelluccio alleges he filed a charge of age discrimination with the Equal Employment Opportunity Commission on

November 17, 2008, which is more than 300 days after both his removal as VP PSD and removal as WellPoint DPE. (Doc. # 1, at 2, ¶ 4.) Castelluccio does not maintain that the two removal actions occurred within the applicable limitations period, but argues instead that the doctrine of equitable tolling should be applied in this instance to avoid the conclusion that those two actions are barred by the statutory limitations period. The Court is not persuaded by Castelluccio's argument that the facts he has presented bring his situation within the scope of the doctrine of equitable tolling as expressed by the Second Circuit in *Cerbone v. International Ladies' Garment Workers' Union*, 768 F.2d 45 (2d Cir. 1985).  The Court does not find that "the facts show that the defendant engaged in conduct, often itself fraudulent, that concealed from the plaintiff the existence of the cause of action." *Id.* at 48. The Court does agree with Castelluccio, however, that it may "properly admit[] background evidence predating the onset of the limitations period," *Chin*, 2012 U.S. App. LEXIS 14088, at *4,  as to the termination claim, which is within the limitations period.

The Court further concludes that the evidence before it, construed in the light most favorable to the non-moving party, i.e., Castelluccio, could support a finding that this adverse employment action occurred under circumstances giving rise to an inference of discrimination."'An inference of discriminatory intent may be established by, *inter alia*, . . . the sequence of events leading to the plaintiff's discharge.'" *Miller v. Hartford Fire Insurance Co.*, 652 F. Supp. 2d 220, 231 (D. Conn. 2009) (quoting *Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009)). Castelluccio has provided evidence that during his initial meeting with his new supervisor, Collins-Smee, and on other occasions thereafter, Collins-Smee raised the issue of Castelluccio's retirement, despite the fact that Castelluccio had never  expressed any interest in

-11-

retiring and, to the contrary, had told Collins-Smee that he did not want to retire. Castelluccio has also provided evidence that at the time he was VP PSD, he was the oldest of the VPs reporting to Collins-Smee, and that he was replaced in that position by an individual who was eleven years younger than Castelluccio. He  further provided evidence that after he was assigned as the WellPoint DPE on an "interim" basis, he was never presented as a candidate for the permanent position of WellPoint DPE, and that after he was replaced on the WellPoint account, he was not given any further responsibilities or duties. Finally, Castelluccio has provided evidence that Collins-Smee did not, as she had indicated she would do, assist him in finding another position within IBM and that there were numerous available executive positions within the company for which he was qualified but not considered. The Court finds that Castelluccio has satisfied his minimal burden of establishing a prima facie case of age discrimination.

### ii.  Legitimate, Nondiscriminatory Reason

The second step under *McDonnell Douglas* is the articulation of a legitimate, nondiscriminatory reason for the adverse employment action by the defendant. IBM asserts that Castelluccio's termination was based on legitimate business reasons. According to IBM, "Castelluccio's performance in both the Public Sector and WellPoint positions was sorely lacking," and he had "a long history of unacceptable performance." (Doc. # 49, at 39.) IBM claims that Castelluccio "has admitted that he knew there were complaints about his leadership and the delivery operations he managed." (*Id.*) Additionally, IBM contends that Castelluccio was separated from service because he was unable to find a new position within the company after six months of searching. Thus IBM has articulated legitimate, nondiscriminatory reasons for Castelluccio's termination and, for that reason, IBM has met its *McDonnell Douglas* burden of

production.

iii.  Pretext

Since the defendant has met its burden of articulating a legitimate, nondiscriminatory

reason for Castelluccio's termination, the Court must "determine, by looking at the evidence

[Castelluccio] has proffered and the counter-evidence [IBM] has presented, whether

[Castelluccio] has raised sufficient evidence upon which a reasonable jury could conclude by a

preponderance of the evidence that [his] age was a 'but for' cause of [IBM's] decision to

[terminate him]. In this respect it is important to consider whether the explanations that [IBM]

gave for [Castelluccio's termination] were pretextual." *Gorzynski*, 596 F.3d at 107.  "Relying on

the same evidence that supports an inference of discriminatory intent, [Castelluccio] could meet

this burden. Viewed in the light most favorable to [Castelluccio], the evidence could support a

conclusion that [IBM's] stated reason[s] [were] pretextual, and that [IBM] planned to remove

[Castelluccio] as an employee, and ultimately did remove him, on the basis of his age." *Miller*,

652 F. Supp. 2d at 232.

"A plaintiff may show pretext by demonstrating 'such weaknesses, implausibilities,

inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for

its action that a reasonable factfinder could rationally find them unworthy of credence and hence

infer that the employer did not act for the asserted non-discriminatory reasons.'" *Bombero v.*

*Warner-Lambert Co.*, 142 F. Supp. 2d 196, 203 n. 7 (D. Conn. 2000) (quoting *Anderson v. Coors*

*Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)). With regard to IBM's stated reason that

Castelluccio's performance was sorely lacking and that he had a long history of unacceptable

performance, Castellucio has provided evidence that for the year 2006 he was rated a "2," which

-13-

means he was a "solid contributor." In his written assessment of Castelluccio's performance for that year, his supervisor (Mr. Jones) specifically noted Castelluccio's solid leadership and people management skills. Castelluccio also offered proof that Collins-Smee had attempted to lower Castelluccio's rating to a "3" for the year 2007, but did not provide Castelluccio with any explanation for her decision to lower his rating. After reviewing Castelluccio's summary of accomplishments for the year 2007, Collins-Smee ultimately agreed that his performance warranted a "2" rating.

Additionally, Collins-Smee sent an email to an IBM Human Resources executive six days after her initial meeting with Castelluccio, and less than one month after becoming his direct supervisor, in which she stated: "We need to replace Jim Castellucio [sic] - I will fill you in tomorrow - Dave L has requested this, had asked months ago from Kelton but, no action. I spoke to Jim C today - he understands and also wants to move, he knew for a while that it was not working."  (Doc. # 75-4, at 2.) Castelluccio has provided evidence that he never told Collins-Smee "that I knew my role as VP of Public Sector was not working out," (doc. # 70-2, at 5, ¶ 37), and IBM has acknowledged that Collins-Smee did not tell Castelluccio that he was terminated for cause or for performance reasons.

With regard to IBM's stated reason that Castelluccio was separated from service because he was unable to find a new position within the company after six months of searching, Castelluccio has provided evidence that Collins-Smee had told him she would assist him in finding a new position but failed to do so, despite the fact that "Collins-Smee's assistance to [Castelluccio] in locating a new position within IBM was extremely important, particularly because executive positions at IBM are not posted to employees and are often kept confidential

until a candidate is selected." (*Id*. at 10, ¶ 86.)  Castelluccio has also provided evidence that there were numerous available executive positions within the company for which he was qualified but not considered.

The Court finds that the evidence produced by Castelluccio could support a conclusion that IBM's stated reasons for his termination were pretextual, and that "a reasonable jury could conclude by a preponderance of the evidence that [his] age was a 'but for' cause of [IBM's] decision to [terminate him]." *Gorzynski*, 596 F.3d at 107.  For that reason, the defendant's motion for summary judgment is denied as to the plaintiff's ADEA claim.  Because "[a]ge discrimination claims brought under the New York State Human Rights Law, N.Y. Exec. Law §§ 290-301, are governed by the same standards as those brought under the ADEA," *Wanamaker v. Columbian Rope Co.*, 108 F.3d 462, 467 (2d Cir. 1997),  the defendant's motion is also denied as to the plaintiff's claim of age discrimination under the NYSHRL.

## III. <u>CONCLUSION</u>

For the foregoing reasons, the defendant's motion for summary judgment (**doc. # 47**) is **DENIED** as to the two remaining counts in the complaint, i.e., Count One (Violation of the

ADEA) and Count Three (Age Discrimination in Violation of NYSHRL).


**SO ORDERED** this 21st  day of August, 2012.



_____/s/ DJS_____
              DOMINIC   J.   SQUATRITO
        UNITED STATES DISTRICT JUDGE