1

```
 1                  UNITED STATES DISTRICT COURT
                      DISTRICT OF CONNECTICUT
 2


 3


 4


 5    JAMES CASTELLUCCIO      )
          Plaintiff          ) 3:09-cv-01145 (TPS)
 6                           )
      VS                     ) January 13, 2014
 7    INTERNATIONAL BUSINESS )
      MACHINES CORPORATION    ) Federal Building
 8        Defendant          ) Hartford, Connecticut


 9


10


11


12                         VOLUME 1

13                    TRIAL HELD BEFORE
                THE HONORABLE THOMAS P. SMITH, U.S.M.J.
14


15


16


17


18


19


20


21


22


23
            Reporter:  WENDY J. ALLEN, RPR, CRR, LSR #00221
24


25
```

                                                                    2

     1

     2      Representing the Plaintiff

     3      Carta McAlister & Moore, P.C.
            1120 Boston Post Road
     4      Post Office Box 83
            Darien, CT  06820
     5          By:  Mark R. Carta, Esq.
                     mark@cmm-law.com
     6          By:  Margaret A. Triolo, Esq.
                     margaret@cmm-law.com
     7          By:  Troy Bailey, Esq.

     8

            Representing the Defendant
     9
            Paul Hastings, LLP
    10      75 East 55th Street
            New York, NY  10022
    11          By:  Zachary Fasman, Esq.
                     Zacharyfasman@paulhastings.com
    12          By:  Todd C. Duffield, Esq.
                     Toddduffield@paulhastings.com
    13          By:  Jean-Marie Gutierrez

    14
            ALSO PRESENT:
    15
            Daniel Fox, Esq.
    16      IBM in-house counsel

    17

    18

    19

    20

    21

    22

    23

    24

    25

3

1                    I  N  D  E  X

2
  WITNESSES:                                  PAGE:
3
  James Castelluccio
4      Direct Examination by Mr. Carta.............  108

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                THE COURT:  Good morning.  My name is

2      Judge Thomas P. Smith, and I'm going to be presiding

3      at this trial.

4                     This case is known as James Castelluccio

5      versus International Business Machines Corporation,

6      otherwise known as IBM.  This is an employment

7      discrimination case brought by the Plaintiff, James

8      Castelluccio, against his former employer, IBM.  The

9      Plaintiff has brought this action under federal law,

10     specifically the Age Discrimination and Employment Act

11     of 1967, as well as state law, New York State law,

12     which we'll go into detail more at a later time.

13                     The Plaintiff alleges that IBM unlawfully

14     and willfully terminated his employment on the basis

15     of age.  Now, the Plaintiff seeks to recover monetary

16     damages to the extent allowed under the two laws, that

17     is the federal law and the New York employment law.

18     IBM denies the allegations and denies that Mr.

19     Castelluccio's termination was in anyway attributable

20     to his age.

21                     Now, I would ask the clerk now to

22     administer the voir dire oath to all of our

23     prospective jurors.  Please rise.

24               (Jurors administered voir dire oath)

25                THE COURT:  Please be seated.

1                    Now, madam clerk, can you announce the

2       names and jury numbers of the 24 individuals who have

3       already been randomly selected

4                    THE CLERK:  Juror number 90, please come

5       forward.

6                    Juror number 63.

7                    Juror number 19.

8                    Juror number 68.

9                    Juror number 95.

10                   Juror number 54.

11                   Juror number 59.

12                   Juror number 60.

13                   Juror number 367.

14                   Juror number 5.

15                   Juror number 28.

16                   Juror number 26.

17                   Juror number 69.

18                   Juror number 123.

19                   Juror number 24.

20                   Juror number 57,

21                   Juror number 113.

22                   Juror number 10.

23                   Juror number 7.

24                   Juror number 98.

25                   Juror number 50.

1            Juror number 32.

2            Juror number 67.

3            And juror number 16.

4            We have one missing.  Juror number 16,

5   juror number 6, juror number 32?  You have to come

6   forward

7            THE COURT:  Okay.  Now, ladies and

8   gentlemen, I'm going to be asking you some questions,

9   and then when I'm finished asking my questions, I'm

10  going to turn the matter over to counsel for each side

11  and allow them to conduct a brief individual voir

12  dire.

13           Now, this process we're going through is

14  known as the voir dire process, and that's a French

15  term, and it means, roughly translated, to speak the

16  truth.  So you've been sworn in, and you're going to

17  be asked questions, and you're going to have to answer

18  the questions truthfully, whether they're put to you

19  by me, or by the lawyers, or one side or the other.

20           Now, the first thing I'd like to do is

21  tell you that the trial in this case is going to start

22  today, and it's my intention that we're going to be

23  starting the trial around 12, 12:30, 1 o'clock, and up

24  until then we're going to be picking the jury and

25  we're going to be getting out of the way certain

1    housekeeping things that we have to do.

2              But right now I want to ask you a

3    question that concerns timing, exclusively timing,

4    nothing but timing.  This case is going to start

5    today, January 13th, and it's going to continue the

6    14th, the 15th, the 16th, and the 17th, which is a

7    Friday.

8              Then we're going to have the weekend and

9    it's going to be a long weekend because Monday the

10   20th of January is Martin Luther King Day, which is a

11   federal holiday, so we have that day off.  At least

12   from court duty.  I don't know what your employers

13   have to say about it.  Don't get me in the middle.

14   I'm only the judge.

15             Then we're going to resume, if need be,

16   the 21st and continue the 22nd and continue the 23rd,

17   which is a Thursday, and my prediction is at the

18   latest we'll conclude on the 24th, which is Friday.

19   So basically we're talking two court weeks, with the

20   exception of the second week will be a four-day week

21   because we have Dr. King's day off.

22             Now, focusing just on those days, and

23   those days only, let me ask you, is there anyone among

24   you who has a truly serious and legitimate reason why

25   he or she cannot serve as a juror on this case during

```
 1    those days?  And I should tell you, there's a
 2    possibility that this could conclude before then.  I
 3    mean I have a tendency to make sure we move as quickly
 4    as we can, and we have some very able lawyers in this
 5    case who know what they're doing, so things should
 6    move expeditiously.  So I think it could be shorter
 7    than that.
 8              The 13th to the 24th.  Is there anyone
 9    among you who has a serious legitimate reason why he
10    or she cannot serve as a juror in this case?  If so,
11    we'll go to the far back row, and raise your hand.
12              In the third row back there, what is your
13    juror number and what is your name?
14              JUROR #59:  59.
15              THE COURT:  Counsel all get that?  You'll
16    have to bear with me, ladies and gentlemen.  I had
17    really great hearing until 1968.  I had really good
18    hearing.  I could hear a pin drop at the far end of
19    the building.  But we were engaged in some activities
20    that involved gunfire back then and I seriously
21    impaired my hearing at that time.  Not serious enough
22    to get a Purple Heart or even an early release, but
23    seriously enough so that you really have to keep your
24    voices up.  I know that's hard to do because sometimes
25    I have a hard time keeping my voice up.  So bear with
```

1    me on that, please.  And I ask counsel to do the same.

2                    Yes, ma'am, what is it?

3                    JUROR #59:  I don't know if you consider

4    it -- I start my next semester of school the 23rd, so

5    the only problem I would have is the two days I go to

6    school Thursday, Friday, and then Tuesdays, after the

7    23rd.

8                    THE COURT:  So you'd have a problem on

9    Thursday the 23rd.

10                   JUROR #59:  Yes.

11                   THE COURT:  And on Friday the 24th.

12                   JUROR #59:  Yes.

13                   THE COURT:  And you're a college student?

14                   JUROR #59:  Yes.

15                   THE COURT:  Whereabouts you go?

16                   JUROR #59:  Manchester Community.

17                   THE COURT:  Anybody else on that far row?

18                   We'll go to the middle row now.  Yes,

19   sir.

20                   JUROR #367:  Number 367.  I work for

21   Merrill Lynch.  I actively manage money for clients on

22   a daily basis.  Even when I take a vacation I don't

23   take off more than a week at a time.  Two weeks I

24   think would be very difficult for me.

25                   THE COURT:  Okay.  Thank you very much.

```
 1    You're right here in Hartford?

 2               JUROR #367:  In Hartford, yes.

 3               THE COURT:  Ma'am?

 4               JUROR #28:  Juror 28.  I have a husband

 5    that had a problem with his health, and it was mild,

 6    but he's the one that's driving me because I don't

 7    drive the highway.  I also am the only one that works

 8    in my house.  He had a mild stroke.

 9               THE COURT:  You're the sole source of

10    income for your house right now?

11               JUROR #28:  Yes.

12               THE COURT:  Your husband is ill?

13               JUROR #28:  Yes.  I'm working with

14    children right now.

15               THE COURT:  Okay.  And you depend on him

16    for transportation?

17               JUROR #28:  Yes, sir.

18               THE COURT:  All right.  Is there anyone

19    else in that middle row?

20               Okay, let's move down to the first row.

21    Is there anyone who has a serious legitimate excuse

22    why he or she could not serve as a juror during that

23    period?

24               Well, the record should indicate that we

25    have received the responses that we've received,
```

1    counsel have had an opportunity to note the responses,

2    and so I'll move on.

3              Is there any prospective juror who has a

4    reason so personal and so private that he or she would

5    prefer to come up to the bench and disclose it to me

6    without speaking out about it in open court?

7              Okay, the record should indicate that

8    there's no response.

9              Is there anyone among you who has a

10   vision problem or a hearing problem that would

11   interfere with your ability to see the witnesses in

12   this case, any video exhibits which may be shown, or

13   to hear the testimony of the witnesses?  If so, would

14   you raise your hand.

15             All right, the record should reflect no

16   response.

17             Now, is there anybody here who is taking

18   any medicine that would impair his or her ability to

19   concentrate on the testimony, the arguments of

20   counsel, or the instructions of the Court?  I mean

21   what we want to know, we all get a headache now and

22   then, we all have an aspirin now and then.  We're not

23   talking about that.  We're talking about something

24   that really makes you incapable of concentrating and

25   paying attention.

1                 The record should indicate there's no

2       response.

3                 Now, other than what you've just heard

4       today about the case from me, is any one of you

5       familiar with this case?  Anybody familiar with any of

6       the allegations in this case other than what I've told

7       you?

8                 The record should indicate no response.

9                 Is there anybody here who's familiar with

10      any of the parties of this case?  And I'll start first

11      with Plaintiff's side.  Is there anyone among you who

12      is familiar with Plaintiff's counsel and witnesses?

13      And I'm going to allow him in a little bit to

14      introduce more lengthy, at a greater length, introduce

15      himself and the Plaintiff and everyone at Plaintiff's

16      table, but right now, just recognizing that

17      distinguished looking man in the blue suit and the

18      yellow tie, is there anybody who's familiar, who knows

19      who he is?

20

21                Okay.  Well, there's no reason you

22      should, because he's from, what I refer to as the

23      southern district of Connecticut, but there's really

24      only one district of Connecticut.  But all right.  So

25      you don't know him and his client, Mr. Castelluccio,

1      the gentleman in the gray suit in the middle?

2                    All right.  The record should indicate no

3      response.

4                    Now, let's turn to IBM.  Is there any one

5      of you who is familiar with IBM?  I would think that

6      unless you're from Venus you probably have heard of

7      IBM.  And it's International Business Machines

8      Corporation.

9                    And I'm sure many of you are too young to

10     remember this, but when the state of the art was the

11     state of the art, the cutting edge was the IBM

12     Selectric typewriter with the interchangeable balls.

13     Elements, I think you called them.  They had italics

14     elements, and scientific elements.  They don't make

15     them anymore, I understand.  Maybe they do.  But they

16     were a really good product.

17                   And the problem today is that, I think,

18     is that you might be able to get a hold of an IBM

19     Selectric typewriter, but you might have a difficult

20     time getting somebody who knows how to repair it,

21     because the technology has moved on.  Then again,

22     maybe IBM has a division that deals with repairing

23     Selectric typewriters, I don't know.

24                   But other than that, IBM, it's a big

25     company, successful corporation, makes business

1    machines, have made all kinds of machines, but one

2    which I think the ordinary layperson like myself or

3    you would be most familiar with would be maybe the

4    Selectric typewriter.

5              I would now like to ask the lawyers in

6    this case, beginning with Plaintiff's lawyer, to

7    introduce himself and his law firm and his client to

8    you.

9              MR. CARTA:  Morning.  My name is Mark

10   Carta.  I am a lawyer with the law firm of Carta,

11   McAlister & Moore.  I represent James Castelluccio.

12   Mr. Castelluccio is the Plaintiff in this action, and

13   you'll be hearing him testify at length.  With me at

14   counsel table is Margaret Triolo and Troy Bailey.

15             In terms of witnesses, the will call Mr.

16   Castelluccio to testify.  We're also going to be

17   calling Mike Morin, who's from Enfield, and I saw a

18   number of people here are from Enfield so I mention

19   that specifically.  We're going to be calling as well

20   Kelton Jones.  Mr. Jones lives in Austin, Texas.

21   We'll be calling Dr. Gary Crakes.  He's an economist

22   and he'll be testifying about Mr. Castelluccio's

23   damages.  And finally we'll be calling Ms.

24   Collins-Smee.  Ms. Collins-Smee is Mr. Castelluccio's

25   former supervisor, and she's the one that

15

1    discriminated against him based on his age.  Thank

2    you.

3              THE COURT:  Okay.  Is there anyone among

4    you who knows any of these people whose names have

5    been mentioned?

6              Yes, ma'am.

7              JUROR #10:  I know a Michael Morin.  I

8    don't know if it's the same person.

9              THE COURT:  And your number?

10              JUROR #10:  10.

11              THE COURT:  You're 10, number 10.  And so

12    Michael Morin you know is about how old, if you had to

13    guess?

14              JUROR #10:  50, 60.

15              THE COURT:  So he's not a fellow student

16    or worker?

17              JUROR #10:  Co-worker at a past job, at a

18    retailer.

19              THE COURT:  I could have sworn you said

20    pot shop.  I was going to say business has a way of

21    spreading.  I didn't know that it was here from

22    Colorado yet.

23              Well, the nature of your relationship

24    with him is just that he's a casual acquaintance,

25    would that be fair to say?

```
 1              JUROR #10:  Yes.

 2              THE COURT:  Now, if indeed this gentleman

 3     were the gentleman whom you had familiarity with,

 4     would that in any way affect you?  And that is, would

 5     it affect your assessment of credibility, would it

 6     affect the weight you'd attach to his testimony, would

 7     you give it more weight or less weight, or would you

 8     find it more believable or less believable than if it

 9     had come from the mouth of a witness that you never

10     had an encounter with?

11              JUROR #10:  Potentially more believable.

12     I think -- I like to think I would have like a, you

13     know, non-biased opinion, but if it's someone that I

14     know, it's possible.

15              THE COURT:  It's possible, but if -- let

16     me ask you this:  If I told you that you and you alone

17     had the task of judging the credibility of the

18     witness, would you be able to compartmentalize your

19     familiarity with this gentleman and isolate a little

20     box and say okay, I'm going to judge him solely on the

21     basis of what I've heard today here in the proceedings

22     in this case rather than on the basis of everything

23     else, would you be able to do that?

24              JUROR #10:  Yes.

25              THE COURT:  And you'd be able to -- if I
```

1     told you that you had to do it, you would be able to

2     set aside any personal beliefs that you previously had

3     or that you still might hold about him as a gentleman,

4     he could come in here and testify that it's Tuesday,

5     and you could believe him, but we all know it's not

6     Tuesday.  So you'd be okay if this gentleman were one

7     of the witnesses who was called by the Plaintiff?

8                    JUROR #10:  Yes.

9                    THE COURT:  Okay.

10                   Now, do we have anybody else?  Yes, sir.

11                   JUROR #367:  Number 367.  My wife and I

12    personally own IBM stock.

13                   THE COURT:  Well, that was a question I

14    was going to ask later on, but --

15                   JUROR #367:  Okay, sorry.

16                   THE COURT:  That's all right.  So do you

17    have familiarity with the corporation, and I am going

18    to be asking that question, or was going to be asking

19    it later on.  Is there anybody here who either

20    personally or with a spouse or a partner owns IBM

21    stock?

22                   Okay, the record should indicate that

23    there is no response.

24                   And by partner I mean, you know, civil

25    union, marriage, just ongoing co-habitation, any kind

1     of close relationship with a stockholder of IBM.

2                    The record should indicate no response,

3     with the exception of          .  Thank you, sir.

4                    Now, I'm going to turn now to the

5     attorneys for IBM and ask them to introduce themselves

6     and tell us about their witnesses.

7                    MR. FASMAN:  Your Honor, thank you.

8                    Ladies and gentlemen, good morning.  My

9     name is Zack Fasman.  I'm a partner with Paul

10    Hastings, is the name of my law firm.  I'm joined here

11    at counsel table with my partner Todd Duffield, Daniel

12    Fox, who's an in-house counsel at IBM, and Jean Marie

13    Gutierrez, who runs this show.

14                   Our witnesses are going to be in this

15    case Joanne Collins-Smee, who I have to say in

16    contrast to Mr. Carta did not discriminate against Mr.

17    Castelluccio.  And the following witnesses are IBM

18    personnel who you may or may not know.  David

19    Liederbach, Keenie McDonald, Gordon Crawford, Keith

20    Holmes, Russell Mandel, and then we'll have an expert

21    witness by the name of Charles Sodikoff, who is an

22    expert on recruiting.

23                   THE COURT:  All right.  Thank you, Mr.

24    Fasman.

25                   Now, is there anyone among you who knows

1    anyone who has been introduced or mentioned by Mr.

2    Fasman?

3                Okay, the fourth gentleman in.  Yes.

4                JUROR #50:  Juror number 50.  I don't

5    know any of those particular individuals personally,

6    but as an attorney for Pratt & Whitney I'm actually

7    currently negotiating an attorney-client privilege

8    matter with IBM and their in-house counsel.

9                THE COURT:  Okay.  You work for Pratt?

10               JUROR #50:  Yes.

11               THE COURT:  And in compliance?

12               JUROR #50:  In intellectual property.

13               THE COURT:  And whereabouts do you work,

14   in East Hartford?

15               JUROR #50:  In East Hartford, Your Honor.

16               THE COURT:  And your name again, sir?

17               JUROR #50:  It's                  .

18               THE COURT:  Thank you, sir.

19               Is there anyone else who knows or

20   believes that he or she may know any of the people

21   that Mr. Fasman has mentioned, any of the lawyers, any

22   of the technical support people who Mr. Fasman

23   mentioned?

24               The record should indicate no response.

25               Have any of you had any business dealings

1    of any kind with IBM, you know, beyond simply having

2    purchased an IBM product, a Selectric or whatever.

3              Name and your number

4              JUROR #95:  95.  I was previously

5    employed by IBM.

6              THE COURT:  You did at one time work for

7    IBM?

8              JUROR #95:  Yes, I did.

9              THE COURT:  And whereabouts was that?

10             JUROR #95:  In Hartford.

11             THE COURT:  In Hartford, okay.  And what

12   did you do there?

13             JUROR #95:  I was part of the consulting

14   group that worked for them.

15             THE COURT:  Okay.  Thank you, sir.

16             Is there anyone else besides the

17   gentleman in the back row or the second row?  How

18   about the first row?

19             JUROR #50:  Just the basic same answer I

20   previously gave, and I have negotiated with IBM

21   previously.

22             THE COURT:  Okay.  Now, is there anyone

23   out there who has any feelings about IBM that might

24   cause him or her to lean toward or against IBM because

25   of those personal dealings or experiences?

1          Okay, we have the gentleman on the top.

2    And your name?

3          JUROR #95:              , 95.

4          THE COURT:  Okay.  Now, is there anybody

5    among you who believes that IBM would be likely to

6    discriminate against a person, an employee, on the

7    basis of his or her age?

8          Okay, the record should indicate no

9    response.

10          Do any of you have any reason to believe

11    that IBM would be likely to discriminate against

12    someone on the basis of some other characteristic such

13    as religion, race, national origin, ethnicity, sexual

14    orientation, or any other basis?

15          Okay.  So am I fair in inferring from the

16    lack of response that you have no reason to believe

17    that IBM is a likely discriminator.

18          Okay.  The record should indicate that

19    the jury has indicated its agreement with my

20    statement.

21          Now, have you read any newspaper articles

22    or seen or heard any other type of reporting

23    concerning this case?

24          The record should indicate no response.

25          Has anyone ever talked to any of you

1    about the facts of this case?

2              All right.  The record should indicate no

3    response.

4              In general is there any one of you who

5    has formed any opinions how companies treat employees

6    over the age of 40?

7              Yes, I see one hand down there in the

8    first row.  Your name, sir?

9              JUROR #24:  Juror number 24.

10             THE COURT:  Thank you, sir.

11             Is there anyone among you who has formed

12   an opinion or a belief or a preconceived notion about

13   how a large company like IBM would be likely to treat

14   older individuals, that is individuals over 40?

15             Okay.  The record should indicate no

16   response.

17             Let's move on to a little bit different

18   area.  Have you or any member of your family ever been

19   a party to a lawsuit?

20             We'll start way up in the back row.  Yes,

21   ma'am, would you state your name and juror number

22             JUROR #19:                 , 19.  My husband

23   had a case against American Airlines.

24             THE COURT:  What kind of case was it?

25             JUROR #19:  Discrimination.

```
 1                    THE COURT:  It was a discrimination on
 2    the basis of age?
 3                    JUROR #19:  Injury, he had an injury.
 4                    THE COURT:  And you felt that -- who's
 5    his employer?
 6                    JUROR #19:  American Airlines.
 7                    THE COURT:  You felt that American
 8    Airlines treated him in an unfairly discriminatory way
 9    because of that injury?
10                    JUROR #19:  Yes.
11                    THE COURT:  Okay.  And this is something
12    that counsel can follow up in their voir dire
13    questions if there's anything.
14                    Did you actually bring a lawsuit?
15                    JUROR #19:  They went bankrupt, so...
16                    THE COURT:  The company went bankrupt?
17                    JUROR #19:  Yes.
18                    THE COURT:  So you were --
19                    JUROR #19:  Out of luck.
20                    THE COURT:  Out of luck.  Okay.  Sorry.
21                    JUROR #19:  No problem.
22                    THE COURT:  Anybody else in that back
23    row?
24                    Okay, we'll move down to the second.
25                    A JUROR:  What was the question?  In a
```

1    general lawsuit, or specifically against a

2    corporation?

3              THE COURT:  Any lawsuit at all.

4              A JUROR:  Three years ago my wife was hit

5    by a teenager, sustained injuries.  We won the

6    lawsuit.

7              THE COURT:  Motor vehicle accident?

8              A JUROR:  Yes.  We were going to court

9    but it was settled.

10             THE COURT:  Your wife was a driver or

11   passenger?

12             A JUROR:  She was a passenger.

13             THE COURT:  A passenger?

14             A JUROR:  Yes.  Someone hit us.

15             THE COURT:  You were driving?

16             A JUROR:  Yes.

17             THE COURT:  And your wife suffered

18   serious injuries?

19             A JUROR:  Yes.

20             THE COURT:  The matter was put into suit?

21             A JUROR:  Yes.

22             THE COURT:  And then later on it was

23   settled?

24             A JUROR:  Yes.

25             THE COURT:  Okay.  Anyone else in the

1    second row?

2              JUROR #123:  My husband filed a suit --

3    juror 123.  My husband filed an age discrimination

4    suit against his employer at that time.

5              THE COURT:  And when was that?

6              JUROR #123:  Oh, probably a good 30 years

7    ago.

8              THE COURT:  About 30 years ago?

9              JUROR #123:  Yes.

10             THE COURT:  And who was the employer?

11             JUROR #123:  It was a small company in

12   Windsor Locks, Adams Industries.  They are no longer

13   in business.

14             THE COURT:  And did the case proceed to

15   trial?

16             JUROR #123:  I don't know if -- no, it

17   didn't go to trial.  They settled out of court.

18             THE COURT:  Okay.  Thank you ma'am.

19             I see someone else in the middle row.

20   Yes, ma'am.

21             JUROR #26:  Number 26.  I sued somebody

22   who hit me in my automobile in small claims.

23             THE COURT:  Did you get relief?

24             JUROR #26:  I did not.

25             THE COURT:  Someone hit you?

1                    JUROR #26:  Correct.

2                    THE COURT:  And didn't pay for the

3     damages?

4                    JUROR #26:  Correct.

5                    THE COURT:  And you sued him in small

6     claims court.  And was there a hearing?

7                    JUROR #26:  There was a hearing, and I

8     was not successful.

9                    THE COURT:  You were not successful,

10    okay.

11                   We'll move down to the first row.  Yes,

12    ma'am, your name and juror number.

13                   JUROR #113:  Juror 113.  I was -- I sued

14    a driver who hit me back in 2000.  It was settled out

15    of court.

16                   THE COURT:  Okay, thank you.

17                   Anyone else in the first row?

18                   All right.  The record should reflect

19    that other than the responses that have been given

20    there are no more responses.

21                   Is there any one of you who has ever been

22    a witness in a trial where you've come to the bench,

23    called by one side or the other, placed under oath,

24    and asked to testify and indeed did testify?  Is there

25    anyone who's ever been -- the top row, no.  The second

1    row.  Yes, ma'am.  Your name and juror number

2               JUROR #69:  My name is     and my juror

3    number is 69.  I was a witness in a medical lawsuit,

4    and I was called to the stand because I took care of a

5    patient who was -- whose family was claiming that

6    standard of care had not been followed at that

7    particular time.  And the ruling was against the

8    plaintiff.  They discovered that standard of care was

9    being followed at that particular time.  So I was a

10   witness for the hospital.

11               THE COURT:  Okay, witness for the defense

12   in a medical malpractice action.  That was in state

13   court here in Connecticut or some other location?

14               JUROR #69:  No, it was here in

15   Connecticut.

16               THE COURT:  In Hartford?

17               JUROR #69:  Yes, sir.

18               THE COURT:  Do you remember the name of

19   the Judge?

20               JUROR #69:  I'm sorry, I do not.

21               THE COURT:  That could be a good thing.

22               Is there anyone in the first row?  Yes,

23   ma'am, you have testified?

24               JUROR #57:  Twice.  Juror 57.  I was an

25   EMT for New Britain EMS and was the first responding

1    EMT on the scene of two separate murders to which

2    myself and my partner testified at both separate

3    cases.  And yes, I do remember the judge's name.

4                THE COURT:  Who was the judge?

5                JUROR #57:  Judge Harry Hammer.

6                THE COURT:  So do you remember you were

7    called by the prosecution?

8                JUROR #57:  Yes, in both cases.

9                THE COURT:  And do you recall what the

10   result was?

11               JUROR #57:  Oh, no.  I was only there the

12   first couple of days and -- well, maybe I guess I do

13   know the result.  I don't know about -- I know they

14   were both found guilty, but I can't tell you about

15   sentencing or anything like that.

16               THE COURT:  Okay.  But you remember the

17   stressfulness of having to testify.

18               JUROR #57:  Oh, I was terrified.

19               THE COURT:  I would be, too.

20               JUROR #57:  I was terrified.  I was 22

21   years old.

22               THE COURT:  That's just a natural human

23   reaction.  I'm terrified up here asking you these

24   questions.

25               As I've said before, I'm going to allow

1    counsel to end up with brief individual voir dire so

2    that they can follow up on any question that they want

3    to, or plug any gaps that may have been left.

4              Has any of you ever served on a jury

5    before?

6              Okay, we see two people in the second

7    row.  Yes, ma'am.

8              JUROR #26:  Juror number 26.  There was

9    an individual who was seeking damages for a slip and

10   fall.

11             THE COURT:  Did the jury reach a verdict

12   or was it settled during the trial?

13             JUROR #26:  We reached a verdict.

14             THE COURT:  For whom did you find?

15             JUROR #26:  We found for the plaintiff,

16   but we only awarded medical bills to be covered and

17   $2,000 in damages, pain and suffering.

18             THE COURT:  Okay, so you --

19             JUROR #26:  It was a minor slip and fall.

20   That's how we found it.

21             THE COURT:  You regarded it as a minor

22   case, and you awarded compensatory damages of about

23   $2,000.

24             JUROR #26:  Yes, sir.

25             THE COURT:  Anyone else?  Your name and

1    juror number, please.

2              JUROR #123:  Juror 123.  I was a juror in

3    a case in court in Manchester concerning someone who

4    was dealing in stolen cars, and we went to jury, a

5    trial, and he was found guilty.

6              THE COURT:  Okay.  This was a criminal

7    case?

8              JUROR #123:  Yes.

9              THE COURT:  Kind of getting back to the

10   issues involving employment, is there anyone among you

11   who has ever felt that your employer gave you an

12   unfair or unjust criticism or evaluation, someone that

13   was just not fair, in your opinion?

14             Okay.  The record should indicate no

15   response.

16             Is there anyone among you who has been

17   forced to retire at a certain age?

18             The record should indicate no response.

19             Is there anyone among you who has a

20   family member who has been forced to retire at an

21   early age?  Or forced to retire at a certain age?

22             Okay.  The record should indicate no

23   response.

24             Is there anyone among you who feels that

25   he or she has been the victim of workplace

31

1    discrimination?

2              The record should indicate there's no

3    response.

4              Is there anyone among you who has ever

5    been accused of workplace discrimination?

6              The record should indicate no response.

7              Is there any one of who you has acted at

8    one time or another as a supervisor or an employer?

9              We'll start with the back row.  Yes,

10   ma'am, your name and juror number.

11             JUROR #19:                , number 19.  I

12   am a supervisor currently for CT Works in Enfield.

13             THE COURT:  And how many people do you

14   supervise?

15             JUROR #19:  Seven.

16             THE COURT:  Yes, sir.

17             JUROR #63:  Juror 63.  I work as a

18   lifeguard supervisor, both in Connecticut and Georgia.

19             THE COURT:  As a lifeguard supervisor?

20             JUROR #63:  Yes, sir.

21             THE COURT:  Anyone else?

22             JUROR #95:  95.  I am a supervisor at a

23   consulting firm up in Windsor.

24             THE COURT:  Okay.  Thank you.  Anyone

25   else in the top row?

```
 1                    Second row, anybody been an employer or
 2    supervisor?  Yes, ma'am, first one.
 3                    JUROR #60:  Juror number 60.  I for years
 4    have worked for various employers as a supervisor.
 5    I'm a management accountant, management accounting
 6    team.
 7                    THE COURT:  Thank you.  Yes, ma'am.
 8                    JUROR #26:  Juror number 26.  I was a
 9    supervisor in the U.S. Air Force.
10                    THE COURT:  Okay, thank you.
11                    Yes, ma'am.
12                    JUROR #69:  Juror number 69.  I own a
13    small business and we have anywhere from seven to 30
14    people employed.
15                    THE COURT:  Oh, my gosh.  And that
16    business is here in Connecticut?
17                    JUROR #69:  Yes, sir.  It's in East
18    Hartford, Granny's Pie Factory.  I myself am Granny.
19                    THE COURT:  I'm not going there.
20                    Yes, ma'am, at the end.
21                    JUROR #123:  Juror 123.  I worked as a
22    nursing supervisor at St. Francis Hospital.  I am now
23    retired.
24                    THE COURT:  Okay, thank you.
25                    Yes, sir, I think the first gentleman
```

1    here.

2                    JUROR #24:  Director at Lincoln

3    Financial, estate filing and compliance.  Juror 24.

4                    THE COURT:  Yes, ma'am.

5                    JUROR #57:  Juror 57.  I hold two jobs

6    but one of them with the City of Bristol.  I'm a

7    lifeguard supervisor.  All year long.

8                    THE COURT:  And how many people do you

9    supervise?

10                   JUROR #57:  It depends on the time of

11   year.  At this time at the indoor pool there's

12   approximately 30, and that swells into summer in the

13   outdoor pools to about 70.

14                   THE COURT:  Where are these pools

15   located?

16                   JUROR #57:  There's three in Bristol.

17                   THE COURT:  In Bristol?

18                   JUROR #57:  Yes.

19                   THE COURT:  Okay, thank you.

20                   Yes, ma'am.

21                   JUROR #10:  Juror number 10.  I'm

22   currently a store manager for a boutique, and I manage

23   about five people.  Previously I have managed about

24   ten in a previous job.

25                   THE COURT:  Okay.  Thank you, ma'am.

1               Yes, sir.

2               JUROR #50:  Number 50.  I have two

3     attorneys reporting to me at Pratt & Whitney.

4               THE COURT:  Thank you.

5               JUROR #67:  Juror number 67.  I work for

6     an owner of apartment complexes, manage maintenance.

7               THE COURT:  Where are the apartment

8     complexes in?

9               JUROR #67:  I'm currently in Connecticut,

10    but I was up in Massachusetts.

11              THE COURT:  Is there any one of you who

12    has had the occasion to discharge and/or discipline an

13    employee?

14              We'll start in the back row.

15              JUROR #19:  Juror 19.  I was involved in

16    a discharge of an employee.

17              THE COURT:  Were you in favor of the

18    discharge?

19              JUROR #19:  Yes.

20              THE COURT:  You were?

21              JUROR #19:  Yes.

22              THE COURT:  Anyone else in the top row?

23              We'll go to the second row.  Yes, ma'am.

24              JUROR #60:  Juror number 60.  I have

25    participated in the discharge of an employee while not

1    actively discharging them, left that to the personnel

2    department.

3                THE COURT:  Part of the process.

4                JUROR #60:  Yes.

5                JUROR #26:  Number 26.  And I had to

6    discharge an airman who was a drug abuser.

7                THE COURT:  I'm sorry, I didn't get that.

8                JUROR #26:  I had to discharge an airman

9    who was a drug abuser.

10               THE COURT:  Are you actually in the Air

11   Force?

12               JUROR #26:  No, I'm not anymore.

13               THE COURT:  You were?

14               JUROR #26:  I was, for ten years.

15               THE COURT:  Wow.  Enlisted or officer?

16               JUROR #26:  Enlisted.

17               THE COURT:  What grade were you when you

18   were discharged?

19               JUROR #26:  I was a staff sergeant when I

20   got out.

21               THE COURT:  That's good.  How long were

22   you in?

23               JUROR #26:  Ten years.

24               THE COURT:  Ten years.  Okay, thank you.

25               Yes, ma'am.

1                    JUROR #69:  Juror number 69.  I work as a

2    nurse also, and I was involved as a charge nurse, in

3    speaking to somebody about practicing out of their

4    scope of practice, which led to disciplinary action.

5    And as a business owner I had to -- I was involved in

6    the process of discharging someone.

7                    THE COURT:  Okay, thank you.

8                    We'll go to the first row.  Yes, ma'am.

9                    JUROR #57:  57.  As part of our duties I

10   have been involved with the termination of a couple

11   of -- well, three employees.

12                   THE COURT:  Okay, thank you.

13                   JUROR #10:  I have terminated an

14   employee.

15                   THE COURT:  You have terminated an

16   employee?

17                   JUROR #10:  Yes.

18                   THE COURT:  That's at the boutique?

19                   JUROR #10:  At a prior retailer,

20   department store.

21                   THE COURT:  Anyone else in the first row?

22                   Yes, sir.

23                   JUROR #67:  Juror number 67.  I've been

24   involved in numerous dismissals for non-performance.

25                   THE COURT:  Okay.

1                    Has any one of you ever been involved in

2          the investigation of an employee's complaint of

3          discrimination?

4                    Second row.

5                    JUROR #69:  Juror number 69.  In the

6          business about a year or so ago an employee brought a

7          complaint of sexual harassment, so I investigated

8          that, and it ended up resolved to this person's

9          satisfaction.

10                   THE COURT:  Okay.  So you participated in

11         an investigation in an attempt to see if the problem

12         could be resolved?

13                   JUROR #69:  Yes, sir.

14                   THE COURT:  And it couldn't be resolved.

15                   JUROR #69:  We made changes to our

16         visitation policy.  She claimed that a visitor

17         sexually harassed her, coming into the shop, so we

18         made changes to that particular policy, and I followed

19         up with her, and she in writing said that the

20         situation was handled to her satisfaction, and that

21         was the end of the discrimination suit.

22                   THE COURT:  So you were part of the team

23         that investigated an allegation.

24                   JUROR #69:  Yes, sir.

25                   THE COURT:  Of illegal discrimination.

```
 1                    JUROR #69:  Yes, sir.

 2                    THE COURT:  And you investigated this

 3        matter along with others to try to see if you could

 4        resolve the problem.

 5                    JUROR #69:  Yes, sir.

 6                    THE COURT:  And you were able to resolve

 7        it.

 8                    JUROR #69:  Yes.

 9                    THE COURT:  Anyone else?

10                    Okay.  Now, this is kind of a

11        hypothetical question, but if an employee is

12        performing a job, and doing so successfully, is there

13        anyone among you who believes that the employee should

14        be able to decide when to retire, regardless of age?

15                    Okay, we got the fourth row back here.

16                    JUROR #59:  I believe that you should be

17        able to choose when you want to retire.  Number 59.

18                    THE COURT:  I got the first part, I got

19        the number, I got the "I believe that," but what do

20        you believe?

21                    JUROR #59:  You should choose when you

22        want to be able to retire.

23                    THE COURT:  So you agree with me.  Let me

24        spin this question around here for a minute.  If a

25        person is doing a good job, is there anybody who
```

1     believes that he should not be permitted to work as

2     long as he's able to do that job?

3             Okay.  I think the question was clear,

4     and I infer from the fact that there are no responses

5     to that, that it's the opinion of the jury panel that

6     if a person is doing a good job, a necessary job, a

7     good job, is performing his functions, then he should

8     not be forced to retire because of his age.

9             Okay.  As reformulated by me, the record

10    should indicate that every juror has indicated

11    agreement that a person who's doing a good job at a

12    necessary job should be able to work and should not be

13    subject to a mandatory retirement age.

14            Now, is there anyone among you who has

15    worked for an employer for more than 20 years?

16            Yes, ma'am

17            JUROR #5:  Juror number 5.

18            THE COURT:  For whom have you worked for

19    more than 20 years?

20            JUROR #5:  Light Mills Company in

21    Southington, Connecticut.

22            THE COURT:  How long?

23            JUROR #5:  34.

24            THE COURT:  34.  My gosh.  I've been a

25    judge for 34 years.  We could have started together.

1              Yes, ma'am

2              JUROR #28:  28 number.  I was a crossing

3    guard for the City of Bristol for 30 years.

4              THE COURT:  30 years?

5              JUROR #28:  Yes.

6              THE COURT:  Congratulations.

7              JUROR #28:  Thank you.

8              THE COURT:  All of those little kids got

9    across the street safely because of you.  That's good.

10   That's something to be proud of.

11             Anybody else?  Second row, no more.  Oh,

12   yes.

13             JUROR #123:  Juror 123.  I worked at St.

14   Francis for a total of probably 36 to 40 years.  I

15   lost count.

16             THE COURT:  Okay.  There's no one else.

17             Yes, sir.  I'm sorry.

18             JUROR #7:              , number 7.  Worked

19   for Kimberly Clark Corporation, been employed for over

20   21 years.

21             THE COURT:  Very good.  You're a young

22   man.

23             Has anyone among you ever had

24   discrimination -- I'm sorry.  Is there anyone among

25   you who has ever had diversity or discrimination

1    training?

2              Okay, we'll go up to the first row.

3              JUROR #19:  Juror number 19.  I have that

4    training in my current position.

5              JUROR #95:  95.  Last time was probably

6    20 or so years ago, but yes, I have.

7              THE COURT:  Discrimination,

8    anti-discrimination training?  Okay.  Next?  Yes,

9    ma'am.

10             JUROR #59:  59.  I've had discrimination

11   training in my current job now.

12             THE COURT:  Yes, ma'am.

13             JUROR #60:  Juror 60.  I have had both

14   anti-harassment and discrimination training with the

15   management team of my employer.

16             THE COURT:  Anyone else in the second

17   row?  Yes, ma'am.

18             JUROR #26:  26.  I've had training and

19   I've actually conducted training.

20             THE COURT:  Okay.  So you train and

21   you've been a trainer.

22             JUROR #26:  Yes, sir.

23             THE COURT:  Have you given training on

24   age discrimination, for example, for anti-age

25   discrimination?

1                JUROR #26:  Yes, I have.

2                THE COURT:  So you've covered the whole

3     spectrum.

4                JUROR #26:  Yes, Your Honor.

5                THE COURT:  Okay, thank you.

6                Yes, ma'am.

7                JUROR #69:  Juror 69.  As part of our

8     yearly competencies at St. Francis we have a diversity

9     training.

10               JUROR #123:  Juror 123.  Part of our

11    mandatory at the hospital is anti-discrimination.

12               THE COURT:  So you participated in that.

13               JUROR #123:  Yes.

14               THE COURT:  Okay.  Yes, sir.

15               JUROR #24:  24.  We have a program in

16    place at the company annually.

17               THE COURT:  Yes, ma'am.

18               JUROR #57:  Number 57.  In both my jobs

19    it's required as an OSHA consultant I do a lot of HR

20    work, we do discrimination classes and training and

21    everything, and as a lifeguard supervisor it's up to

22    me to present that to them.

23               JUROR #113:  113.  As part of my function

24    at work I have to participate in training for

25    harassment, discrimination.

1                    THE COURT:  Thank you.  Yes, ma'am.

2                    JUROR #10:  Working at different various

3    retailers I've received diversity training probably

4    most everywhere.

5                    THE COURT:  Yes, sir.

6                    JUROR #7:  Juror 7.  Not sure if it's

7    annual, I believe it is, but harassment,

8    discrimination and code of conduct training through my

9    company.

10                   THE COURT:  Yes, sir.

11                   JUROR #98:  Number 98.  Yearly mandatory

12   training for discrimination and harassment.

13                   THE COURT:  Yes, sir.

14                   JUROR #50:  Juror 50.  UTC has all sorts

15   of training including harassment, discrimination.

16                   THE COURT:  Yes, sir.

17                   JUROR #67:  Juror 67.  We undergo it

18   every year as part of our yearly training.

19                   THE COURT:  Okay.  Thank you.

20                   Is there any -- probably asked this.  Is

21   there anyone among you who has had military service?

22   Second row.

23                   JUROR #26:  Number 26.

24                   THE COURT:  Air force?

25                   JUROR #26:  I was in the Air Force, yes,

1    sir.

2              THE COURT:  Is there anyone among you who

3    is a member of a labor union?  Number 26.

4              JUROR #26:  I work for the State of

5    Connecticut and I'm part of the union.

6              THE COURT:  Is there anyone among you who

7    has ever had a really serious dispute with his or her

8    employer?

9              Yes, sir.

10             JUROR #63:  Juror number 63.

11             THE COURT:  Who was the employer?

12             JUROR #63:  Energy Connection LLC of

13   Canton, Connecticut.  The conflict that I had with

14   them was that I was not registered for my electrical

15   apprenticeship and I lost hours towards my

16   apprenticeship, so I left the company, and there was a

17   conflict between myself and the employer over

18   unemployment benefits.

19             THE COURT:  Anybody else?

20             Okay.  The record should indicate there's

21   no response.

22             Is there anyone among you who believes

23   that are there any circumstances where it is

24   appropriate to treat an employee differently solely

25   because of that employee's age?

1                    Okay.  The record should indicate no

2       response.

3                    Is there anyone among you who believes

4       there are just too many laws which protect employees

5       from unfair treatment by employers?

6                    The record should indicate no response.

7                    Is there anyone among you who believes

8       that too much time or effort is spent on considering

9       and guarding against age discrimination in the

10      workplace?

11                   The record should indicate there's no

12      response.

13                   Is there anyone among you who believes

14      that people should not bring complaints of

15      discrimination against their employers?

16                   Is there anyone among you who thinks that

17      claims for age discrimination are made too frequently?

18                   The record should indicate no response

19      again.

20                   Is there anyone among you who believes

21      that there should be a cap, that is a limit, on the

22      amount of damages that can be awarded in an age

23      discrimination case?

24                   The record should indicate no response.

25                   Okay.  Now, do you realize that if you

1    are selected as a juror, you have an absolute duty, a

2    sworn duty, to keep an open mind in this case until

3    you have heard all of the evidence, all of the closing

4    arguments, and the Court's instructions to you on the

5    law?  In other words, you've got to keep an open mind.

6    You got two sides here, each one of which is looking

7    to you for fairness, and you can't pre-judge.  You

8    have to wait until you hear all the testimony, you see

9    or otherwise examine any exhibits that are introduced,

10   you hear the lawyers make their closing arguments, and

11   you hear the Court's jury instructions.  You can't

12   even begin to deliberate until you've heard all of

13   those things and then you're sent to the jury room and

14   told okay, please select a foreperson, and begin your

15   deliberations.  You all understand that?  Anyone not

16   understand that?

17            Okay.  Is there anyone who can think of

18   anything that might prevent you from being completely

19   fair to both sides in this case?

20            Yes, sir.

21            JUROR #95:  95.

22            THE COURT:  Okay.  Thank you, sir.

23   Anyone else?

24            Does anyone not understand that a company

25   such as IBM, in fact in this case IBM, is entitled to

1    the same fair and impartial treatment as any other

2    party to a lawsuit?

3                The record should indicate that the

4    jurors have acknowledged that they understand this.

5                Is there anyone among you who holds any

6    views, one way or another, concerning employment laws

7    prohibiting unlawful discrimination that would make it

8    difficult for you to decide this case and the facts in

9    this case fairly and impartially?

10                The record should indicate no response.

11                Is there anyone among you who believes

12    that just because an employer -- or excuse me.  Is

13    there anyone among you who believes that just because

14    an employee has been with a particular employer for a

15    long period of time, that employee is basically immune

16    from being terminated for legitimate reasons?

17                The record should indicate that no one

18    holds such a belief.

19                Now, if during the course of this a

20    witness said something or a lawyer asked a question

21    and the Court for one reason or another as a legal

22    matter sustained, that is upheld, an objection to that

23    question, and said ladies and gentlemen, I instruct

24    you, you have to disregard that answer, is there

25    anyone who would have a problem following my

1    instructions?

2              Remember, you're going to be sworn to

3    apply the law that I give you and to follow the law.

4    You're not going to be able to fashion your own law,

5    but you're going to be required to apply the law that

6    I give you and obey the law that I give you, and if I

7    told you, ladies and gentlemen, please disregard that

8    answer, would you be able to just disregard it?

9              You'll able to take notes.  Each one of

10   you will have a notepad and somebody could write down

11   disregard, or if you had written something, you cross

12   it out, but the important thing is, if I tell you that

13   you must disregard something, you really must

14   disregard it.  Everyone understand that?

15             The record should indicate that every

16   juror has indicated his or her understanding.

17             Now, would any of you have reluctance

18   about returning a verdict for a substantial sum of

19   money if you believed that the Plaintiff established a

20   case for age discrimination?

21             The record should indicate no response.

22             Do any of you -- suppose it's better to

23   ask this the other way.  Do you believe that a person

24   can't suffer emotionally as a result of

25   discrimination?

1                THE COURT:  Yes, ma'am.

2                JUROR #59:  59.  Yes, I believe.

3                THE COURT:  Appears to me that every

4    juror has nodded his or her head in agreement with the

5    fact or in agreement with the position that somebody

6    can indeed suffer emotionally as a result of

7    discrimination.

8                Do you believe that a person who has

9    suffered emotional discrimination may be entitled to

10   compensatory damages as a result of that

11   discrimination?

12               Okay.  The record should indicate all

13   jurors are in agreement.

14               Now, before I turn this over to counsel

15   for a brief individual voir dire I just want to ask

16   one more time, based on what you know so far and what

17   you've said so far, is there anything that would cause

18   you to believe that you couldn't be fair in this case?

19               The record should reflect that there is

20   no response.

21               Several members of the prospective panel

22   have shaken her heads indicating that they hold no

23   such feelings.

24               I've already had the lawyers introduce

25   themselves and their law firms, identify to you the

1    parties and witnesses, and I have conducted a voir

2    dire which is an amalgamation of the questions that

3    counsel have asked me to ask.  I will now turn this

4    over to counsel to permit the lawyer for each side to

5    conduct a brief individual voir dire and follow up on

6    any things that I forgot to ask or any questions that

7    counsel thinks should be followed up on.

8              So Mr. Carta, with that please go ahead.

9              MR. CARTA:  Now, then, my name is Mark

10   Carta.  I represent the Plaintiff, James Castelluccio,

11   in this matter.

12             Your Honor, I'm very pleased with the

13   questioning, and I just have a couple of very brief

14   points that I want to ask.

15             Juror number 95, you indicated that you

16   had some feelings about IBM, and you didn't articulate

17   what those were.  Were those also the feelings that

18   you said you thought might influence your ability to

19   be fair, and can you just explain what that is, sir?

20             JUROR #95:  Our unit had been purchased

21   by IBM.  It was 2002.  I was part of a three-person

22   negotiation team that IBM was attempting to sell our

23   unit.  My dealings with personnel at IBM didn't go too

24   favorably.  We had many contentious moments.  Our unit

25   was sold off, and May 1st of 2003 I was no longer...

1                    MR. CARTA:  And do you think if the Judge

2      directs you to be objective and listen to the

3      testimony that's going to be given here today or over

4      the course of the next two weeks, that you would be

5      unable to let your past experience be put aside and

6      you wouldn't be able to be fair to IBM?

7                    JUROR #95:  I would like to believe I

8      could be, but I guess I can't say that I absolutely

9      could be.

10                   MR. CARTA:  Even if the Judge directed

11     you to listen just to the testimony and make a

12     decision based upon just what you heard here in the

13     courtroom, do you think you could be fair and

14     objective?

15                   JUROR #95:  Yes.

16                   MR. CARTA:  Thank you.

17                   Juror number 123.  You indicated, I

18     believe, that your husband had filed an age

19     discrimination case involving some situation

20     completely different from what we have here, is that

21     right?

22                   JUROR #123:  Yes.

23                   MR. CARTA:  And again, if the Judge

24     directed you to just make your decision based upon

25     what happens here, what happens in the courtroom, the

1    documents and testimony that are here, do you think

2    your prior experience would prevent you from being

3    objective in terms of making a proper decision in this

4    case?

5              JUROR #123:  No.

6              MR. CARTA:  You think you could be

7    objective?

8              JUROR #123:  I do.

9              MR. CARTA:  You seem confident of that.

10   Are you sure?

11             JUROR #123:  I do, yes.

12             MR. CARTA:  Thank you.

13             Juror number 24.  You indicated, I think,

14   that you had some opinion about older employees or

15   that you had some experience -- I wasn't quite sure, I

16   couldn't hear you.  Could you share with us what that

17   opinion was?

18             JUROR #24:  Previous employer, large

19   corporation, I was with them for 14 years, sterling

20   reviews, let go at age 52, was put in outplacement

21   that they provided with 14 other members, ten of which

22   all of them were over 50.  We all had an opinion about

23   that, but never pursued it.

24             MR. CARTA:  So that's your personal

25   experience?

1              JUROR #24:  Yes.

2              MR. CARTA:  Well, let me ask you the same

3    question.  Given the fact that this is a different

4    employer and a different situation, and a different

5    person who's life has been affected, do you think that

6    your prior experience would so taint your judgment

7    that you couldn't be a fair and objective if the Judge

8    asked you to be fair and objective?

9              JUROR #24:  I could be fair and

10   objective.

11             MR. CARTA:  You think you could.  Thank

12   you very much.  Appreciate that.

13             That's all.

14             THE COURT:  Mr. Carta, thank you, sir.

15             Mr. Fasman.

16             MR. FASMAN:  Ladies and gentlemen, thank

17   you.

18             Your Honor, that was -- I can see why the

19   lawyers get just a few minutes for voir dire.  It was

20   very nice.  Thank you.

21             Just a couple of questions.            ,

22   let me just go back to the questions that Mr. Carta

23   asked you.  Are you sure of that?  I mean I just --

24   IBM is here, and it wants a fair and impartial jury,

25   and I heard at least some hesitancy in your voice when

54

1    you answered him about being fair and objective.  If I

2    asked you to tell us the bottom line, is that the

3    bottom line?

4                   JUROR #95:  Yes.

5                   MR. FASMAN:  Okay.  Are any of you

6    members of an advocacy group, Mothers Against Drug

7    Driving, anything along those lines, anything that

8    relates to this?

9                   JUROR #26:  I'm a parent advocate on the

10   Psychotropic Medicine Committee at DCF.

11                  MR. FASMAN:  Anybody else?  Okay.

12                  According to the law, a person who seeks

13   damages in an employment lawsuit in a termination case

14   has an obligation to do everything reasonably possible

15   to find another job to reduce his damages.  Does that

16   rule sound fair to you?  Is that a rule that you think

17   you could apply?  Anybody here have any problem with

18   applying that rule?  No?  All right.

19                  19, you mentioned your husband's lawsuit

20   against American Airlines

21                  JUROR #19:  That's correct.

22                  MR. FASMAN:  I was also having trouble

23   hearing back there, too.  It's a big courtroom.  I

24   didn't understand the details of that.  What were the

25   details of that?  What was it?  What was it about?

```
 1                    JUROR #19:  Back in 2008, and he was
 2     injured, and upon his return they asked him to take a
 3     program that never even existed in the company, or
 4     else he would be terminated.
 5                    MR. FASMAN:  And what was the outcome?
 6                    JUROR #19:  American Airlines went
 7     bankrupt and the outcome is nothing.
 8                    MR. FASMAN:  Is that going to affect you
 9     one way or the other in this case?
10                    JUROR #19:  No.
11                    MR. FASMAN:  No?
12                    Let me ask all of you, if you were a
13     party in this case expecting a fair trial, would you
14     be willing to have a juror with your frame of mind sit
15     on that jury, on the jury?  Anyone say no?  Okay.
16                    Judge, that's all I have.  Thank you
17                    THE COURT:  Thank you, Mr. Fasman.
18                    MR. FASMAN:  Thank you.
19                    THE COURT:  I'll allow the lawyers a
20     couple of minutes to caucus before I ask them to
21     approach the bench, and while you're caucusing among
22     yourselves I'll just tell you that during the trial
23     from time to time a question may come up, and counsel
24     may ask to approach the bench, or I might ask the
25     lawyers to come up to the bench so we can discuss
```

1    something.  We don't mean to be rude to you.  It's the

2    last thing we mean.  But what we're doing is we're

3    dealing with certain legal questions that I have to

4    decide, and the lawyers have to make their legal

5    arguments, and we don't want to put before you things

6    that really don't have to be before you.

7              In this case I'm the judge of the law,

8    you are the judges of the facts, and at the

9    appropriate time I'll instruct you on the law, and

10   then you will take those instructions -- you'll have a

11   copy of those instruction, you'll take them in with

12   you to the jury room, and you can read them over or

13   refer to them or parts of them at any time you want

14   when you're deliberating, and you're the ones who are

15   charged with the responsibility of deciding the facts.

16             Now, have counsel had enough time to meet

17   with me and the clerk up here, or would you like a

18   couple more minutes?

19             MR. FASMAN:  Couple more minutes, please,

20   Your Honor.  Thank you.

21             THE COURT:  Let me just continue on with

22   my -- I want you to be comfortable.  I want you to be

23   relaxed.  I don't like waiting, and because of that I

24   don't like to keep people waiting.  I really don't.

25   There will be times during this case where you think

1    oh, boy, we're going to start at exactly 10 o'clock,

2    or we're going to start at 9:30, and you don't start

3    exactly when we said we're going to start.

4              Usually that's due to conversations that

5    I've had with the lawyers on both sides about whether

6    there are steps we can take to shorten the proceedings

7    or to expedite the proceedings, and I found in my

8    experience that by having these conversations with the

9    lawyers, a lot of times we're able to contract what

10   was thought to be a much longer case into a smaller

11   one.

12             So if you're waiting, we keep you

13   waiting, please do not think that it's because I don't

14   value your time.  I do.  If I do keep you waiting, it

15   will be because I have something else that I have to

16   do which is designed to make your job easier and

17   quicker.

18             We're fortunate this is not my criminal

19   month, so I won't have interruptions all day long.

20   It's difficult to conduct a trial, at least it is for

21   me, when it's my criminal month, because people are

22   brought in before the Court for various offenses and

23   they have to be advised of their rights at that

24   particular point, we have to be hooked up with

25   counsel, and so I mean that's an interruption, but

1    this is not my criminal month, so that should go

2    smoothly.  And I have tried to clear my calendar up of

3    mostly everything else that I have to do.

4              Mr. Carta, Mr. Fasman, are you gentlemen

5    ready?  Please approach the bench.

6              (Conference held at sidebar)

7              MR. CARTA:  I think that the college

8    student, juror 59, she's indicated she doesn't think

9    she can take the time.

10             MR. FASMAN:  I agree.

11             THE CLERK:  15?

12             THE COURT:  Yes.

13             MR. FASMAN:  What about the fellow that

14   owns IBM stock?

15             MR. CARTA:  Yes.

16             MR. FASMAN:  We have to strike him.

17   That's 367.

18             MR. DUFFIELD:  Also juror 28 said that

19   she was the sole provider for her family.

20             MR. CARTA:  The attorney negotiating the

21   deal with IBM.

22             THE COURT:  That's trouble.  I think

23   that's trouble.

24             MR. FASMAN:  I don't think that's cause,

25   either.

1                THE COURT:  I do.

2                MR. FASMAN:  Did you strike him, Judge?

3                THE COURT:  Yes.

4                MR. CARTA:  That's all I have for cause.

5                MR. FASMAN:  Despite what you just said,

6        I still would strike the fellow in the last row who's

7        obviously had a bad employment experience with IBM, a

8        bad experience with IBM.  I know he said he could be

9        fair and impartial.  I think that that's --

10                THE COURT:  I agree.

11                MR. DUFFIELD:  95.

12                THE COURT:  Gentlemen, you got to be

13       careful now, because we're down to 13, and we need

14       eight, and it's going to be the first eight on the

15       list.  So personally, I don't think I've ever seen a

16       more acceptable panel.

17                MR. FASMAN:  Yeah, they're pretty good.

18                THE COURT:  They all seem okay except for

19       the ones we identified.

20                THE CLERK:  So are we going to do

21       challenges now?

22                THE COURT:  Yes.

23                MR. CARTA:  Can you review for a moment

24       which ones have been stricken?

25                THE CLERK:  Number 15 excused for cause.

1    Number 59.  Number 367 excused for cause.  Number 28

2    excused for cause.  And number 50 excused for cause.

3              MR. CARTA:  So you want to know who we

4    exercise on the first eight as peremptory challenges?

5              MR. FASMAN:  One at time?

6              THE CLERK:  Right.

7              MR. CARTA:  Juror 60.

8              MR. FASMAN:  And we'll strike number 63

9    on the list.

10             MR. CARTA:  Juror 26, number 12 on the

11   list.

12             MR. FASMAN:  We would like to strike

13   number 54 on the list.

14             MR. CARTA:  Strike juror 69, number 13 on

15   the list.

16             MR. FASMAN:  We'll strike number 123.

17             THE CLERK:  Before I read these, juror

18   number 1 is juror number 90, juror number 2 is juror

19   number 19, juror number 3 is juror number 68, juror

20   number 4 is juror number 5, juror number 6 is

21

22             MR. DUFFIELD:  I thought he was stricken.

23             MR. FASMAN:  I thought he was stricken.

24   I thought we struck this fellow on the end who had to

25   come up with an opinion about how employers deal with

```
 1    older workers based on his prior experience, I thought
 2    you said he was stricken.  Can I call one other
 3    strike?
 4              THE COURT:  Zack, there was a witness --
 5    you think that there was a witness who answered that
 6    older people could be treated differently by
 7    employers?
 8              MR. FASMAN:  No, I thought that he said
 9    that he thought that corporations treat older workers
10    improperly based on his prior experience.
11              THE COURT:  Somebody in this courtroom
12    said that?
13              MR. CARTA:  I didn't hear that.
14              THE COURT:  I didn't hear that.
15              MR. FASMAN:  He did answer your question
16    that way, Judge.
17              THE COURT:  There was one question.
18              MR. FASMAN:  Then he talked about the
19    fact that he'd been laid off by a prior employer after
20    14 years and had been forced into an untenable
21    situation.
22              MR. CARTA:  And I thought I asked him
23    about his judgment and he said he could be objective
24    if directed to do so.  He's the gentleman in the front
25    row on the far left.
```

```
 1                    THE COURT:  This is an otherwise
 2    acceptable jury to everyone?  Can you work with this?
 3    I mean if you strike this man?  I want to make sure we
 4    have enough.
 5                    MR. CARTA:  Let me see if we can work it
 6    out.  Just a second, please.
 7                    MR. FASMAN:  I think I have to strike him
 8    for cause then.
 9                    THE CLERK:  Which one, sir?
10                    MR. FASMAN:  If he's not struck.
11                    THE CLERK:  Number 24?
12                    MR. FASMAN:  24, yes.  I take one back.
13                    THE CLERK:  Okay.  So you're striking
14    this one.  Which one are you taking back?
15                    MR. FASMAN:  123.  Right above it.
16                    THE CLERK:  We'll start again.  Juror
17    number 1 is       Juror number 2 is       Juror
18    number 3 is   .  Juror number 4 is   .  Juror
19    number 5 is   .  Juror number 6 would be      .
20    Juror number 7 would be      .  Juror number 8 would be
21         .
22                    MR. FASMAN:  Yes.
23                    THE CLERK:  Let's go over it one more
24    time.  Juror number 1 is       Juror number 2 is
25            Juror number 3 is     .  Juror number 4 is
```

```
 1            .  Juror number 5 is     .  Juror number 6 is

 2            .  Juror number 7 is     .  Juror number 8 is

 3

 4                   THE COURT:  All set?

 5                   MR. FASMAN:  Yes.

 6                   THE COURT:  All set, Mark?

 7                   MR. CARTA:  Yes.

 8              (Conference concluded at sidebar)

 9                   THE COURT:  All right.  Are counsel

10     satisfied with the jury?

11                   MR. CARTA:  Yes, Your Honor.

12                   MR. FASMAN:  Yes, Your Honor.

13                   THE COURT:  And are counsel satisfied

14     with the jury selection process and the voir dires?

15     Anything that the parties would like me to do along

16     those lines?

17                   MR. CARTA:  Absolutely, Your Honor.

18                   MR. FASMAN:  We're absolutely happy, Your

19     Honor.  Thank you.

20                   THE COURT:  Okay.  Madam clerk, would you

21     please read the names of the jurors.

22                   THE CLERK:  When I read your number

23     please stand.  Juror number 90, juror number 19, juror

24     number 68, juror number 5, juror number 123, juror

25     number 57, juror number 113, and juror number 10.
```

```
 1              THE COURT:  Okay.  Those of you who are
 2   standing have been selected as the jurors in this
 3   case.  And don't go anywhere.  Those of you who have
 4   not been selected, those of you who came in, I thank
 5   you for participating in this process.  Even though
 6   you weren't selected you enabled us to do what we have
 7   to do to select the jury.  We have a good jury in this
 8   case.  Those of you who are not standing, with my
 9   thanks, are excused.
10              (Jury panel excused)
11              THE COURT:  Now, we have to do some
12   paperwork, the clerk has to do some paperwork getting
13   things in order, and counsel and I have to discuss
14   some legal points.  So we're going to have to ask you
15   to go into the jury room and probably wait for us 15
16   minutes.  However, the good news is, there's coffee in
17   the jury room, and, even better, there are chocolate
18   chip cookies.  There's a bathroom in there.
19              So if you'd like to go into the jury room
20   and adjust yourselves and get the memo pads and that
21   sort of thing, we'll be calling you back in, and at
22   that point I'm going to give you some very preliminary
23   instructions about what to do.  Then after I do that
24   I'm going to allow counsel, if they want to, to make
25   brief opening statements.  Have counsel decided on
```

1    that issue?

2                 MR. CARTA:  Yes, Your Honor.  We intend

3    to do so.

4                 MR. FASMAN:  Yes, and we do too, Your

5    Honor.

6                 THE COURT:  Okay.  So counsel are going

7    to make brief opening statements.  Then when they

8    finish making those statements I'm going to say, Mr.

9    Carta, call your first witness.  Then the witness will

10   come to the witness stand and the trial will be begun.

11   Of course then you'll be sworn in, a jurors' oath

12   before we begin the trial, but for now, just go in.  I

13   can actually attest that the coffee is much better

14   here and now than it was in 1968.  Much better.  And

15   you can drink as much as you want.  And I hope the

16   budget can give you enough chocolate chip cookies for

17   these good people.  Okay, folks.  You may follow the

18   clerk.

19                 (Jurors excused)

20                 THE COURT:  So be comfortable.  When Ms.

21   Sunbury has done all of the forms that need to be

22   filled out and the paperwork that's necessary, we'll

23   get the jury back in here.  Don't let me forget to

24   swear the jury in.

25                 MR. CARTA:  May I have a men's break?

```
 1              THE COURT:  I'm going to go and recess
 2    until Barbara calls me.
 3              MR. CARTA:  Okay.
 4              THE COURT:  Okay.  Good job, gentlemen,
 5    very good job.
 6              MR. CARTA:  Thank you.
 7              MR. FASMAN:  Thank you, Your Honor.
 8              THE COURT:  It was suggested to me that
 9    maybe it would make sense to send the jury to lunch,
10    and they come back about 1 o'clock, 1:05, somewhere in
11    there.  They will have full stomachs and they'll be
12    ready to go.  If you want to get something, you can
13    get something to eat as well.
14              MR. FASMAN:  Whatever's good, Your Honor.
15    That's fine with us, sure.
16              THE COURT:  Remember, tell them not to
17    talk to anybody about the case, and they're not to
18    talk among themselves about the case.
19              THE CLERK:  Yes.
20         (Recess taken from 12:18 p.m. to 1:28 p.m.)
21              THE COURT:  Anything else to take up, or
22    can we call the jury in?  Fine.
23                   (Jurors present)
24              THE COURT:  Well, welcome back, ladies
25    and gentlemen.  I don't know who suggested it, but it
```

1    was one of these bright thoughtful individuals out

2    here that suggested while we take up these legal

3    matters we have to take up, would it make sense to let

4    the jury go to lunch and then come back, and I

5    scratched my head and said hey, that makes really good

6    sense, and so we got word to you.

7              Chocolate chip cookies in there?

8              A JUROR:  We're saving some for the

9    afternoon.

10             THE COURT:  In case you're wondering,

11   these two handsome young up and coming men are,

12   farthest away on your left, Michael Slitt, and closest

13   to the Court is Jake Pylman.  And each year federal

14   judges get to hire two able lawyers, males and

15   females, to help us out with a lot of the work that

16   the job entails, and I consider myself very fortunate

17   to have them.  So you might see them scurrying around,

18   and I don't want you to have to guess who they are.

19   They're fine lawyers.

20             This is the point where I'm going to be

21   giving you preliminary instructions.  But first you

22   have to be sworn in, so I would ask you to please

23   stand, raise your right hands while the clerk swears

24   you in.

25             (Jurors were sworn by the clerk)

1                THE COURT:  Now, ladies and gentlemen,

2       it's going to be -- I should say ladies and

3       gentleman -- it's going to be your job to decide the

4       facts in this case on the basis of the evidence that's

5       presented before you here in court.  I will instruct

6       you as to the law, and you must apply the law that I

7       give you to the facts as you find them to be.  That's

8       how you will reach your verdict.  In your

9       deliberations you must follow the law that I give you

10      whether you agree with it or not.

11               You must not take anything that I say or

12      do during this trial as indicating what your verdict

13      should be.  Don't be influenced by my taking notes,

14      because my notes may have nothing to do with the

15      matter at hand, and they might have nothing to do even

16      with this case.

17               Now, it's the duty of the Court to

18      sustain or to overrule objections that are made by the

19      attorneys in this case.  You should not hold it

20      against any attorney for objecting, nor should you

21      infer that I have any particular feelings about this

22      case or about the attorney from the way that I rule on

23      the objection.

24               You will decide the facts of this case

25      from the evidence which will be presented here in

1    court.  The evidence in a trial usually consists of

2    the testimony that you hear from the mouths of the

3    witnesses here in court, any documents that are

4    introduced into evidence, and any stipulations or

5    agreements by the lawyers that I instruct you to

6    accept.

7              The following things are not evidence and

8    you should not consider them as evidence in deciding

9    the facts of this case:  The statements and the

10   arguments of the lawyers, the questions and the

11   objections of the attorneys, and anything that I

12   instruct you to disregard, and anything that you may

13   have seen or heard when the court is not in session,

14   even if it's said or done by a party or a witness to

15   this case.

16             Now, there are two kinds of evidence,

17   direct evidence and circumstantial evidence.  Direct

18   evidence is testimony by a witness about what that

19   witness personally saw, heard or did.  Circumstantial

20   evidence, on the other hand, is indirect evidence of

21   one or more facts from which you may infer another

22   fact.

23             If, for example, a witness testified that

24   it's raining outside, that would be direct evidence

25   that it's raining outside.  On the other hand, if a

1   witness testified that people are coming into the

2   courtroom or into the federal building with dripping

3   umbrellas, you would have circumstantial evidence from

4   which you may infer or you may conclude that it's

5   raining outside.

6           Now, you may consider direct and

7   circumstantial evidence in deciding a case.  The law

8   permits you to give equal weight to both, and I

9   instruct you that circumstantial evidence may be just

10   as good and strong as direct evidence.

11           Sometimes I may order the evidence be

12   stricken from the record or that you ignore or

13   disregard the evidence, and that means that when

14   you're deciding the case you should not consider the

15   evidence that I've told you to disregard.  Also,

16   sometimes evidence is admitted for a limited purpose.

17   When I instruct you that evidence has been admitted

18   for a limited purpose, you may consider that evidence

19   only for that limited purpose, and no other.

20           Now, I want to talk to you about burden

21   of proof.  You may be familiar -- you probably are

22   familiar with the burden of proof that applies in a

23   criminal case.  We've all seen television dramas

24   involving crimes and trials before judges, and in

25   those cases the prosecution has the burden of proving

1    its case beyond a reasonable doubt.

2             Now, you should take that concept, beyond

3    a reasonable doubt, that phrase, beyond a reasonable

4    doubt, and just put it completely aside.  That has

5    nothing to do with this kind of case.  This is not a

6    criminal case.  This is a civil case.

7             In a civil case like this one the

8    Plaintiff has the burden of proving the case by what's

9    called a preponderance of evidence.  That means that

10   the Plaintiff has to produce evidence which when

11   considered in light of all the facts leads you to

12   believe that what the Plaintiff claims is more likely

13   true than not.  If the Plaintiff fails to make that

14   burden, then the verdict must be for the Defendant.

15            I'll read that again.  That's very

16   important.

17            Proving a case by a preponderance of

18   evidence means that the Plaintiff has to produce

19   evidence which considered in light of all of the facts

20   leads you to believe that what the Plaintiff claims is

21   more likely true than not.

22            That's the burden that the Plaintiff must

23   carry.  If the Plaintiff fails in this carrying of the

24   burden of proof, then your verdict must be for the

25   Defendant.

1              Now, you should note, or you have noted

2    that the Defendant, IBM, is a corporation.  You should

3    not let -- you cannot let bias or prejudice or

4    sympathy play a part in your deliberations.  Defendant

5    IBM is a corporation.  Corporations are entitled to

6    the same fair trial as a private individual.

7              I'll repeat that.

8              You should not let bias, prejudice or

9    sympathy play a part in your deliberations.  Defendant

10   IBM is a corporation.  Corporations are entitled to

11   the same fair trial as a private individual.

12             Now, from time to time you may hear a

13   lawyer object to a particular question or the

14   introduction of an exhibit into evidence.  If I

15   overrule the evidence, the question may be answered or

16   the exhibit may be received into evidence.  If I

17   sustain the objection, then the question may not be

18   answered at that time, and/or the exhibit cannot be

19   received into evidence at that time.

20             If I sustain an objection to a question

21   or to the admission of an exhibit, you must ignore the

22   question and must not guess as to what the answer to

23   the question might have been.  As already discussed,

24   you must not consider evidence that I've ordered

25   stricken from the record.

1            Now, gentlemen, do we have expert

2    witnesses in this case?

3            MR. CARTA:  Yes, Your Honor.

4            MR. FASMAN:  Yes, we do too, Your Honor.

5            THE COURT:  Okay.  Thank you.

6            Now, when knowledge of technical subject

7    matter may be helpful for the jury, a person who has

8    special knowledge or experience in that technical

9    field is what we call an expert.  An expert is someone

10   who is permitted to state his or her opinion on those

11   technical matters.  However, you are not required to

12   accept that opinion.  As with any other witness, it is

13   up to you to decide whether to rely on it and how much

14   weight, if any, to give the testimony of an expert

15   witness.

16           And of course as with any other witness

17   you may consider any evidence of unbiased, as well as

18   the data, the methodology and the reasons being used

19   in support of that opinion.

20           As jurors you should not begin

21   deliberating or discussing this case among yourselves

22   or discussing the claims or the parties or the

23   witnesses until the trial has concluded and you have

24   been instructed more fully on the law.

25           Second, do not talk with anybody else

```
 1    about this case or talk to anyone who has anything to
 2    do with it until the trial has ended and you've been
 3    discharged as jurors.  Anyone else includes your
 4    family and friends.  Now, of course you can tell your
 5    family and friends that you are a juror in a civil
 6    case in the U.S. District Court, but avoid telling
 7    them anything about the case until you have been
 8    discharged.  This is an instance where it's just
 9    better for you to say to friends and spouses,
10    significant others, I just can't talk about it right
11    now, so let's leave it at that.
12                Next, don't let anyone talk to you about
13    this case.  If somebody should try to talk to you
14    about this case, please report it to me immediately.
15                Do not read or listen to any coverage the
16    media may or may not give to this case.  Do not
17    conduct any research of your own or any investigation
18    of your own.
19                And finally, don't make up your minds
20    about the verdict and what it should be until after
21    you have been more fully instructed on the law and
22    have deliberated with your fellow jurors and have
23    discussed the evidence in the jury room.  Keep an open
24    mind until you reach your decision.
25                You will be permitted to take notes
```

1    during the trial if you wish.  My experience over the

2    years has been some jurors like to take notes, some

3    jurors don't take notes.  If you do keep notes, take

4    notes, bear in mind that those notes that you take are

5    being taken to assist you.  They are not evidence in

6    the case.  Rather, they're to assist you in jogging

7    your memory of what you've seen or what you've heard

8    or what your thoughts are.  But those observations

9    themselves are not evidence in the case.

10              At the end of the day the clerk will

11    collect your notebooks and return them to you the next

12    morning.  When the case is all over, they will be

13    collected by the clerk and destroyed in the normal

14    course of business.

15              Now, at the end of the trial you're going

16    to have to make your decision based on what you recall

17    of the evidence.  You will not have a transcript of

18    the testimony to consult, and it's difficult and

19    time-consuming to locate lengthy testimony in the

20    stenographer's notes, and then have the stenographer

21    read it back.  So I urge you to pay close attention to

22    the testimony as it's being given.  We will have no

23    transcript that you can look at and read, because a

24    transcript is generated at a much later date, if at

25    all.

1           Now, jurors are not permitted to ask

2    questions of the parties, the witnesses or the

3    attorneys.  However, if you can't hear a witness or a

4    lawyer, just raise your hand, let me know, say I can't

5    hear, or speak louder, and we'll be able to deal with

6    it that way.

7           The same is true with respect to the need

8    to take a break for matters of personal convenience.

9    I mean how long can people go without having to

10   stretch?  If you reach a point where someone really

11   needs a break, just give me the time out signal, I'll

12   see it, and we'll take a break.  No one here wants you

13   to be uncomfortable.

14          Now, here's an outline that I try to

15   adhere to in all of my cases.  We'll begin taking

16   testimony at 10 o'clock in the morning, and we'll

17   continue until 11:30 a.m., at which point we take a 15

18   minute break.  We will resume about 11:45 and continue

19   until 1 p.m., at which time we will take a break for

20   lunch.

21          Our lunch break will normally be from 1

22   to 2.  Sometimes we might make it from 12:30 to 1:30,

23   or, you know, it's going to be in that area.  We're

24   going to let a witness finish answering the question.

25   We're not going to curtail a witness's ability to

1    answer a question, if it can be answered relatively

2    quickly, but that's the ballpark.  That's what we're

3    shooting for.

4                    And we are hoping that if we go from 1 to

5    2 for lunch, we'll begin promptly at 2 o'clock, we'll

6    continue until 3:30, at which time we'll take a 15

7    minute break.  Then at quarter to 4 we'll come back

8    and we'll continue until 5 p.m.  The proceedings will

9    end at 5 p.m.  The lawyer may finish asking a question

10   or a witness may finish answering a question, but many

11   of you have childcare concerns, familial

12   responsibilities, and 5:00 p.m. will mark the end of

13   your day.

14                   And tomorrow you will report back to the

15   same room, and you have to be here by 9:45 at the

16   latest.  And we hope that there'll be coffee and some

17   sort of solid refreshment more nutritious than

18   chocolate chip cookies, yet less new industry

19   nutritious than oatmeal.  So you can pretty well count

20   on the day ending at 5 o'clock for you.

21                   I want to say something about the day

22   beginning.  We're going to be beginning to take

23   evidence at 10 o'clock, but don't think that that's

24   when we're starting our day, because we start our day,

25   lawyers start their day, I start my day, much, much,

78

```
 1   much before 10 o'clock.  I have other cases, the
 2   lawyers have work to do in this case, so we are
 3   putting our time to good use.
 4              Now, occasionally during the trial it
 5   might be necessary to take up more lengthy matters, in
 6   which case I may ask you to go back to the jury room
 7   while we discuss these legal issues, and perhaps our
 8   discussion of the legal issues will make the case move
 9   faster and more smoothly.
10              I'm now going to permit counsel to
11   conduct, or to deliver, I should say, opening
12   statements.
13              Mr. Carta, I call on you first, sir.
14              MR. CARTA:  Thank you, Your Honor.
15              Good afternoon.  Mr. Castelluccio and I
16   appreciate your willingness to participate in this
17   trial.  I know that for some of you it's a sacrifice.
18   And we really thank you for that.
19              I'm going to spend the next 15 to 20
20   minutes outlining the key points in our case in the
21   hope of trying to set a general framework for you to
22   understand once you start hearing the evidence.
23              As Judge Smith has already explained,
24   this is an age discrimination lawsuit.  The suit was
25   filed by James Castelluccio against IBM.  It is based
```

1    upon the conduct by a high-ranking executive at IBM,

2    Ms. Collins-Smee.  Ms. Collins-Smee was Mr.

3    Castelluccio's immediate boss.  He worked for her for

4    about 17 months.

5              This is not a simple case.  Civil rights

6    violations such as age discrimination are not obvious.

7    Often age discrimination is only revealed when an

8    employer's conduct is scrutinized over a period of

9    time.  It would be easier if this case were a TV drama

10   and I could tell you, you know, let's look at the

11   videotape or let's go to the definitive DNA test and

12   then we'll know the truth.

13             However, age discrimination is a mental

14   process.  Therefore, determining whether someone's

15   conduct is tainted by an age bias, you have to figure

16   out what was their motive, why did they do what they

17   did.  Sometimes that motive can be seen from their

18   overt conduct; as the Judge said, their direct

19   behavior.

20             More often than not age discrimination is

21   revealed in what a person fails to do.  It is shown by

22   the way a manager treats older employees differently

23   than the way they treat younger employees.

24             Age discrimination can be inferred from

25   the way a manager disregards accepted practices and

1    procedures.  And you'll see IBM has no short list of

2    practices and procedures.

3              Mr. Castelluccio did not and never asked

4    for a guarantee of employment.  What he did expect and

5    what he's legally entitled to is the right to work

6    free from illegal age discrimination.  IBM had a

7    bargain with Mr. Castelluccio.  It got from him a

8    willingness to work 12-hour days, sometimes seven days

9    a week, a commitment that Mr. Castelluccio honored for

10   40 years, a commitment that produced for IBM from Mr.

11   Castelluccio and his team tens of millions of dollars

12   annually, a commitment that Mr. Castelluccio willingly

13   made.  In exchange Mr. Castelluccio was assured that

14   he would be evaluated based upon his performance, not

15   his age.

16             You are likely to hear from IBM about its

17   slogan, "Your career is your responsibility."  You

18   will learn that Mr. Castelluccio had an exceptional

19   career at IBM.  He started at the very bottom, entry

20   level position.  He rose to the level of vice

21   president.  How did he do that?  As a result of

22   talent, hard work, and incredible commitment.

23             In his 40 years at IBM Mr. Castelluccio

24   trusted that he would be judged based upon objective

25   criteria, based upon the merit of his performance.

1   Throughout his career he took responsibility for

2   improving his skills.  He advanced his career by

3   taking on greater and greater jobs with more and more

4   responsibility, and he was fairly rewarded for his

5   work.  That is, until Ms. Collins-Smee became his

6   boss.

7           At one level Mr. Castelluccio's case is

8   about an employee who spent 40 years learning and

9   living by a set of values only to be betrayed,

10  betrayed by Ms. Collins-Smee who never saw beyond the

11  60 year-old vice president she inherited as part of

12  her recent promotion.

13          He was the oldest of eight -- of her

14  eight vice presidents, a lifetime worker who had

15  wanted to continue to work and who doggedly refused to

16  crumble under the pressure of an impossible mountain

17  of work that she had assigned to him, a mountain of

18  work that had already forced into retirement a highly

19  skilled peer.

20          Mr. Castelluccio, if he can be criticized

21  at all, it's over how long it took him to come to

22  realize that Ms. Collins-Smee was playing by an

23  entirely different set of rules.  As IBM will

24  emphasize in its cross-examination, in some ways it is

25  remarkable that it took Mr. Castelluccio as long as it

1    did to realize that he was being treated differently

2    because of his age.  I would submit to you that Mr.

3    Castelluccio's reluctance to realize what was going on

4    is actually evidence of the extent to which he

5    believed IBM would not tolerate age discrimination.

6              Mr. Castelluccio and I are simply asking

7    you to listen carefully, to listen thoughtfully to the

8    evidence.  We will establish through evidence of Ms.

9    Collins-Smee's overt behavior and to what she failed

10   to do that she engaged in a 17-month campaign, a

11   campaign to demoralize, overwork, isolate, and then

12   ultimately to dismiss Mr. Castelluccio.

13             Mr. Castelluccio will testify about the

14   overt acts Ms. Collins-Smee -- that demonstrated her

15   age bias.  He will tell about how she began to ask him

16   in their very first face-to-face meeting, she began to

17   ask him his age, and then she caught herself

18   mid-sentence and said, oh, and then she answered her

19   question, oh, you're old enough to bridge to

20   retirement, right?

21             Although Mr. Castelluccio was eligible to

22   retire at 60, Ms. Collins-Smee admits that he told her

23   that he had no interest whatsoever in retiring.  He

24   felt that he was on the top of his game, and he wanted

25   to continue to work at IBM.  He liked it there.  It

1    was his life.

2              Nevertheless, Mr. Castelluccio will tell

3    you how Ms. Collins-Smee unilaterally raised the

4    question of his retirement on two more occasions in

5    the brief 17-month period she worked -- he worked for

6    her.

7              Another overt act of Ms. Collins-Smee

8    that reveals her age bias is her assignment of him to

9    one of the most troubled contracts in IBM's entire

10   outsourcing business.  The contract was between IBM

11   and a large healthcare company known as Wellpoint.

12   You'll hear a lot about Wellpoint.

13             Ms. Collins-Smee is likely to tell you

14   that she assigned Mr. Castelluccio to the Wellpoint

15   account in order to give him an opportunity to

16   demonstrate his turn-around -- his ability to turn

17   around troubled accounts.

18             Please keep in mind that both of the

19   predecessors of IBM in the same position had been

20   unsuccessful at turning around the Wellpoint account.

21   And also the magnitude of the problems on that

22   account.  IBM's own experts who came in and

23   objectively assessed the problems with the account

24   estimated that they would lose $40 million, $40

25   million in one year.

1           Also listen carefully to the evidence of

2    the other responsibilities Ms. Collins-Smee piled on

3    Mr. Castelluccio at the same time he was being put

4    into the position that the two prior -- his two

5    predecessors had been unsuccessful at.

6           Please also reflect on the fact that when

7    Ms. Collins-Smee assigned Mr. Castelluccio to his

8    position, she never followed the stated procedures,

9    which is to introduce the new employee to the client,

10   have them get to know each other and get a certain

11   rapport.  That was the standard procedure, and that

12   did not happen here.

13          More importantly, Ms. Collins-Smee

14   presented a parade of other candidates to Wellpoint

15   for the same position that Mr. Castelluccio had been

16   assigned to, a parade of candidates that continued

17   even after she told Mr. Castelluccio, this is your

18   job.

19          Also keep in mind that she did not

20   disclose to Mr. Castelluccio while he was in that

21   position that this parade of candidates to the client

22   was going on behind his back.

23          Ms. Collins-Smee's age bias towards Mr.

24   Castelluccio is also apparent in what she failed to

25   do.  Mr. Castelluccio will testify that Ms.

1    Collins-Smee repeatedly kept him in the dark about

2    decisions that she was making with respect to his

3    career, decisions that would ultimately end his

4    career.

5              You will hear Mr. Castelluccio explain

6    that Ms. Collins-Smee did not disclose to him for four

7    months, four months, her first decision to replace him

8    in his position as vice president, a decision she had

9    made within days of when she first met him face to

10   face.

11             Later when she removed him from his

12   second position and gave him no new work, she waited

13   for over two months after she had chosen his

14   replacement.  All of that time he could have been

15   looking for other work, he could have been exploring

16   other opportunities.  He didn't know it.  He didn't

17   know the decisions had been made behind his back.

18             Mr. Castelluccio will also explain how

19   IBM's confidential system for placing executives in

20   new positions works.  The system is known as the

21   5-minute drills.  They're basically -- 5-minute drills

22   are basically the name of a document and an event.

23   When IBM has a new opening, they want to let a certain

24   number of executives know about that opening, or if

25   they have some executives available, they want to let

1    other executives know about that availability.

2              But all of that information is

3    confidential.  It's not like the regular jobs at IBM

4    that are posted.  These jobs are only known within a

5    certain sector of people, only the people who are

6    participating on the 5-minute drill, and that's why

7    it's so critical for executives at Mr. Castelluccio's

8    level to be able to participate in that drill and to

9    have someone there to be his advocate.

10             You will see from the documents, the

11   5-minute drill documents themselves, how Ms.

12   Collins-Smee failed to use the system to assist Mr.

13   Castelluccio to find a new position at IBM.  With

14   respect to the few instances in which she did provide

15   him with some assistance, please take note that they

16   occurred in two instances only weeks before he was

17   fired.  Read the two non-committal transmittal letters

18   that she sent to her colleagues.  The letters

19   themselves, it's very clear that she had not even

20   called her colleagues before sending along the

21   information about Mr. Castelluccio.  By any standards

22   these two letters do not qualify as recommendations.

23             Ask yourself if hers is the conduct of a

24   manager who is really trying to assist one of her

25   executives to locate a new position.  Is she really

```
 1    trying to help him find a job, or is this the
 2    conduct -- is this conduct more consistent with the
 3    behavior of a manager looking to create the appearance
 4    of trying to help someone, and even at that, at the
 5    very eleventh hour, the conduct of someone with her
 6    own agenda.
 7             In addition to Mr. Castelluccio's
 8    testimony we are calling Mike Morin to testify.  Mike
 9    Morin is the IBM executive who Mr. Castelluccio
10    replaced on the Wellpoint account.  He will explain in
11    more detail -- in somewhat more detail the situation
12    into which Ms. Collins-Smee placed Mr. Castelluccio.
13    Mr. Morin will provide important background so that
14    you can evaluate for yourself the merits of the
15    criticism that was later pointed at Mr. Castelluccio
16    for his performance in that job.
17             IBM's placement of Mr. Morin in a new
18    position after he resigned from Wellpoint is also the
19    best evidence of the way it's supposed to be done, the
20    way Mr. Morin ultimately attained new work is the way
21    executives are supposed to be placed at IBM.
22    Therefore, please compare the way IBM treated Mr.
23    Morin with the way Ms. Collins-Smee treated Mr.
24    Castelluccio, a dramatic contrast.
25             We next intend to call Ms. Collins-Smee
```

1    to the stand.  She does not dispute that she raised

2    the issue of Mr. Castelluccio's retirement in at least

3    one conversation.  She even admits that he made it

4    perfectly clear to her that he wanted to continue to

5    work.

6              She cannot contest the fact that within

7    six days of their first face-to-face meeting with Mr.

8    Castelluccio she sent an e-mail to her HR executive

9    stating, quote, we need to replace Jim, nor can she

10   distance herself from her admission in this same

11   e-mail, quote, I need to get him on Pat Karin's

12   5-minute drill.  That's something she failed to do not

13   for one month or two months, but for seven months.

14   Seven months after she made the decision and said I

15   need to get him on Pat Karin's drill, she didn't do

16   it.

17             And try as she might, she cannot explain

18   away the operative fact that at the end of 2007 she

19   engaged Mr. Castelluccio in IBM's formal evaluation

20   process.  It's called a PBC process, and you'll hear

21   quite bit about that, and you'll have a good

22   understanding of the formality and legitimacy of it

23   and the importance of it.

24             After some discussion and some

25   deliberation with Mr. Castelluccio, she made a final

1    determination that Mr. Castelluccio was a solid

2    contributor, and therefore she rated him a 2.  You

3    will see her trying as hard as possible to get away

4    from what she did.  At the time she rated him a 2.

5              Finally, given IBM's rigorous training of

6    its managers, Ms. Collins-Smee cannot claim that she

7    did not know her discriminatory treatment of Mr.

8    Castelluccio was illegal.  That's the willfulness

9    issue that you'll need to decide at the end of the

10   trial.  Again, given IBM's rigorous training of its

11   managers which they will not deny, Ms. Collins-Smee

12   cannot claim that she did not know her discriminatory

13   treatment of Mr. Castelluccio was illegal.

14             Our fourth witness is Dr. Gary Crakes.

15   Dr. Crakes is an economist.  He will share with you

16   his calculation of Mr. Castelluccio's economic loss.

17   This calculation is based upon a number of

18   conservative assumptions.  For example, when he did

19   the calculation he assumed that there would be no

20   increase in Mr. Castelluccio's raises.  He just

21   flat-lined it assuming that he would get the same

22   salary for the whole period of time.

23             Our final witness will be Kelton Jones.

24   Mr. Jones is one of the founders of IBM's outsourcing

25   business and is not retired.  Before retiring he was

1    the general -- he was a general manager at IBM and Mr.

2    Castelluccio's supervisor.

3             Among other things, Mr. Jones will

4    testify about IBM's confidential 5-minute drill, how

5    it's supposed to be used, how he used it, and how it's

6    used to get executives new positions.

7             Mr. Jones will also discuss IBM's

8    performance review procedure, IBM's management

9    training regarding age discrimination, and Mr. Jones

10   will share with you his assessment of Mr.

11   Castelluccio's job performance, his reputation and his

12   qualifications for jobs that became available while

13   Mr. Castelluccio was relegated to what's called the

14   bench, jobs that Ms. Collins-Smee chose not to

15   disclose to him, didn't tell him that they were open.

16            Mr. Jones will also testify about the

17   transition of his position to Ms. Collins-Smee.  Ms.

18   Collins-Smee came in and stepped into his shoes when

19   Mr. Jones retired.

20            Finally, Mr. Jones will address the

21   question of whether Ms. Collins-Smee's placement of

22   Mr. Castelluccio on the bench and her lack of support

23   for him once there, whether that was consistent with

24   past practices and procedures at IBM.

25            Just a moment to go through the rest of

1   what we expect to happen.  We have been informed that

2   IBM intends to call six of its current employees as

3   witnesses.  We expect that they will present evidence

4   of the extensive problems at Wellpoint and that

5   they'll try to attribute those problems to Mr.

6   Castelluccio.

7            When listening to these witnesses there

8   are three things that I'd like to have you keep in

9   mind, one of which I've already discussed, which is

10  that Mr. Castelluccio's final formal review, the one

11  he received from Ms. Collins-Smee, she awarded him a

12  2, which is a solid -- which means solid performance.

13  Despite what IBM's witnesses may tell you now, before

14  Mr. Castelluccio complained of age discrimination Ms.

15  Collins-Smee only gave him a favorable rating but she

16  voluntarily praised his performance in the overall

17  performance section of her evaluation, and we'll read

18  that to you.  Significantly, you will also learn that

19  Ms. Collins-Smee's boss affirmed the decision,

20  affirmed her decision that Mr. Castelluccio deserved a

21  2 rating.

22            Second, you will hear extensive evidence

23  about one specific contract, that's the Wellpoint

24  contract.  And Mr. Castelluccio had two different

25  relationships with the Wellpoint contract.  Wellpoint,

1    IBM will admit, as it must, that it was a deeply,

2    deeply troubled account, that no one person was able

3    to turn around quickly.  Each of the various people

4    assigned to that contract definitely made progress,

5    and we'll talk to you about that, but it wasn't

6    something that one person could turn around.

7    Particularly without adequate support.

8              Please keep in mind that most of the time

9    Mr. Castelluccio was involved with the Wellpoint

10   account, Wellpoint was only one -- only one of 30

11   different contracts that he was responsible for.  That

12   changed in the end, but initially it was only one of

13   the 30 contracts he was responsible for.

14             The third thing I want you to keep in

15   mind is we want you to take note of the multiple

16   responsibilities assigned to Mr. Castelluccio in the

17   three-month period when he was first assigned to take

18   Mike Morin's position on Wellpoint.  That critical

19   three-month period is significant.  Keep in mind that

20   during that period Mr. Castelluccio was not only still

21   holding down his responsibilities as vice president,

22   but he had those in addition to the responsibilities

23   of Mike Morin, the person who was crushed by the work

24   and actually quit.

25             In a rare moment of candor one of Ms.

1    Collins-Smee's peers, a peer who fully understood the

2    magnitude of the problems on the Wellpoint account,

3    states in an e-mail to her that the multiple

4    responsibilities she is heaping on Mr. Castelluccio

5    will, and I quote, cause him to implode.

6              At the appropriate time the parties will

7    also -- have also agreed to have certain deposition

8    testimony read to you from three IBM employees.  This

9    testimony will focus on the understanding of these

10   employees with respect to IBM's internal practices and

11   procedures.

12             So in conclusion, IBM is certain to tell

13   you this is a simple case.  Although IBM's witnesses

14   may testify at length about their view of Mr.

15   Castelluccio's performance on the Wellpoint contract,

16   IBM would be pleased to have you consider Ms.

17   Collins-Smee's conduct only in the last six months

18   before she fired Mr. Castelluccio.  That was the time

19   during which he was put on the bench, with no work to

20   do.

21             We will demonstrate to you that even in

22   this six month period her age bias is apparent.  She

23   not only removed him from one full-time position and

24   failed to place him in another position, but she

25   provided him with no temporary work.  Rather than

1    that, she just put him on the bench, said find a job

2    if you can.  Once on the bench she isolated him from

3    his peers and kept him in the dark about scores of

4    open executive positions that she knew about and he

5    had no access to.

6              The principal question you'll be required

7    to answer is why did Ms. Collins-Smee fire Mr.

8    Castelluccio after a successful 40 year career?  Why

9    did she do it?  Mr. Castelluccio will tell you that

10   Ms. Collins-Smee was motivated by age discrimination.

11   When Mr. Castelluccio informed Ms. Collins-Smee that

12   he had no interest in retiring, the evidence will show

13   that Ms. Collins-Smee waged a 17-month campaign

14   against him designed to push him out the door because

15   she thought he was too old to work.

16             Ultimately she was able to relegate him

17   to the bench without a position in order to isolate

18   him from his peers and his contacts.  Once he was

19   isolated and left with no work to do, she terminated

20   him, claiming he was being terminated for not having a

21   position.  A situation she herself had created.

22             Please think critically about the

23   justification IBM now gives for firing Mr.

24   Castelluccio, that justification being they couldn't

25   find a job for him.  The evidence will show that not

1    only is IBM's explanation implausible, but it has

2    changed over time, and that's significant.  When

3    somebody does something like age discrimination, they

4    look for whatever reason they can, whatever

5    justification they can.  The evidence will show that

6    not only is IBM's explanation implausible, as I said,

7    but it changed.

8              Initially IBM sought to justify Ms.

9    Collins-Smee's conduct by claiming that Mr.

10   Castelluccio's performance was the reason he was

11   fired, it was performance.  Most recently IBM has

12   changed its position.  Why?  Because the evidence will

13   show that up to and including the year he was

14   terminated Mr. Castelluccio never received a negative

15   performance review.

16             Although Mr. Castelluccio was not able to

17   turn around the Wellpoint account overnight, he and

18   his team met key performance milestones and were well

19   along the way to bringing Wellpoint to a break even

20   situation.

21             Despite the time that IBM will spend

22   showing what it believes is evidence of Mr.

23   Castelluccio's poor performance, in the end, in the

24   end it will not say that performance was the reason

25   Mr. Castelluccio was fired.  Instead, IBM will try to

1    convince you that Mr. Castelluccio was fired simply

2    because it couldn't find him a job.

3              You'll hear evidence of procedures IBM

4    uses to place its executives, and you have to ask

5    yourself, is it likely that a 40-year veteran who had

6    previously held many different executive positions

7    across many of IBM's different industries, why IBM

8    could not find him a place anywhere?  Does that make

9    sense?

10             When you hear evidence of how overworked

11   and stressed IBM executives were in this specific

12   business, in their outsourcing business at the time,

13   ask yourself, does it make sense that Ms. Collins-Smee

14   fired him because there was no work for Mr.

15   Castelluccio to perform?  Or was there some other

16   reason?

17             In deciding what was really driving Ms.

18   Collins-Smee's agenda, we ask one thing, scrutinize

19   what you hear carefully.

20             Thank you very much

21             THE COURT:  Thank you, Mr. Carta.

22             Mr. Fasman.

23             MR. FASMAN:  Ladies and gentlemen, good

24   afternoon.  Thank you also for agreeing to sit in in

25   case and to be fair and impartial in judging these

1    issues.  As I said earlier, my name is Zack Fasman.

2    I'm joined at our trial table by my partner Todd

3    Duffield, and next to Mr. Duffield is Ms. Collins-Smee

4    herself.  We're privileged to represent IBM, one of

5    America's truly great companies.

6               This is an age discrimination case, and

7    what you will eventually be asked to decide is whether

8    Mr. Castelluccio was terminated because he was 60

9    years old at the time.  He and his counsel, Mr. Carta,

10   have the burden of convincing you that he was

11   terminated because of his age, that he would not have

12   been terminated if he'd been younger.

13              So what I would simply ask you to do, as

14   you hear the evidence in this case, is to ask

15   yourself, does this prove age discrimination?  Does

16   this show that he was treated this way because of his

17   age?  Because at the end of the trial when you go back

18   into the jury room to deliberate, that's the question

19   you are going to have to answer.

20              Now, this is a somewhat unusual age

21   discrimination case because Mr. Castelluccio admitted

22   that no one at IBM, except for Ms. Collins-Smee, ever

23   said or did anything to him that made him believe they

24   were biased because of his age.  No one.  There were

25   no adverse age references, no improper comments,

1    nothing.

2              And even with regard to Ms. Collins-Smee,

3    he admits that she never told him that he was too old

4    to do the job, that he was getting long in the tooth,

5    or even that he should retire, much less ever calling

6    him an old man.  There was none of that.  You will

7    hear no age bias remarks at all here.

8              Now, the reason for that is that IBM

9    tends to be a pretty mature place.  IBM is not

10   Facebook.  It's a hundred years old.  And at the

11   executive level one almost never finds anyone in their

12   thirties.  In fact, almost all of the people involved

13   in this case are 50 years old or older.

14             Ms. Collins-Smee was 50 when she made the

15   decision to remove Mr. Castelluccio from two

16   positions.  She filled one of those positions with

17   Miguel Echavarria, who at the time was 49 years old.

18   She pulled him out of the other position and filled

19   the second one with Gordon Crawford, who was 59 years

20   old.  Mr. Castelluccio was 60 years old.  That's

21   hardly evidence of a youth movement.

22             Mr. Castelluccio claims that Ms.

23   Collins-Smee brought up retirement as an option for

24   him in three conversations during the 18-month period.

25   She denies making those comments as he claims, but

1     those comments should not be relevant to your

2     decision.  It's not illegal for an employer to ask an

3     employee whether he wishes to retire.  It's done every

4     day, when an employee gets close to reaching his

5     retirement age.

6                    Mr. Castelluccio admitted himself during

7     his deposition it wasn't forbidden to discuss

8     retirement as an option with an individual who was

9     eligible to retire.  And Mr. Castelluccio admitted,

10    again in sworn testimony, that Ms. Collins-Smee never

11    said, You ought to retire, or, I want you to retire.

12    It was only, according to him, Retirement is an option

13    if you wish.

14                    And according to him, again, these

15    comments were made at three separate points.  We don't

16    agree with this, but even taking him at his word, they

17    were made in February 2007, ten months later in

18    November 2007, and five months after that in March

19    2008.  That's it.  Retirement is an option if you

20    wish.  And that's their evidence of age

21    discrimination, and that's the basis for which Mr.

22    Carta says she was involved in a 17-month campaign to

23    eliminate him from the workplace.

24                    Even if you believe their version of

25    events, which we don't think you should, three

1    references to retirement during 18 months does not

2    prove that his age had any connection with his

3    termination in June 2008.

4              Mr. Castelluccio also alleges that in

5    their first meeting in February 2007 she started to

6    ask him how old he was, said how old, and then stopped

7    herself before saying that.  Ms. Collins-Smee denies

8    that completely.  She will testify that she never

9    asked an employee how old he was.

10             And Mr. Castelluccio, although he will

11   get on the witness stand and tell you he was shocked

12   by her comment, didn't report it to human resources at

13   the time.  He knew how to report a problem if he

14   wanted to report a problem.  But he didn't go to human

15   resources or register any complaint at all about what

16   he was shocked about.

17             He did, in fact, file an interim

18   complaint of discrimination, but not until a year and

19   a half later.  A year and a half later, and only after

20   he had been told that if he didn't find a job for

21   himself in the next month, his employment would be

22   terminated.

23             As to that complaint of discrimination,

24   the parties have stipulated, it was investigated by

25   IBM under IBM's well-established appeals process.  You

1    will hear from Russ Mandel, who runs IBM's internal

2    appeals process, about his investigation.

3            But as I say, even if she started to ask

4    him his age back in February 2007, that's not proof of

5    anything unlawful.  Congress never said that no one

6    can ask anyone about their age, and there are a

7    million different reasons why that might have been

8    said.

9            But the whole point is, he was terminated

10    in June of 2008.  This comment was made supposedly in

11    February of 2007, 18 months earlier.  Those things

12    aren't linked up.

13            Now, I've said repeatedly, and I'll say

14    again, this is about his termination in June of 2008.

15    He will introduce evidence about his being removed

16    from two positions in 2007.  One, from the initial

17    position he held when Ms. Collins-Smee took over, vice

18    president of Public Sector division, and then he was

19    placed on the Wellpoint account, which we started to

20    talk about, and he was removed from that at the end of

21    2007.

22            Mr. Castelluccio did not challenge those

23    removals at the time.  The Court has held that those

24    removals can't be challenged in this case.  So again,

25    I say what's before you is his termination in 2008.

1    These two things happened in 2007, and the issue

2    you'll have to decide is the later termination, but

3    not these.

4              But these are relevant as background, and

5    as background, Mr. Castelluccio's claim that you'll

6    hear that he was removed from these jobs improperly is

7    absolutely untrue.  We have and you will see literally

8    dozens of written complaints about his performance in

9    both positions from people who he has admitted were

10   not biased against him because of his age.  Many of

11   these complaints were made well before Joanne

12   Collins-Smee ever became his supervisor.

13             In fact, his principal internal client in

14   his first position as vice president of Public Sector

15   division, David Liederbach, who will testify before

16   you, told Mr. Castelluccio's prior supervisor, Mr.

17   Jones, who you've heard about, in 2006 he said to Mr.

18   Jones, You need to replace Mr. Castelluccio, he is not

19   doing the job, he said repeatedly.  You'll see it in

20   writing.  He talked to Mr. Castelluccio about it, what

21   he was doing wrong.

22             And that was many months before Ms.

23   Collins-Smee ever showed up.  And when she did show

24   up, Mr. Liederbach went to her and said listen, you

25   need to replace Mr. Castelluccio, this is not working,

1    please do so.

2              You'll see and hear from witnesses who

3    would tell you that Mr. Castelluccio was not

4    responsive.  He didn't follow through on things that

5    he had committed to do.  He was not visible to

6    clients.  He was removed from the first position, as I

7    say, as the vice president of the Public Sector

8    division, and then a job came up on the Wellpoint

9    account.

10             Mr. Carta has said, oh, the Wellpoint

11   account was a troubled account.  It was a troubled

12   account.  It was a difficult account for IBM, no

13   question about that.  But it was not an impossible

14   account.

15             The reason it was not an impossible

16   account is that Mr. Castelluccio, who was ultimately

17   replaced on that account at the end of 2007 by Gordon

18   Crawford, who as I said was 59 years old at the time

19   to his 60 years old, Mr. Gordon Crawford came in, he

20   fixed the account.  WellPoint's a great account for

21   IBM.

22             Gordon Crawford put his nose to the

23   grindstone and got it done.  He did it himself.  And

24   you'll hear it.  You'll meet Mr. Crawford.  You'll

25   hear what he did.  You'll hear from people that know

1    the account what he did.  It wasn't impossible.  It

2    was tough, no question about it, but this was not

3    something that Mr. Castelluccio couldn't have done if

4    he had wanted to do it.

5              And as to his initial assignment to that

6    account, he claims that he was a specialist in

7    troubled accounts, and you'll see him say that to

8    various people.  I asked him during his deposition, I

9    said, If you had this open account and you were

10   sitting in Ms. Collins-Smee's shoes and you had a

11   specialist in troubled accounts available, wouldn't

12   you assign yourself to this account?  And he said,

13   That would have made sense.  So I don't understand how

14   his assignment to this account is proof of anything

15   other than a sensible business decision.

16             I said when I started this opening

17   statement that I was privileged to represent IBM, and

18   here's one reason.  Why after being pulled off of

19   these two positions IBM did not fire Mr. Castelluccio?

20   Instead of terminating Mr. Castelluccio they gave him

21   six full months at full executive pay, full executive

22   benefits, to try to find himself a new position within

23   the organization.  Six full months to find something

24   else.

25             Ms. Collins-Smee agreed to assist him in

1   this search, and she did just that.  She put him on

2   executive placement drills.  She listed him as a

3   person to move.  She recommended him to colleagues and

4   sought out positions for him.  She will testify as to

5   what she did, and so will Mr. Holmes.

6            In fact, you heard Mr. Carta talk about

7   his personal business commitment ratings performance

8   evaluation where she evaluated him as a 2, a solid

9   performer.  She actually called him, Mr. Castelluccio,

10   and said Jim, I think I have to give you a 3 because

11   you didn't do well this year, and he complained and

12   said, You shouldn't really do this, and she thought

13   about it, and you'll hear her testify to this effect,

14   that he was at that time looking for another position,

15   that if she gave him a 3 he'd have even more

16   difficulty finding another position, so she gave him a

17   2.

18            Now, he claims she should have done more

19   for him, put him on more drills, gone to more

20   colleagues.  She'll testify as to exactly what she

21   did.  But as Mr. Carta said, there is a saying at IBM,

22   which is, "Your career is your responsibility."

23   You're in charge of your career.  Mr. Castelluccio was

24   responsible for using his own networks, developed over

25   40 years, to knock on doors, to meet with people he

1    knew at IBM, and to find himself another position

2    within the organization.  Instead, as he testified

3    during his deposition, he took more time off during

4    this six months that he was supposed to be finding a

5    job than he ever took while he was at IBM.  And you'll

6    also see he was looking for jobs outside IBM at the

7    same time.

8              But the most important thing, and the

9    thing I would ask you to bear in mind, it was not Ms.

10   Collins-Smee's job, but his, to locate another

11   position.  That's the way IBM works.  And IBM had

12   given him five months, full pay, full benefits, no

13   responsibilities, to find a new position.

14             Ms. Collins-Smee met with him and told

15   him he had one month to find another position, and if

16   not, IBM would have to let him go.  And that's what

17   happened.  He didn't find another position within the

18   month.  He retired.  He's been receiving his full

19   retirement benefits, which he continues to receive,

20             Now, if they could show that IBM treated

21   younger employees more favorably in this whole

22   process, that might be proof of age discrimination,

23   but there's no evidence of that.  There's no evidence

24   that anyone younger was treated any better than he was

25   throughout this process.

1          And even Mr. Castelluccio when I asked

2     him, do you think six months was a reasonable period

3     of time to find a new position, he said yes.

4          At the end of the day, IBM terminated him

5     after a full six months with full pay and benefits,

6     searching for a new job at IBM with no success, and I

7     submit to you that's not age discrimination, but it

8     was fair and generous treatment.

9          So let me in closing just urge you again

10    as you listen to the evidence, listen for evidence of

11    age discrimination.  We're confident that at the end

12    of the day, having listened carefully for such

13    evidence you'll conclude there wasn't any.

14         Thanks very much.

15         THE COURT:  Thank you, Mr. Fasman.

16         Mr. Carta, call your first witness.

17    (James Castelluccio, sworn by the clerk)

18         THE CLERK:  Please state your name for

19    the record.

20         THE WITNESS:  James Castelluccio.

21         THE CLERK:  Your city and state where you

22    live, please.

23         THE WITNESS:  Stamford, Connecticut.

24         THE COURT:  Mr. Castelluccio, don't be

25    bashful at all about moving that microphone up so it

1   gets close to you.  That's not the greatest microphone

2   in the world but it's the best that we have.

3               Okay, Mr. Carta.

4

5               DIRECT EXAMINATION BY MR. CARTA:

6

7   Q    Deep breath.  Ready to go?

8        Why did you bring this lawsuit?

9   A    I brought it because I felt I was fired by IBM

10  because of my age, age discrimination.

11  Q    And when did you start working at IBM?

12  A    Started in March of 1968.

13  Q    And for how many years did you work there

14  before you were terminated?

15  A    40 plus years.

16  Q    And your termination was effective June 30 of

17  2008?

18  A    That's correct.

19  Q    And what was your age at the time you were

20  dismissed?

21  A    I was 61.

22  Q    And at what age did you hold -- what age had

23  you planned to retire?

24  A    I hadn't thought of it at that time.  It would

25  be 65, 66 would be the age.  Still had some family at

1    home, so my expectation was that would be the age I

2    would retire.

3         Q    And what was the highest position that you

4    held at IBM?

5         A    I had reached the vice president level.

6         Q    And would you describe your responsibilities,

7    the ones that you held when you were vice president?

8         A    There are two positions as vice president.

9    One was running IBM's largest commercial contract,

10   Wellpoint.

11        Q    Very end.

12        A    Very end I was vice president Public Sector.

13        Q    And how many people reported to you directly?

14        A    I was managing the workload --

15        Q    Directly or indirectly.  I'm sorry.

16        A    I was managing the workload of about 2,500

17   people.

18        Q    2,500?

19        A    Yes.

20        Q    And do you recall what your compensation

21   package included as a vice president of Public Sector

22   at IBM?

23        A    At that position it was your base salary, your

24   annual incentive, which was more or less a bonus,

25   stock options, particularly retention stock options,

1    IBM contribution to W-2, and so forth.

2        Q    I'd like to -- before we proceed through your

3    career and education I want to just step aside for a

4    moment and talk about the evaluation procedure so that

5    when we get to talk about your evaluations we'll have

6    it in some context.

7             Does IBM have an annual evaluation procedure

8    that it uses?

9        A    Yes, it does.

10       Q    And how frequently are its employees rated?

11       A    It's a requirement.  Every employee is

12   required to be evaluated once a year annually.

13       Q    Every employee at every level?

14       A    All 450,000 IBMers, it's all full-timers are

15   required to be evaluated, go through evaluation.

16       Q    And what is that procedure called?

17       A    Personal business commitment.

18       Q    So the acronym is PBC?

19       A    Yes, it is.

20       Q    Were you evaluated -- how would you

21   characterize the PBC process?

22       A    It was a very formal process, and it was like

23   the -- I could describe the process, but it was a very

24   rigid process that was like the major point of salary

25   increase, promotions, and so forth.  So it was very

1    formal and very well-monitored by human resources and

2    tracked.  All managers must report on it.

3        Q    And take a look at Exhibit 1.  What is Exhibit

4    1?

5        A    This is the manager's -- I believe it's the

6    manager's manual.  It's actually a website -- must be

7    a ScreenScape off a website of IBM's PBC commitment.

8    So it's a manual about the various steps you have to

9    go through and how you document the procedure and

10   actually go through the formal evaluation.

11       Q    And were you responsible for completing the

12   PBC reviews of the employees who work for you?

13       A    Absolutely.

14       Q    And what training did you receive in

15   connection with that process?

16       A    It evolved over my years in management, but it

17   starts with formal management training about PBCs.

18   You do role playing, and so forth, so you understand

19   what are the different aspects of it and how do you

20   set goals, and so forth.

21           On an annual basis we have to go through an

22   annual educational process.  I think most recently

23   when I left it was a web access of training, so you

24   went through that formal training on an annual basis.

25       Q    And you were held responsible for maintaining

1    adherence to the manual?

2        A    Absolutely.

3        Q    And are there steps that you're supposed to

4    follow?

5        A    Yes, there are.

6        Q    And what are those?

7        A    In the beginning of the year, assuming you're

8    just starting off the year, generally in the February

9    time frame, January, February, is when we're required

10   to do it, you have to set goals and objectives for

11   your employees, something you should measure them on

12   through the balance of the next following 12 months.

13       Generally those objectives are -- factors that

14   go into that is you have certain things you're

15   supposed to be performing in your business unit, your

16   particular department, your area.  Those are built

17   into the set of objectives that are put together.  The

18   manager and their employee must agree on those

19   objectives.  And that starts to trigger for the

20   evaluation period to occur.

21       So it's done very early in the beginning of

22   the year.  It's tracked.  We have to report whether

23   we've completed all of these goal settings across our

24   employees.  So it's very -- I know I'm repeating

25   myself here, but it's a very formal and very tracked

1    process, because it's so important.

2        Q    And the criteria upon which you're evaluated,

3    are they subjective, objective?

4        A    Well, they evolve to very objective, because

5    we wanted to take the subjective part out of it so

6    there would be less disagreement at the end of the

7    year when you're being evaluated between the employee

8    and manager.

9             So we were setting measurable results.  And

10   particularly in the area that I was in, there were

11   measurements.  And it said that, for example, you may

12   have to reduce cost in your unit by X percent, and you

13   will be given a percentage that you have to reduce it,

14   and at the end of the year it's very simple to do the

15   scoring on that to say you met it, you didn't meet it,

16   you overachieved, you did some, and then you can

17   calculate how the person's evaluated based on that.

18       Q    And at the conclusion of the procedure, you've

19   established your goals, then you document your

20   results, what's the third step, what's the final step?

21       A    Actually if I can go back to the document in

22   part, because during the year you're executing against

23   these goals you and your manager have agreed to, and

24   it's a document, so you can refer back to it if you

25   lose track.  So during the year you're being measured

114

1    on that.

2           At the end of the year before you have your

3    meeting with your manager to sum up your year, how you

4    performed, the employee puts together a set of what

5    they feel they've accomplished against those goals.

6    So you actually summarize your activity for those 12

7    months, the things you did, that you were successful,

8    how successful, and so forth, and then that's

9    forwarded to your manager.  So your manager has been

10   observing you during the year to see how you're

11   performing, and making your own judgment now you're

12   assisting by providing your input into that, and

13   seeing how you perform.

14   Q    And what does that all funnel down -- what's

15   the conclusion at the end?

16   A    When it's all crunched together, you then meet

17   with your manager, and they determine how well you did

18   against that criteria.  So they evaluate you, and they

19   give you a formal rating on how you did.

20   Q    What impact, if any, does an employee's PBC

21   rating have on that employee's compensation in the

22   future?

23   A    Oh, it's like the major measurement on how you

24   deal with that.  Dollars are allocated to the business

25   unit.  They take a look at how individuals perform and

1    then the allocation of those dollars across those

2    individuals based on their performance.

3        Q    What impact, if any, does it have on an

4    employee's long-term career at IBM?

5        A    It's very important.  I mean not only salary,

6    which is an immediate, but also career-wise, because

7    people look at and will ask how an individual is

8    evaluated, what -- we use numerical numbers, but what

9    was he rated, what was that person rated, when you're

10   considering looking at candidates to fill a position,

11   so you're looking across all the candidates and what

12   their ratings were so you kind of get a calibration of

13   how well they're doing.

14       Q    So you it boils down to a single number, and

15   what during the relevant time period, 2000 to 2008,

16   what was the range of ratings that was used at IBM?

17       A    We had four.  The top rating was a 1,

18   numerical 1, then it was 2 plus, followed by a 2, then

19   there was a 3, and then a 4 was the lowest rating.

20       Q    And where does those ratings appear?  I mean

21   if was there information that defines those ratings?

22       A    Yes.  In the actual publication, the

23   documentation for the personal business commitment

24   program, those numbers are actually identified in

25   there, and that's what I'm looking at.

1    Q    And what does a number 1 rating mean?

2    A    Number 1, as I said before, is your top

3    performer, and it's among the top contributors for

4    that year, so it's how they're rated in that year, and

5    under the definition a little bit -- because you have

6    to look at the description and definition.  The

7    description, for example, would say for a 1 performer,

8    achieved exceptional results, purely stands out from

9    the rest and is a role model for the IBM values.

10   Q    And how is a 2 plus rating, how is that

11   defined?

12   A    2 plus says you're doing more than what you

13   were asked to do.  You're an above average

14   contributor, and you go above and beyond your job

15   responsibilities, and you outperform most of your

16   peers in that area.

17   Q    And how about a 2?

18   A    Two says you're doing everything that's

19   expected of you.  You consistently meet your job

20   responsibilities.  You're reliable in your job.  You

21   demonstrate the appropriate knowledge of skills.  You

22   know what you're doing.  You're demonstrating you're

23   qualified and you're performing, you know, all of the

24   things that you're being asked to perform.

25   Q    And how about a 3?

1      A      A 3 is -- this is among the lowest

2      contributors, and when you're rated a 3, you need to

3      improve in that area.  You're not meeting what's

4      required of you in the job.  You're doing some but not

5      all of the requirements.

6      Q      In lieu of a numerical rating do the managers

7      sometimes use standard phrases or words to mean the

8      same thing?

9      A      Yeah, it varied.  It depends on your heritage

10     as a manager, but you use descriptions sometimes, top

11     contributor, above average.  They'll go into the

12     description part of this and use some of the text off

13     the description part.  A solid contributor.

14     Q      Solid contributor is used with a 2?

15     A      2, yes.

16     Q      And how did IBM define a 4 rating?

17     A      That's an unsat.  There are a few of those,

18     but it's says that you're not meeting even the minimum

19     requirements of your job.

20     Q      Do you know what percentage of IBM employees

21     typically receive either a 2 plus or a 2 rating?

22     A      Actually IBM used to have a skew that they

23     would send out in the beginning of the year.  When you

24     were setting goals with your employees there was a

25     skew that went out to all the managers and said we

1    expect you in your department, your distribution to

2    be -- the bulk of it was in the 2 plus and the 2, 65

3    to I think it was 80 percent of the people reporting

4    to you were expected to fall within this range.  And

5    then it was, I think, 5 to 7 percent in the 1

6    performance, and then down below that in 3 performance

7    it was, again, whatever -- I can't do the math now,

8    but whatever the delta between those numbers are.

9            And we had to -- in the beginning of the

10   appraisal process we would have to report -- before we

11   actually conducted the evaluation with the employee we

12   would have to go through -- as a manager we'd have to

13   determine what we thought we would give each of the

14   individuals, and we'd have to report that distribution

15   to IBM HR to say this is what we're expecting as far

16   as distribution in our area.

17   Q    Take a look at Exhibit 2.  What is Exhibit 2?

18   A    This is the online manual that talks about --

19   it's not what we have on the screen, but it talks

20   about how you set your goals, how you go about setting

21   your goals as a manager.

22           There's also a guide for employees as well, so

23   the employee knows how -- who may not be in

24   management -- how they're supposed to work with their

25   manager to set the goals.

1          And then it continues through after you set

2     the goals, how do you document results.  Because I

3     mentioned there's a responsibility an employee has for

4     documenting the results, so the manual explains how to

5     do that, for the manager as well as the employee.

6          And then you also in this manual -- it's not

7     what we're looking at here, but it talks about how you

8     do the rating, how does a manager conduct the rating,

9     what should the employee expect when they go into the

10    rating.

11         After you've been through it a few times as an

12    employee you understand what needs to be done as a

13    manager and non-manager, but we still go through

14    annual formal training on how you do this process

15    because it's so important and there shouldn't be any

16    confusion.

17    Q    And Exhibit 3, what is Exhibit 3?

18    A    Exhibit 3 is a document that really goes

19    through kind of -- as you're conducting -- it's not

20    what we have here, but it's as you're conducting the

21    evaluation with the individual, some of the things you

22    should listen for.  So an employee may get very

23    defensive in some spots, how do you deal with that, a

24    person being defensive.  If an employee is puzzled by

25    something, what you -- kind of how you should read

1    when you're meeting with the employee and actually

2    conduct that evaluation, and it gives you pointers on

3    what you should be looking for, what you should do and

4    what you shouldn't do.

5        Q    Does the PBC procedure also report supervisors

6    with an optional means of further elaborating on the

7    numerical assessment?

8        A    Yeah.  The structure and format is you have

9    your goals set up front, then you have your agreed to

10   accomplishments, then there's the rating, and after

11   the rating is agreed to, your manager, not you as the

12   employee, but your manager has the option, they can

13   write in some description on.  Some utilize it, some

14   don't.

15       Q    And are employees provided with copies of

16   their evaluation?

17       A    Yes, they are.

18       Q    And typically when does that occur, when you

19   give the copy of the evaluation?

20       A    It's after you've agreed and you're told what

21   your evaluation is.  You actually have to -- because

22   it's all done online now, you have to do it

23   electronically.  I would as an employee have to sign

24   off on it, and then my manager would then sign off on

25   it, and that's where they have the option of bringing

1    that description, whether they want to make any

2    additional comments.

3        Q    Is there anyone else above your manager who

4    also participates in this process?

5        A    Yes.  What we've done, I guess, kind of to

6    make sure there's equity in the system, we also make

7    your manager, or in my case if I was the manager my

8    manager would have to also sign off on every

9    evaluation I gave to my employees.

10       Q    And in what way does the second level manager

11   indicate whether he or she approves the evaluation?

12       A    Well, the second level manager's really

13   responsibility is looking for consistency across his

14   managers and the organization.  So you have one

15   manager that's very lenient in one area and one who's

16   really a very difficult evaluator, so the second line

17   managers looking for fairness across it.

18            And in some cases the second line manager --

19   well, fairness across all of the managers.  And in

20   some cases the second line manager knows the

21   individual who has just been evaluated and can also

22   lend their comments on it.

23       Q    And in your role as vice president were you

24   required to approve the PBC evaluations performed by

25   those who were reporting directly to you?

1      A      Absolutely.  That was a requirement.  Second

2   level approval and signoff.

3      Q      And what was the point of requiring the second

4   level manager to also participate in this formal

5   process?

6      A      That was, as I mentioned, a bit is for equity

7   across and fairness across the system, so the managers

8   were treating like level individuals in evaluating on

9   the same criteria across the various -- where I may

10   have had seven managers reporting to me, I was looking

11   for consistency across the seven managers and fairness

12   across the seven managers.

13      Q      And in your career have you ever successfully

14   caused a manager's PBC rating to be revised when you

15   were in the second tier as a manager's manager, were

16   you involved in the process and actually had --

17      A      Yes, I have done that before.

18      Q      So the idea is that the manager's manager,

19   their signature on the PBC is not just a rubber stamp?

20      A      I would hope it wasn't a rubber stamp, or

21   believed to be a rubber stamp by an IBM executive line

22   manager.  There's no point in going through the extra

23   step.  No, it was -- it was -- second line managers --

24   I was a second line manager.  You understood that your

25   responsibility was for looking for fairness across all

1   of your managers' PBC, so you did take the time to

2   look at it, and sign off on it.

3        Q    Take a look at Exhibit 4, please.

4        A    I recognize that.  Is that my PBC?

5        Q    It is.

6        A    Okay.

7        Q    Why don't you look in your book because we're

8   having a portion of it held up.

9        A    I do.  I have it here.

10       Q    So what is Exhibit 4?

11       A    Exhibit 4 is the actual rating of the formal

12   PBC that I went through on January 24th, 2008.

13            Oh, so in 2008 my last formal PBC, this was my

14   rating of that, and this is the rating that --

15       Q    This is the last rating you got before you

16   were fired, and this is the rating that -- who gave

17   you this evaluation?

18       A    This was done by Joanne Collins-Smee.  And

19   this is for my work for 2007.  So just not to be

20   confused, this was done in January 2008, but it was

21   for all of my work in 2007.  And it's a solid

22   contributor, which says that you're doing everything

23   that's required of you, and you're demonstrating your

24   knowledge and ability to do that.

25       Q    In addition to the rating, you said that part

1    of the process is the also optional comment section?

2    A    Yes.

3    Q    Actually it's the overall assessment?

4    A    Right.

5    Q    And is that required for the supervisor to

6    fill that out?

7    A    No, it's not mandatory.  Some do, some don't.

8    Q    And would you read to the jury what is stated

9    optionally by Ms. Collins with respect to your

10   performance in 2007?

11   A    Yeah.  In --

12              MR. FASMAN:  Your Honor, may I object to

13   that?  The jury can read that.

14              THE COURT:  I'm sorry?

15              MR. FASMAN:  May I object to that?  The

16   jury can read what Ms. Collins-Smee wrote.

17              THE COURT:  Okay.  This is in evidence?

18              MR. CARTA:  It is.

19              THE COURT:  Objection's noted, it's

20   overruled.  You can answer the question.

21              THE WITNESS:  Okay.  Again, this "Overall

22   Assessment" is the heading for the area that's

23   optional for managers.  So what you're seeing here is

24   Joanne Collins-Smee chose to write these comments in

25   there to kind of summarize my activity, and she said,

1    "Jim started the year as the ITD vice president for

2    Public Sector."

3            And we've already heard in the opening

4    arguments that I was there until June 5th of 2007.

5            "In the second half of the year he was acting

6    VP on the Wellpoint account.  In the Public Sector

7    role Jim's team reduced head count significantly and

8    were able to continue to meet our service level

9    objectives."

10           And just as a point of understanding on that,

11   that says what we've committed to customer service

12   level objectives, we're meeting it, we're doing what

13   the customer is expecting from us on the service side.

14           "On the Wellpoint account Jim and the team has

15   made significant progress on programs to improve

16   service quality."

17           We heard about all the problems.  We'll hear

18   more about that.

19           "Making significant steps to improve the

20   quality service to Wellpoint, the customer, and also

21   to reduce costs."

22           And we'll see the financials on that later.

23           "Particularly in these areas:  Data center

24   migration, negotiating, SW."

25           Software, so you understand, software

1    licensing.  Like you get Microsoft on your servers at

2    work, and hardware vendor contracts, which are

3    generally what we call break fix.  If one of these

4    hardware boxes, IT boxes break, you call them and they

5    come in and they fix the service on it.  So we were

6    renegotiating -- I was renegotiating with them in

7    trying to reduce that.

8         "Jim needs to continue to focus on those

9    activities that would demonstrate effective leadership

10   to both the IBM team as well as the client."

11        Q    And did anyone else approve this rating?

12        A    Yes.  This would, as we discussed before,

13   would have to go to Joanne Collins-Smee's manager, who

14   at that time was Robert Zapfel.

15        Q    And what was his position, if you recall, in

16   the organization?

17        A    He was I believe the title of general manager,

18   and he was responsible for -- we talked about -- we

19   didn't talk about it yet, but the area of business of

20   outsourcing for IBM, and he had global responsibility.

21   So where Joanne had one segment of the world, she had

22   the Americas, Bob Zapfel managed one step above that,

23   and he had the whole -- the world.  Europe, Asia, so

24   forth.

25        Q    And to what extent, if any, did Mr. Zapfel

1   have actual direct experience working with you in

2   2007?

3       A    One would think in his level he would have

4   little, but he had a lot.  I was in meetings with him.

5   He called me up to have him briefed.  He called my

6   cellphone.  He's called my house.  And I had a lot of

7   dialogue with him back and forth over the second half

8   of 2006, particularly in reference to the Wellpoint

9   contract, as you would expect.  So he knew what my

10  work and what I was achieving on that, and my

11  effectiveness on that contract.

12      Q    So let's step aside for a second and talk

13  about what didn't happen.  Throughout your career at

14  IBM, did IBM ever -- did IBM have established

15  practices for disciplining underperforming employees?

16      A    Yes, it did.  Very -- again, a very

17  well-documented well-understood program for managers.

18      Q    Were you ever once disciplined?

19      A    No.

20      Q    Throughout your career at IBM, did IBM have

21  established procedures in place for warning employees

22  that the procedures were inferior?

23      A    Yes.  It's expected, because there's such a

24  trust between the manager -- I mean the employee and

25  the manager, that if there is any indication of any

1    dissatisfaction, it has to be brought to the employee.

2    The employee has to know so the employee can

3    understand it and do whatever's necessary to correct

4    it if that were the case, and that was my practice,

5    and you're taught in management school that's what you

6    should do.

7        Q    And did you provide -- were you provided any

8    such written warnings?

9        A    No.

10       Q    Now I want to go to where we typically would

11   start, which is go through your background a little

12   bit.

13       A    Okay.

14       Q    What formal education did you have before

15   starting at IBM at age 21?

16       A    I started out at Providence College, didn't

17   finish at Providence College.

18       Q    What was the highest level of education you

19   achieved at IBM?

20       A    I was selected for the IBM executive MBA

21   program and I went through that program.

22       Q    Are you married?

23       A    Yes, I am.

24       Q    Have children?

25       A    Yes, I do.

1       Q    And did you tell me, what's your current age?

2       A    Current, 66.

3       Q    Let's walk you through your career rather

4    quickly at IBM.  What was your first position at IBM?

5       A    It was entry level.  I worked in the data

6    center as a computer operator.

7       Q    And shortly after starting at BM did IBM

8    invite you to participate in a six-week programming

9    school?

10              MR. FASMAN:  Objection to form, Your

11    Honor.

12              MR. CARTA:  I'll rephrase.

13    BY MR. CARTA:

14       Q    What, if anything, did IBM invite you to

15    participate in after six weeks?

16       A    I was selected by IBM to attend programming

17    school.

18       Q    And what skills, if any, did you learn there?

19       A    Well, it's -- probably no one would know what

20    it is now because it was so long ago, but it was

21    assembler language.  It was programming to build

22    applications like payroll, inventory, and I was

23    learning how to program to do that type of work.

24       Q    And what was your next position at IBM?

25       A    I was made a manager, of the data center.

1    Q    Of the whole data center?

2    A    Well, part of the data center.  It was two

3  shifts I was responsible for, so two-thirds of the

4  data center.

5    Q    And how many people did you manage in that

6  capacity?

7    A    I managed -- it was about 50 people.

8    Q    And on what basis were you promoted?

9    A    My skills that I demonstrated.  I mean

10  manager's generally looking for is leadership, someone

11  who can -- with interpersonal skills, you can motivate

12  people, you can work with people, and plus being in

13  the field that we're in, there has to be a level of

14  technology skills that you needed, and I'm assuming

15  that's what they based the promotion on.

16    Q    How long were you at IBM before you received

17  this first promotion?

18    A    I think it was within my first year.

19    Q    At some point early on in your career were you

20  identified and evaluated for your potential?

21    A    Yes, I was.

22    Q    And when was that, as best you can recall?

23    A    If I recall correctly, it was in -- I wasn't

24  with the company that long.  I think it was 1968.

25    Q    How were you selected?

1          A     Actually it was -- I was surprised, pleasantly

2     surprised, but it was a rigorous process where you

3     would have to be -- managers would have to nominate

4     individuals who they wanted to be considered for this,

5     and there was a criteria they had to go through in

6     order to nominate someone, that nomination from all

7     these managers, and it kept going up and being

8     filtered down and sorted and sorted until it got to

9     the executive level, who had the ultimate decision on

10    that, and they decided out of all the candidates that

11    were provided to them who would attend that session.

12         Q     So you had to have an executive sponsor you to

13    get into the program?

14         A     Yeah.  My executive -- my business unit would

15    have to represent me, or think enough of me to bring

16    me forward, and then it went to another executive in

17    IBM who had other executives report to them, kind of

18    confusing, but they made the final decision on who

19    would attend.

20         Q     Can you give us some idea, approximately, how

21    many people were in competition for, let's say, one

22    spot?

23         A     Oh, God.  On my unit alone, I'm not sure exact

24    number, but there had to be 20,000 of us that were

25    within that one director's responsibility.

1    Q    And how did you perform in that program?

2    A    Very interesting.  I did well.  I think I did

3    well, because I wasn't asked to leave.  And then when

4    I got back to the office I was called in by this

5    executive, and I was told that the evaluation that

6    they had written up on me -- and there were executive

7    observes in this session.  It was kind of an

8    interesting exercise.  But the report that they wrote

9    up on me said that I was someone that was identified

10   that they should take, you know, and do other things

11   with them as a result of my evaluation.

12   Q    And in terms of your career, what was the

13   consequence of that evaluative process?

14   A    It was interesting, because what was explained

15   to me at the time -- the idea was if you're going to

16   be an executive at IBM -- IBM is huge -- they wanted

17   to move you around to different areas in IBM, so you

18   could get a background on how those areas perform, and

19   you get a better appreciation for IBM as a total

20   business.  So what he told me at that point, even

21   though I enjoyed the job I was in, he told me they

22   would start moving me around to different assignments

23   across IBM, and that's what happened.

24   Q    And can you recall a number of the geographic

25   locations to which you were later assigned?

1       A    Wow, they had me all over.  I was in

2    Washington, D.C., working with the federal government.

3    They put me down there for that.  Chicago, Illinois.

4    I went there in middle of winter, which is not

5    pleasant.  Nice city.  And I was working on banking so

6    they got me into the financial area, sector, of IBM,

7    so I was working with the IBM sales team out there on

8    that.  I was in Palo Alto, California, working on the

9    networking area for IBM.  I think it was Denver,

10   Colorado.

11      Q    What business area were you involved in when

12   you were in Colorado?

13      A    Colorado was -- I think it was our business

14   recovery.  Yeah.  I'm not a hundred percent sure, but

15   I think that's what it was at that time.

16      Q    What's that mean, business recovery?

17      A    That's when a data center crashes, working on

18   it somewhere else, that type of work.

19      Q    Other locations?

20      A    I worked in White Plains, New York.

21      Q    Is that where the headquarters is for IBM?

22      A    It was for our business unit at that time.  It

23   was 1133 Westchester Avenue.

24      Q    Did you work in New Jersey?

25      A    Yes, I'm sorry, I did work in New Jersey.  I

1    spent -- hopped around different areas, all around.

2        Q    What business were you involved in there?

3        A    That was telecommunications.  That was

4    companies that manufacture communications equipment.

5        Q    In 1989 did IBM select you to participate in

6    its graduate business management program?

7        A    Yes.

8        Q    Do you recall how many IBM employees were

9    selected to receive this training at that time?

10       A    I think our class size was 25, 20 to 25.

11       Q    And that was out of how many people?

12       A    The who was putting up the candidates was

13   probably about 1,500 people that were being

14   considered.

15       Q    And please describe the purpose of the

16   graduate training program?

17       A    It was really to -- it was an accelerated MBA

18   program, a mini-down MBA program.  Companies, I guess,

19   all do that.  It's an executive MBA program.

20       Q    And was the program part-time or full-time?

21       A    Well, that was the thing, you had to be freed

22   up from your current assignment and it was full-time,

23   and the rules were your manager, your department, no

24   matter what happened, they couldn't pull you back, you

25   would have been on a do-not-disturb position while you

1    were attending that.

2        Q    How many days a week was it?

3        A    Seven days a week.  It was a crash MBA

4    program.  We worked on weekends.  We had homework,

5    quizzes, so forth.

6        Q    And where was it conducted physically?

7        A    It was in -- I believe it was stayed in dorms

8    in Pace University, which I think is Westchester

9    County.

10       Q    What was the curriculum, just quickly?

11       A    They flew in professors from Arizona

12   University that taught the course, so they were there

13   for the duration of this.

14       Q    And those are the professors.  What

15   curriculum?

16       A    It was really -- it was MBA.  How do you run a

17   business.  It was no longer the technical side, which

18   is where I had been.  When I was moving around I was

19   learning all the different technical things.  This was

20   more on a higher level on how you run a -- doing

21   financial forecasting, reading financial reports.

22   There were courses in microeconomics, macroeconomics,

23   statistics, so forth.

24       Q    Did you successfully complete that program?

25       A    Yes, I did.

1       Q       And were you graded for your work?

2       A       Yes, we were.

3       Q       I'd like to have you take a look at Exhibit 5

4    and just quickly identify what that document is,

5    please.

6       A       That's a congratulations on graduating the MBA

7    program, and it's signed by Larry Ford, who was a

8    senior executive at IBM.

9       Q       And do you recall where you stood in your

10   class?

11      A       I was in the top third.

12      Q       Generally in the nearly 30-year period between

13   1968 and 1996, what happened in your career?  Trying

14   to accelerate this forward, so between '68 and all the

15   way to '96, just generally, what was the process?

16      A       Well, I was on this movement around various

17   parts of IBM, and I was very fortunate because I was

18   getting promoted into different jobs as I moved along

19   this window of time, and which was interesting.  It

20   was a very rewarding time; difficult time because you

21   were moving around so much.

22      Q       At what rate did you receive these promotions,

23   generally?

24      A       Not a hundred percent sure, but I think it was

25   like every two or three years they would move me to a

1    different job, a different position.

2        Q    And were you working in any one particular

3    kind of business at that time period?

4        A    In that period of time, no.  I was moving

5    around.  That's what the concept was, to move around

6    and get experience, a broad experience.

7        Q    And what experience, if any, did you get in

8    IBM's networking design and engineering area?

9        A    Oh, that was -- I enjoyed that the most.  But

10   in that particular area it was really designing --

11   obviously learning simulation runs of networking

12   designs.  I was doing engineering design work.  We

13   were looking at product.  We were prototyping products

14   that IBM was selling, network products at that point,

15   and I was involved with all of that.

16       Q    Did you have any experience in that time

17   frame -- what experience, if any, did you have in that

18   time frame with respect to sales, technical sales and

19   engineering sales?

20       A    I did get exposed to that when I was in

21   Chicago at -- I can't think of the name of the bank,

22   but I was reporting to the branch manager in that

23   area, and that was on the sell side.  There actually

24   the salesman were selling IBM products out there.  I

25   was tagged along as to assist the sales team in the

1    selling of that, and that was more bringing my

2    technical knowledge to the sales team, to assist the

3    sales team, but it was also to teach me how it all

4    works in the marketing area of IBM.

5        Q    Can you estimate the approximate number of

6    positions that you held in that 27-year period between

7    '68 and '95?

8        A    Wow.  Like I said, my experience was every

9    couple years I would move to a different job, so every

10   couple years it's three, ten, twelve, ten positions,

11   maybe, eight.

12       Q    At some point -- after getting that diverse

13   background, at some point did you become specialized?

14       A    Yes.

15       Q    And approximately when was that?

16       A    That was around '95, '96.

17       Q    And in what area?

18       A    It was IBM outsourcing.

19       Q    Can you help us understand what that means?

20       A    I'll try.  At that point IBM was getting

21   into -- not only -- prior to that we had been selling

22   products, IBM products, to provide maintenance to kind

23   of what I described before.  Now we were getting into

24   taking over someone's entire IT organization.  So --

25       Q    IT standing for?

1      A     I'm sorry, information -- it's information

2    technology.  And it's really going into a company

3    that -- a company could be like a bank, and the bank

4    has these terminals and these servers that help run

5    their business.  We would go in with an approach as

6    part of our outsourcing business and tell the bank,

7    we'll take over running all of that stuff to servers,

8    the network screens that your tellers have, you

9    concentrate on your core business, which is finance,

10    accounts, selling, loans, so forth, and that was

11    outsourcing, and we did that in all the industries,

12    all aspects.

13      Q     So you're starting to focus on the strategic

14    outsourcing work.  What was your first promotion to an

15    executive level position?

16      A     It was certainly after I went in there, I was

17    promoted to a director level.

18      Q     When you say "went in there", what do you

19    mean?

20      A     When I went into the outsourcing part of

21    IBM -- excuse me.  I'm sorry.  I was promoted like

22    within the first year, and shortly after that I was

23    promoted to the director of an outsourcing contract.

24      Q     And we're going to need to get into a little

25    bit more IBM-ese here.  Was there a band or a label

1    associated with that promotion?

2    A    Yeah.  I guess because they're computers we

3    have to deal with binary numbers, but as you saw on

4    the PBC, IBM is like 1, 2, 2 plus, 2 blah, blah, blah,

5    and that equates to something in English.   In the

6    executive ranks there were bands, there were four band

7    levels, and they were A, B, C, D, the top being the A

8    position, and the entry level being the D position.

9    When I became director I entered into at the low end,

10   which was the D executive.

11   Q    Was that the first time you'd actually entered

12   the ranks of what IBM acknowledges as an, or describes

13   as an executive level?

14   A    Yes.

15   Q    And that was a Band D?

16   A    That was a Band D, correct.

17   Q    And what level had you been immediately prior

18   to that?  What's below the Band D?

19   A    I was -- again, we had a different number

20   system, but I believe it was a band -- but it was a

21   senior advisory level, so it was the highest level you

22   could achieve at that position, so it's like band --

23   I'm pretty sure it was a Band 10.

24   Q    You're saying 10?

25   A    Ten, number 10.

141

1       Q      What was your first executive title -- what

2    was your title in that position that you were promoted

3    to in 1996?

4       A      The title I had was senior delivery project

5    exec.  Which was --

6       Q      What does that mean?

7       A      SDP.  It really is -- you're in charge of

8    managing a bunch of people, and delivering the

9    services that are contained within that outsourcing

10   department.  So the example I used before, the bank,

11   it would be the people would work for me and I had

12   overall responsibility for managing the day-to-day

13   running of that information technology infrastructure

14   that was there.

15      Q      And was there a specific company that you were

16   promoted to have that role for?

17      A      Yes.  I was specifically assigned -- when I

18   became the director and then senior DPE position, I

19   was assigned to one contract, which was United

20   Healthcare.

21      Q      And what were your responsibilities as the DPE

22   at United Healthcare?

23      A      I was on the side that was responsible for

24   delivering day-to-day services to that customer,

25   United Healthcare.  All of their IT components was my

1     responsibility, to make sure it was available and

2     running for them.

3         Q     What was your understanding as to why you were

4     selected to run that particular account?

5         A     Well, United Healthcare at that point was one

6     of the earlier contracts that we had, and we had

7     some -- IBM had issues -- okay, let me restate it.

8     United Healthcare had issues with IBM on that

9     contract, issues as to what was included in the

10    contract, what IBM should be doing, which we weren't

11    doing.

12          There were also financial issues with that --

13    IBM had some financial problems with the way that

14    contract was structured and put in place.  And on the

15    customer side they had an IBM executive who was the

16    primary one that was interfacing with IBM, and being

17    dissatisfied in that area he was writing many, many

18    notes and calling many senior executives in IBM to

19    complain.

20        Q     And how did you come to get introduced to that

21    position?  How did you get presented to the client, if

22    at all?

23        A     The practice that we go through, which makes a

24    great deal of sense, is the customer is unhappy with

25    IBM, they were going to introduce me into that

1    position that I would take over and try to fix the

2    problems that existed there, but they wanted to

3    make -- IBM wanted to make sure that the customer was

4    satisfied with me coming into that position, so they

5    wanted to give the customer the right of refusal on

6    me, so I had to have -- I went -- I flew out to

7    Minneapolis, with my boss, and I was scheduled an

8    interview with the CIO for United Healthcare.

9        Q    And did United Healthcare accept you as the

10   DPE?

11       A    Up to that point it was the most grilling

12   interview I went through, but yeah, they were

13   satisfied with what we exchanged in that.

14            And the reason it's important is, they can

15   validate my background, other than looking at a resumi

16   or someone saying it, because they can ask you

17   questions, and you did -- you don't just meet with the

18   CIO, you meet with some of the other executives that

19   he has.  So they get a couple windows of opportunity

20   to talk to you to find out whether you're right, I

21   have the right skills to help them address what they

22   have.

23            But it also gives you moving into that role

24   the opportunity to sit with the CIO and the senior

25   vice president to understand what their expectations

144

1    were, what are the real issues.  Because you hear a

2    lot of that in the background, but until -- and

3    sometimes it's translated by an IBMer who doesn't want

4    to say it's IBM's fault, or by a customer blaming IBM

5    and it really isn't IBM's fault.  So it gives you an

6    opportunity to sit there and listen to them, and they

7    can tell you what they believe are the priority areas

8    that need to be addressed, so if you do anything else,

9    Jim, I want you to concentrate on this aspect first.

10       Q    How many people were you supervising in that

11   position as the DPE on the United Healthcare account?

12       A    I think it was -- I've lost track -- a little

13   over a hundred, I believe, in that role.

14       Q    Do you recall any milestones that you and your

15   team achieved?

16       A    The situation I went into, and why I was

17   placed in there, was because of serious customer

18   satisfaction issues.  The customer was unhappy with

19   IBM.  Some of it was justified, but some of it, quite

20   honestly, when we got in there, was not justified.  It

21   was a misunderstanding.

22            The other part of it was IBM had serious

23   financial problems, and when IBM has serious problems

24   on a contract like that, of course you tend not to

25   make investments that are necessary to fix, address

1    the issues, so -- because our financial windows are

2    measured on such quarter to quarter to quarter, so

3    there are financial sides, investment concerns.

4         And what we were able to do is we were able to

5    convince IBM through planning and showing what we

6    could do, So you may have to spend a little bit more,

7    IBM, but we can show you over the long haul, you can

8    actually reduce the run cost of keeping that customer

9    in place.  So it may cost you some now, but we'll get

10   that recovery later on.

11        So we were able to convince them, and we were

12   able to execute on that, so we did improve the

13   day-to-day running of that account, and as a result

14   the customer was very satisfied, so the customer Sat

15   went up, so we helped IBM financials and we helped the

16   customer.

17   Q    What awards, if any, did you win for your role

18   in that turnaround?

19   A    I forgot what they were called at that time,

20   but there were -- at the time the head of all of

21   Americas outsourcing, there was a recognition award.

22   I honestly don't recall specifically what it was, but

23   it came from the general manager who was running all

24   this outsourcing for IBM, and it was actually

25   financial I was given recognition through.

1    Q    And you served in that position as DPE on the

2    United Healthcare for how long?

3    A    I think I was there for about four years.

4    Q    1996 to 1999, sound about right?

5    A    Yeah, that is right, because I know where I

6    went next.

7    Q    So what was your next executive position?

8    A    From there it was decided, because -- well, I

9    mean United Healthcare at that point had stabilized,

10   and they took me and gave me -- instead of one

11   contract they gave me -- I think it was six contracts,

12   that IBM had me then manage, contracts like --

13   something that -- United Technology was one of the

14   contracts, and United Technology had all the different

15   divisions, so Pratt & Whitney up here was one of

16   those, and I think we were managing the outsourcing

17   with that.  Sikorsky Aircraft down in -- south.  So

18   those are two that were in Connecticut.  So it was

19   United Technology and its divisions, it was Stanley

20   Tools, it was Starwood Hotels, the luxury hotels.

21   There were a couple other in that mix also.  So it was

22   a collection of different contracts.

23   Q    And what was your title?  Do you recall?

24   A    Yeah.  I was acting like a senior VP.  I was

25   director, I think of delivery services, but I was a

1    senior VP over these individual contracts that had

2    their own leads on them.

3         Q    And at that point how many employees were you

4    responsible for?

5         A    That number would be larger.  I think the size

6    of the contract -- United Healthcare had the largest

7    data center in Newington.  It had to be over 500

8    people at that point.

9         Q    And what band -- had there been a change in

10   the band that you were in?

11        A    No.  I was still at the director level, Band D

12   level.

13        Q    And at what point, if ever, did you attain the

14   level of vice president?

15        A    That was my --

16        Q    Question withdrawn.  Let me ask you this.  How

17   long were you in that position?

18        A    That was fairly short.  I was only in that, I

19   think -- I believe it was less than two years.

20        Q    So that was up through sometime in year 2000?

21        A    It was into 2000.

22        Q    And at what point did you attain the level of

23   vice president?

24        A    That's when I was promoted to the vice

25   president level, in the latter part of 2000, I think

148

1    like October of 2000.

2        Q    And what band were you promoted to at that

3    point?

4        A    Going back to IBM's A, B, C, D, rankings, I

5    had been at a D and moved up one notch to a C level.

6        Q    In 2000 when you first achieved the level of

7    vice president, what was your job title?

8        A    I was vice president of service delivery for

9    Lucent Technology.

10        Q    So you'd gone from managing several contracts

11    back to just managing one?

12        A    Yes, but one very large contract.

13        Q    Explain what your position was.

14        A    I had responsibility for -- again, I hope I'm

15    not confusing anyone, but again, using the bank

16    example, we were going to take over the servers in the

17    bank and the teller screens and whatnot.  This was at

18    a much grander scale.  It was Lucent Technologies,

19    which was in New Jersey, which was a huge company.  It

20    was a spin-off from when AT&T divided, and they took

21    all of the technology and engineering part and that

22    became Lucent Technology.  Bell Labs went there.  And

23    it was a very, very large contract.  In fact, it was

24    the largest contract IBM had ever signed, and I

25    believe to date had ever signed as an outsource.  It

1    was what they called a mega deal for IBM.

2        Q    And how many people worked under you in that

3    position?

4        A    That was a big leap forward.  That was 3,200

5    people that reported to me in various capacities in

6    that contract, and that was across the U.S., and we

7    had a sprinkling in Europe as well.

8        Q    Please summarize for the jurors what your

9    responsibilities were as vice president on the Lucent

10   Technologies contract?

11       A    It was really running -- we took over running

12   all of their IT, and it was huge.  They were as big as

13   IBM at that point, which was huge.  I think they had

14   like 400,000 employees working for them.  That's why

15   I'm saying, 3,200 of us to work with.  We took over

16   all their cites where they had data centers, managing

17   all the of the smaller servers, which are smaller

18   computers, bigger than a desktop, but we took over

19   managing those across the U.S. as well.

20            So it was running of all of that.  We had a

21   help desk.  And it's -- I don't want to sound like

22   bragging, but I'm just trying to set the scope on

23   this.  The help desk we were running received over

24   10,000 calls, like, a day.  It was huge.  They would

25   get business calls -- we had a team -- we built a

1    whole center in Boulder, Colorado, to accommodate all

2    that.  So it was huge.  And the revenue on that

3    contract, as I said, in one year, one year alone to

4    IBM was a billion dollars.  That was the revenue to

5    IBM.

6        Q    I'm sorry, what?

7        A    One billion dollars.  So it was huge.

8             And the part that I managed was, I didn't

9    manage the sell side, I managed the cost side that was

10   responsible for maintaining the sites in the data

11   center, so my cost on it that I was managing at that

12   time was $600,000 worth of costs.  $600 million worth

13   of costs, I'm sorry.

14       Q    I want to just go back a second.  When you

15   were going to be placed in the Lucent Technology

16   position, what process did you go through, if any, to

17   be introduced to the client?

18       A    Oh, that was an absolute must.  I went down --

19   I think I had something like four or five interviews,

20   with Lucent.  I actually met with the CIO.  I met with

21   three of their executives -- they were senior vice

22   presidents, they weren't vice presidents -- two of

23   which we were taking over what they had been

24   previously running.

25            And same thing.  They talked about what their

151

1    issues were, what their expectations were.  They got

2    an opportunity to ask me about my background, and they

3    did.  They asked me about my background, would someone

4    from United Technology be willing to -- could they

5    call someone from United Technology and ask about me.

6    So they did a thorough background check on me before I

7    was accepted into the position.

8        Q    And what site work -- what sites were you

9    working at at that time?

10       A    My physical location was in New Jersey, and I

11   pretty much -- the CIO was moving around, and

12   generally on these outsourcing deals we co-reside with

13   the executive that is dealing with IBM on the

14   contract.  So I moved -- I think I started in

15   Parsippany.  It was the three locations that I went

16   to, and Murray Hill was the last location I wound up.

17   That was their old Bell Labs building.  So I moved

18   between these three locations.

19       Q    And what hours did you typically work in that

20   position?

21       A    Well, these jobs are all demanding jobs.  In

22   that particular one, you were in the office -- general

23   rule of thumb is you get in five minutes before the

24   CIO, you a leave five minutes after the CIO leaves,

25   but which was hard because he was a workaholic.  But

1    in the office a good ten hours, and then on call for

2    the balance of the day and the night.  And it wouldn't

3    be unusual if there was an outage somewhere, you'd get

4    a call, or the CIO had a question, or one of his

5    senior VPs would get a call.  It was seven days a

6    week.  It was Sunday through Saturday.

7        Q    Do you recall what your salary was in that

8    position in 2000, approximately?

9        A    Oh, boy.  With compensation?

10       Q    I mean compensation, not salary, total

11   compensation.

12       A    I think it was like $280,000.  I'm not a

13   hundred percent sure.

14       Q    Could it be 192?

15       A    It could.

16       Q    What do you think it was?

17       A    It was a lower number.  280 sounds high.

18   Probably around 200,000, because I was in that range

19   for a while, so I would guess...

20       Q    And in your first year as vice president

21   running the Lucent Technologies contract, what was

22   your PBC rating?

23       A    First year on that contract I was a 2 plus.

24       Q    Please identify the next document.

25       A    I only see one page.

1      Q      Actually go to document 7.

2      A      This is one page out of the PBC.

3      Q      So that indicates you got 2 plus, is that

4   right?

5      A      That's what that is.

6      Q      And this is a case where they used the words

7   rather than the number?

8      A      Right.  Not sure why, but yeah.  Well, if you

9   look at the 2 plus, the description for 2 plus is you

10  achieved everything and exceeded things.

11     Q      And would you please review the overall

12  assessment made by your manager for your first year in

13  that position?

14     A      Yes.  Under "Jim had done an extraordinary job

15  managing the Lucent account.  The severe problems in

16  Lucent's business has caused a rapid decline in the

17  services and staffing on the contract.  Through Jim's

18  leadership as the DPE we were able to anticipate

19  reductions, support the Lucent customer's needs, and

20  also exceed the contract profitability targets set by

21  our business.  Jim is considered by all execs in

22  GSD --" which is the unit I was in "-- as one of the

23  best DPEs in the strategic outsourcing--" that's the

24  outsourcing "-- business and the model for --"

25     Q      I'm sorry?

1      A     There's a second part of that.

2      Q     You can read it from yours.  What's the rest

3   of it say?

4      A     Well, here it is.  It was "-- a model for SO

5   DPEs managing large complex contracts.  Had our

6   overall SO business been more successful in 2001 and

7   achieved its plan, Jim's personal performance would

8   far exceeded --" in fact, some interesting story on

9   that.

10      Q     I'm sorry?

11      A     This is a 2 plus rating, but that was the year

12   our whole business unit didn't do well, and from --

13   the first time I ever saw it in IBM, but anyone that

14   was rated a 1 had to be downgraded, because the

15   business unit didn't meet -- even though the

16   individual exceeded, the business unit didn't do it at

17   a grander scale, and the edict came from above that

18   anyone who was rated a 1 would be -- had to be

19   downgraded because there would be no 1s in the unit.

20      Q     And you received a 2 plus nevertheless?

21      A     Right.  And I think that's why that comment

22   was put in there.  "Far exceeded" was the term that's

23   used for a 1 performer.

24      Q     And how long did you run that contract?

25      A     That was a little over two years, I believe.

```
 1      Q     Do you recall what your PBC rating was in the

 2   second year in the Lucent Technology contract?

 3      A     Yes.  The restriction was lifted and I

 4   achieved a 1 performance.

 5      Q     Would you please identify Exhibit 8?  What is

 6   Exhibit 8?

 7      A     Here's the rating.  Again, it's extraordinary.

 8      Q     Okay.  What other awards or other forms of

 9   recognition did you receive from IBM in your second

10   year on the Lucent Technology contract?

11      A     We went to Golden Circle.  We went to 100

12   Percent Club.  I did get -- our team was recognized at

13   the -- I think it was the Golden Circle.

14      Q     What does that mean, Golden Circle?

15      A     It's a recognition event for top performance.

16   The Golden Circle was more -- a lot of these

17   recognitions were on the sales side, but they were

18   bringing in the people that supported the sales side

19   that also helped the sales side be successful, and

20   that's what we might get, so it was people across the

21   U.S., actually the Americas, and we were chosen to

22   attend.

23      Q     You said something about being invited to the

24   100 Percent Club.  What was that?

25      A     The 100 Percent Club really had the strict
```

1   marketing side of IBM and they continued that

2   recognition event as well.

3       Q    And you stated that you were in that position

4   until late 2002, is that right?

5       A    Yes.

6       Q    And what was your next position?

7       A    From there I moved to brand new business for

8   IBM.  It was a startup business.  The title was On

9   Demand, but anyone -- people would recognize it today

10   as cloud computing.  So this was IBM's creation to

11   start the cloud computing, which we called at that

12   point in time On Demand.  So it was something brand

13   new.  It was drawn up on a sheet of paper, and that

14   was it.  It was one page, this is the concept.  And I

15   was brought in with the team to actually take it from

16   this one page concept into an actual service that IBM

17   could sell.

18      Q    So it was sort of a new startup sponsored by

19   IBM?

20      A    Yes.

21      Q    And what were your responsibilities in that

22   position?

23      A    That was soup to nuts.  It was define what the

24   services could -- what service we would offer.  It

25   was -- you had to figure out what it would cost to

1    provide those services, what services, how we would

2    market those services, how we would price those

3    services.  We'd work with consultants on this.  I

4    brought in consultants to help us evaluate this.

5         So it was a small team that was put together

6    of expertise in all these different areas, someone

7    from legal, someone from contracts, someone from HR,

8    someone from IBM technology area.  We had a marketing

9    team in there, so we looked at advertising, and so

10   forth.  And that's what we put together to build this

11   offering of IBM.

12   Q    And what was your position there?  What band

13   were you in?

14   A    When I was there I was a vice president, still

15   a Band C.

16   Q    And did you go from this plan to actually

17   having a product that you were able to sell?

18   A    Yes, we actually did.  We -- surprisingly,

19   with a lot of work -- it was very interesting because

20   it was something very new for me to go into.  But we

21   actually did come up -- we sold services.  I think we

22   sold close to a billion dollars of new contracts into

23   this service.  Now, that's not for one year.  That's

24   over -- a contract would be for three years, so you

25   have to take that and divide it by three, and so

1    forth.

2           Our customers were -- Williams Sonoma, is one.

3    We had Hallmark, which was interesting because that's

4    the first time Hallmark was going to allow you -- they

5    were offering up flowers, roses, for Valentine's Day,

6    so there was a lot of risk that we were doing for

7    them, otherwise they would -- they invested a fortune

8    in some farm in South America for roses, and we had to

9    really give it off right so that when Valentine's Day

10   would come around you could go in and order roses.

11   The other area were the video store.

12        Q    Blockbuster?

13        A    Blockbuster, right.  Blockbuster was a

14   different approach.  Blockbuster was struggling

15   financially, so saw this as an opportunity to save --

16   to reduce their expenses for IT and -- so those were

17   some, and we had more that came in with that.

18        Q    And by whom were you chosen to run this new

19   venture?

20        A    Tony Macina.

21        Q    And who was Mr. Macina?

22        A    I think at that point in time he was a general

23   manager.  I believe he was running -- he had global

24   responsibilities I think for IBM's outsourcing from

25   the delivery side.  So like the side of IBM that I was

1    a part of.  I believe that's what his role was.  But

2    he was the one that came up with this concept and had

3    gone forward in the business with the business model

4    on how this thing would work, this On Demand or Cloud.

5       Q    And when had you worked with Mr. Macina

6    previously, if at all?

7       A    I had worked -- Mr. Macina was my boss when I

8    was at Lucent Technologies.

9       Q    So you had just been working with him --

10      A    Right, right.

11      Q    -- fairly soon previously.

12           In that position, the startup position, how

13    many people did you supervise, if you recall?

14      A    That was a small group of subject matter

15    experts.  There were, I think, 20 to 30 of us.  That's

16    all.

17      Q    And --

18      A    To get it started.

19      Q    Can you identify Exhibit 9, please?  What is

20    Exhibit 9?

21      A    That's my PBC rating, or completed PBC

22    evaluation for me, for -- that would have been for two

23    thousand -- my work in 2003, and it's my rating and

24    comments by my manager.

25      Q    And how long were you in that position?

1      A     I believe I was there for almost two years.

2    We had the launch.  The launch was a success.  We had

3    the customers come in, and then I moved on.  I was

4    there until the beginning of 2005, that I recall.

5      Q     And Exhibit 10.  Can you identify that

6    document?

7      A     Yes.  That's a -- that's my PBC for 2004.

8      Q     That would be your second year in that VP of

9    On Demand computing position?

10     A     That's right.

11     Q     What was your PBC rating?

12     A     I was a 2 performer.

13     Q     So let's pick up with 2004.  What was your

14   next position at IBM?

15     A     I was asked to be the vice president of Public

16   Sector.

17     Q     And this was the position that ultimately Ms.

18   Collins-Smee removed you from?

19     A     That's correct.

20     Q     So let's start -- when were you assigned to be

21   vice president of Public Sector?

22     A     I was asked and accepted and assigned -- my

23   actual start date was January 1st, 2005.

24     Q     And what is meant by Public Sector, what's

25   that mean?

1      A      Again, working with basically the same thing.

2   We're still running -- I'm not going to go back to the

3   bank example, but we're still running all the IT

4   hardware equipment that businesses used to support

5   their business.

6          Public Sector was a grouping of like customers

7   under what we called the sector, and the like grouping

8   was I had state and local government, I had health and

9   life sciences, and I also had federal government.  So

10  any contracts in those areas or any interaction with

11  those from delivering day-to-day service, they would

12  fall under my area of responsibility.

13     Q      I think it might be helpful to look at the

14  organizational chart, which is Exhibit 11, and maybe

15  that will put some of this in context for the jurors.

16             THE COURT:  Before we go into this,

17  Barbara reminds me we've been going since 2:30.  Do

18  you think we should take a short break?

19             MR. CARTA:  That'd be fine.

20             THE COURT:  Until about ten minutes to 4?

21  That okay?  Hopefully the coffee is still warm in

22  there.

23             (Jurors excused)

24             MR. CARTA:  Ten minute break?

25             THE COURT:  Yeah, let's take a break

1    until five minutes to 4.

2              MR. CARTA:  Excellent.  Thank you.

3              THE COURT:  You're welcome.

4         (Recess taken from 3:39 p.m. to 3:57 p.m.)

5              THE COURT:  Please resume, Mr. Carta.

6    BY MR. CARTA:

7         Q    Mr. Castelluccio, can you use this

8    organizational chart to try to help us understand the

9    hierarchy?  We've been talking about lots of different

10   people and lots of different levels, and I think it

11   might be helpful.

12             MR. FASMAN:  Your Honor, if I could make

13   one request, we've get a fan right above us and it's

14   hard to hear Mr. Castelluccio.  It's harder to hear

15   Mr. Carta because he's facing away from us.  Could I

16   ask you to speak up a little bit?

17             THE COURT:  You can move that and adjust

18   it.

19             MR. CARTA:  I moved it because I didn't

20   want to be too loud.

21   BY MR. CARTA:

22        Q    Can you use this chart, and if it helps you to

23   stand and point, I think I'd ask you to do that so the

24   jurors can follow you.

25        A    Can I do that?

1      Q    Yes, absolutely.

2                THE COURT:  You want him to use a

3      pointer?  What is it you propose to do?

4                MR. CARTA:  I just want him to stand up

5      and use the chart so the jurors can see what he's

6      pointing to.

7                THE COURT:  You're talking about the

8      screen?

9                MR. CARTA:  On that screen, yes.

10                THE COURT:  Oh, I just caught sight of

11     that monitor now.  My peripheral vision is not great.

12                You can stand up, and let me move down

13     here.  Mr. Fasman and co-counsel, if you'd like to

14     come up both so you can see and hear at the same time.

15                MR. FASMAN:  I'll take a look, Judge.

16     Thanks.

17     BY MR. CARTA:

18      Q    Let's start with you.  Where are you on this

19     chart?

20      A    Work from the bottom up?

21      Q    Sure.

22      A    This is me over here.  And as I described

23     earlier, in 2005, January 2005, I became vice

24     president of Public Sector, and that's me.  And what

25     you see across here, it's a little hard to read, but

1    it's trying to show a higher tier.  These are my

2    peers.  So Carol McHattie was vice president Financial

3    Sector, and she had her own set of contracts that she

4    managed based on the Financial Sector.  So she had

5    banks, you know, J.P. Morgan, so forth.

6         Then you move across, it's the same.  Jim

7    Dickman was Industrial Sector, Joe Corranno was

8    Distribution Sector.  And one that's missing from

9    this, there was actually a fifth of us, that were

10   assigned to a sector, and it should be another bar

11   here, and that was Communications Sector, vice

12   president Communication Sector, and that was Tony

13   Grimaldi.  I think it was Sue Tang was vice president

14   of Canada, so she had a geography, she didn't have a

15   sector.

16        And Kim Smith was -- he was vice president of

17   Security Risk Management, so he kind of watched all of

18   us that we stayed in compliance, weren't violating

19   contract regulations, government regulations, and so

20   forth, as far as audits, and so forth.

21        And then Diane over here on the far right, she

22   owned most of the people that she gave to this crowd

23   over here for us to do our day-to-day ranges.

24   Q    When you say "own people", what do you mean by

25   that?

1    A    They actually reported to her.  She hired

2    them, she fired them, she managed those people.  We

3    would -- this group over here, the sector people, we

4    would go to her and say I need five people who know, I

5    don't know, Microsoft Windows, because this client has

6    a lot of desktops that are Microsoft.  She would find

7    the people in her organization, Jim, you can have

8    those, and over here I would assign them to one of the

9    contracts of my business.

10        So anytime we needed -- we would identify what

11   we need, we would go to her and say we need five of

12   these, six of these, seven of those, and she was

13   supposed to provide them in a pseudo just-in-time

14   fashion, and when I was done using them, because maybe

15   it was a short project with the customer, we would

16   give them back to her and she would allocate them

17   somewhere else.  So that was the dynamics going on.  A

18   little confusing, but it actually worked most of the

19   time.

20    Q    So going up above you, to whom did all those

21   people report?

22    A    All the blue people worked in the Americas;

23   Canada, U.S., and South America all reported in to

24   Joanne Collins-Smee.  Initially in 2005 it was Kelton

25   Jones.  Kelton owned this organization when I first

1    took this job.  He was the one that recruited me for

2    the job, and later on when he retired Joanne

3    Collins-Smee came in, and that's when she appeared, in

4    February 2007, so we all reported to her.  She did our

5    PBCs and so forth.

6       Q    Earlier we talked about Mr. Zapfel being the

7    second line manager who approved your critical rating,

8    2008?

9       A    Yes.

10      Q    And 2007.

11      A    Joanne had Americas.  As you can see, there's

12   some like her that had Europe, someone had Asia

13   Pacific, so forth.  They had a similar structure, but

14   reported into them.  So Joanne had Americas, and

15   Joanne reported to the general manager of ITDelivery

16   for all of these geographies or regions, and that --

17   initially when I was reporting to Kelton when I first

18   took the job in 2005, that person was Tony Macina, and

19   then Tony left about the same time that Kelton left,

20   so the two people I'd been working with for probably

21   the last three, four years of my service was with

22   Kelton Jones and Tony Macina in those positions.  They

23   retired, Joanne came in here, Joanne Collins-Smee and

24   Bob Zapfel came there, and then he reported up to

25   Moffat, and if you went up above that he reported to

1    the chairman of the board.

2        Q    And what part of that hierarchal chart

3    reflects people who were in the delivery --

4    outsourcing delivery business?

5        A    Across the world?  This was all outsourcing.

6        Q    So that captures the hierarchy of people who

7    were involved in that kind of business around the

8    world?

9        A    Right.  So going back to your point before,

10   Joanne or Kelton give my PBC.  What I explained

11   before, we had my annual evaluation, he or she would

12   sign it, it'd go up to Zapfel and Zapfel would sign

13   it.

14           Now, my particular case, I had a lot of

15   interaction with him.  Good or bad, I had a lot of

16   interaction with him.  So he knew firsthand what I was

17   doing.  You might look at this thing, and how could

18   you possibly know what you were doing.

19       Q    So let's go back to your chair, and we're

20   picking up -- that's where you were as senior vice

21   president and that's to whom you reported?

22       A    Correct.

23       Q    And again, just the business that that whole

24   sector was in, that Integrated Technologies, I think

25   it says Integrated Ops, what was that business within

1    IBM?

2         A    That was all part of our contracts that we

3    negotiated with the companies.  Like I used the

4    example before, United Technology.  We would go in and

5    take over running their IT departments.  We'd take the

6    people, we take their equipment, and we would run it

7    for them on a day in and day out basis.

8         Q    In 2005 when you first became vice president

9    of Public Sector, specifically what were your

10   responsibilities?

11        A    Maybe I should explain a little bit of Public

12   Sector so you understand it.  I had 30 contracts.  We

13   called them commercial contracts, but I had 30

14   contracts that I was responsible for doing this day in

15   and day out type of service, and the contracts were

16   grouped into different groupings.  I had healthcare,

17   and in the healthcare world, the kinds of contracts we

18   had in there, it was your insurers, like United

19   Healthcare, or Wellpoint, or Blue Cross Blue Shield.

20             So every year when you go in you do your

21   signups at the end of the year, it was one of those

22   companies like them that we were providing the IT

23   services for them.  We didn't have anything else to

24   do.  We weren't administrators, we were just running

25   what we always referred to as the plumbing that keeps

1    that running.

2         We also had hospitals.  That was another part

3    of the healthcare and life sciences piece.  So for

4    example, I had two contracts in New York City that I

5    was running, which was NYU Medical Hospital, which is

6    a teaching hospital, and Mount Sinai Hospital, and I

7    was responsible to the IT, running the IT within that,

8    and I'll explain a little bit more what that's like.

9         And then I had the pharmaceuticals.  So

10   Johnson & Johnson, AstraZeneca, it was research and

11   coming up with new drugs.  They also had large IT

12   organizations that we took over and ran.

13        And then we also had a couple that would

14   actually be the drug trials, like Colgate, J&J or

15   AstraZeneca had Colgate through drug trials, and we

16   would run that.  That's on the healthcare life

17   sciences side.

18        When you get into the state and local it was

19   government.  So for example, Commonwealth of

20   Pennsylvania, we ran their data center for them.  We

21   took over running that program for Pennsylvania.  If

22   you ever get a speeding ticket in Chicago, the

23   notification that you receive that's run off the

24   computers that you have to pay this fine, we were

25   running those systems, that Chicago downtown traffic

1    was running.

2         Then we had child services, in California, a

3    few other states, Indiana.  There were others that we

4    were running for them.

5         And I also mentioned I had federal government.

6    So we had contracts with U.S. Forestry where we were

7    running equipment that was sitting actually in the

8    towers where they were looking out for forest fires

9    and we were managing that equipment for them.

10        We were also doing it for Homeland Security.

11   So all of the records of the passbook and for across

12   the border, we were running a lot of systems for them,

13   and there were other contracts behind them.  Kind of

14   get an idea of the different types was companies.

15   Q    So what you've been talking about are an

16   example of the 30 contracts that you were overseeing

17   in that position as vice president?

18   A    Yes.

19   Q    Can you explain the services that you were

20   providing?  Let's just say for a hospital, just drill

21   down one level just for a minute, what was going on

22   with respect to one specific contract?

23   A    I don't know if there's any nurses here, but

24   I'll try to explain.  In a hospital, when you -- and

25   I'll use different areas of what we took over running

1    for them.  In the admissions office when you go in and

2    you sit down with the administrator on the other side

3    of the table and he's asking all -- or she's asking

4    all the questions, what's your coverage, address, who

5    should we notify first if something happens, and so

6    forth, when they're sitting at that terminal typing,

7    we're actually managing that terminal, and we're

8    managing what it's connected to, which is a bunch of

9    servers behind it.  So we're managing that, making

10   sure it's available to that administrator, so when you

11   walk in to the hospital to be admitted, it's running

12   for you.

13        Once you get beyond that and you're in the

14   hospital, the doctor walks around -- now they don't

15   have clipboards anymore, they have this -- like an

16   iPad that they're walking around with, portable

17   device.  What we were responsible for is that iPad was

18   connected to, again, a database of information about

19   the patient in that particular room; what they were

20   treated for, any vital signs that they had, any

21   medication they were on.  So the doctor had available

22   to him, as they walked around, they could just give

23   the room -- I'm assuming the room number, and it would

24   pull up that up information.  We made sure all those

25   things were running to be able to provide that

1    information.

2            And then the doctor, go one step further, is

3    if the doctor, they want to issue a new prescription

4    for an individual, they would go out to the nurse's

5    station -- and the nurse's station has multiple

6    terminals out there.  We were making sure those

7    terminals were up and running.  And when a

8    prescription's put in, it goes down to the pharmacy,

9    which is usually on a different floor.  We were also

10   supporting that.

11           So in a hospital there's a lot of vital

12   systems there that we had to make sure is up and

13   available to the doctor and nurses and pharmacists.

14   Q    So back to the next higher level, the 30

15   contracts that you were running, can you give the

16   jurors your best estimate of the total revenues that

17   were generated by all of those 30 contracts for IBM?

18   A    I believe as an aggregate of all of the

19   individual contracts, it was about 700, $700 million a

20   year in revenue that we were collecting against these

21   customers.

22   Q    Can you give us a general idea of the annual

23   revenues generated on one of the contracts, just a

24   range?

25   A    It varies.  There were little contracts that

173

1    we had.  There would be as low as, say, $10 million,

2    to -- the bigger contracts in this particular area,

3    the sector I had, was probably in the neighborhood of

4    about $40 million, $46 million.

5        Q    What was the typical length of one of those

6    contracts?

7        A    IBM preferred when they negotiated to get a

8    seven-year contract.  That was kind of the standard we

9    were trying to go to.  Customers were getting smaller,

10   didn't want to be tied up with us for seven years, and

11   they were setting up for a smaller period of time,

12   like three.  So it was three to seven year what IBM

13   wanted to set up.

14       Q    And your compensation in that position was

15   just a little over $200,000, around 217, is that

16   right?

17       A    That's correct.

18       Q    So to what extent were you the one responsible

19   for the quality of the services and the customer

20   satisfaction on all of those 30 contracts?

21       A    Well, we had day-to-day delivery of that and

22   were responsible for making sure that service was

23   available to the customer day in and day out, and we

24   had measured things that the customer was -- well, the

25   customer had measurements that we were being held to

174

1    as far as how we performed against all those things,

2    and for customer staff, we were a good part of it.  We

3    weren't a hundred percent of it, but we were a good

4    portion of it.  If they're satisfied with us because

5    we were keeping them running, we'd get a favorable

6    result.

7        Q    And in the role as vice president Public

8    Sector, with what frequency did you field complaints

9    registered by customers?

10       A    Well, that really varied.  Complaints were not

11   unusual.  You have a relationship role, you have a

12   customer with higher expectations than what we think

13   we sold them.  So it varied.

14            The better the way a contract was negotiated

15   and agreed to with a customer -- so it's like if you

16   have your kitchen redone and you're sitting with the

17   contractor and he's telling you what color the

18   cabinets, how many pieces, and so forth, were in

19   there, and he delivers on that, you're satisfied, but

20   if he comes in and says, I'll give you nice cabinets,

21   without getting into the details, and then he puts

22   them in and it's the wrong color, something like that,

23   you're dissatisfied.  So the better we had these

24   contracts defined where we told them what the cabinet

25   would look like, we had less issues.  Fewer

1    complaints.

2          The other side of that is where you didn't

3    have that well-defined where you stated things that

4    weren't achievable, they were very upset.  They had

5    every right to be upset, and they would register, and

6    they used every means possible to register, and they

7    kept up with those complaints until they were

8    satisfied something was fixed.

9          And some of it was a decision on IBM's part,

10   too, where we couldn't afford to deliver everything we

11   told the customer, so we would cut back and try to

12   hold back costs on that, and as a result the delivery

13   side was trying to meet the expectations of the

14   customer, but didn't have all the dollars to get the

15   necessary people, the necessary equipment, or get

16   newer equipment, and the customer perceived it as

17   fail, and we took risks on poorly written contracts

18   like unfortunately at the expense of the customer.

19   Q    So would you briefly summarize the

20   achievements of the Public Sector team in 2005, your

21   first year in that position?

22   A    Actually in 2005 when I took over we had one

23   really bad situation in New York City, but in spite of

24   that, when you compare -- on the org chart, my peers

25   there, we actually had measurements against each

1    other.  We outperformed the other sectors as far as

2    customer Sat.  We had the highest customer Sat rating

3    of all of my peers in that organization.  In fact, our

4    customer Sat is rated on a scale of 1 being the lowest

5    and 10 being the highest, and we had something like 10

6    of our contracts score as perfect, totally satisfied

7    with us.  So we had a very high score.  And our

8    financials, we were able to grow the business.  We

9    were able to show that we could deliver these services

10   in this sector, and as a result we had revenue growth.

11       Q    I think you indicated when you were looking at

12   the org chart, but to whom were you reporting at that

13   point, 2005?

14       A    2005 I was reporting to Kelton Jones.

15       Q    And his position, again, was?

16       A    He was the general manager of -- he made --

17   his title may have been vice president, but vice

18   president and GM are interchangeable at IBM, but he

19   essentially ran all ITD America, so he had all of the

20   Americas delivery responsibility.

21       Q    Did Mr. Jones provide you with an annual

22   review for your first year as vice president of Public

23   Sector?

24       A    Yes, he did.

25       Q    And do you recall what rating you received?

1     A     I believe I was a 2 plus.

2     Q     Could you look at Exhibit 13, please.

3           THE COURT:  That was 18?

4           MR. CARTA:  I'm sorry, 13.

5           THE WITNESS:  It's a 2 plus, above --

6     PBC, that's three on top, you've seen a couple of

7     these already, above average contributor.

8     BY MR. CARTA:

9     Q     And would you would you mind reading the

10    highlighted portion of your overall assessment,

11    please?

12    A     Sure.  "Jim provided strong leadership to his

13    team and led them in a very strong delivery

14    performance for the Public Sector across 2005.  Jim

15    provided key leadership in support of critical

16    situation management --" we call them Crit Sits

17    "-- within the sector accounts and key leadership in

18    driving balance in cost management."  That's where I'm

19    doing the equation of cost and delivery execution

20    across the accounts.

21          "Jim led his team in helping the sector

22    achieve their profit plans, and he and his team met or

23    exceeded his spend targets in every quarter."

24          Down at the bottom it says, "Jim and his team

25    do need to improve on the outlook/commitment roadmap

1    process around full year plans and quarter to quarter

2    dynamics.  This is a changing dynamic in our business

3    process and I know with the rigor Jim brings to his

4    overall management he and his team will get this

5    addressed as a focus area."

6        Q    So is it unusual in the overall assessment for

7    a manager to suggest to you the areas in which they

8    want you to continue to improve?

9        A    Generally not at all, is the answer.  And

10   during the actual evaluation process when you're

11   sitting with the employee and going through that, a

12   lot of times -- not a lot of times -- you bring up

13   these issues with them, and then you have the option

14   of just summarizing at the end so it's clear when you

15   leave there that that's an area you want to focus on,

16   was forecasting cost.  And we put it in there to make

17   sure I understood it, we had discussed it, here's

18   something I want you to look at.

19       Q    Did you also continue to work for Mr. Jones

20   for all of 2006?

21       A    Yes.

22       Q    Were there any important changes in your

23   responsibilities in your second year as vice president

24   of Public Sector?

25       A    My responsibilities stayed the same.

1     Q     Again, would you briefly summarize the major

2     achievements, if any, of your team in the second year

3     as VP of Public Sector, 2006?

4     A     2006?  Well, in 2006 a lot happened.  2006 was

5     a -- that was a difficult year, and a difficult year

6     in the sense that we had two large contracts that was

7     within my sector that were extremely profitable for

8     IBM, and that was United Healthcare, and that was

9     Pacific Care, both insurers that you register -- I

10    mentioned before about when you go and get your

11    benefits -- they were too large.  In fact United

12    Healthcare at that time was the largest Healthcare

13    provider in the U.S.  We had those two contracts.

14         They decided they didn't want to continue

15    doing business with IBM and they terminated their

16    contracts, and the reason that happened was they had a

17    new CIO team come in and they feel more comfortable

18    running their own business than giving it to someone

19    else to run.  That's not unusual.  That happens.  So

20    they took -- those two contracts were terminated,

21    which were very, very profitable for IBM.

22         They were, in fact, masking a problem that was

23    starting to surface on another contract.  They were

24    masking the problem of how bad Wellpoint was.  We had

25    signed Wellpoint in -- I think it was July of 2005.

1   We were really getting into running it in 2006, and

2   the financials on those were not really that visible

3   until the two that were offsetting the damages from

4   Wellpoint left IBM, and now you had this huge -- I

5   don't know what it was.  It was like a -- I don't want

6   to say a number because I don't remember, but it was a

7   large number of revenue and profit, and the main thing

8   is profit for IBM, that left, taking it back in-house.

9   And what that looked at -- you had this other contract

10  now that was new that was starting to have a

11  significant effect on the other 28 contracts that were

12  still within the Public Sector, and it got a lot of

13  attention.

14      Q    In terms of your other achievements in terms

15  of the second year as VP of Public Sector, how did you

16  do in terms of the -- what you call the customer Sat

17  or customer satisfaction ratings?

18      A    We lost our two favorite accounts, right?  But

19  we continued to lead my peers in performance on client

20  satisfaction.

21      Q    And did you have any significant audits during

22  that one-year period?

23      A    That's another thing I should mention.  2006

24  was also interesting because we had audits of how we

25  were running and handling the business, and those were

1    corporate audits.  We do our own internal friendly

2    audits to help you know where you may have problems

3    and then you can actually address.  There's no penalty

4    for friendly ones, but when you had a corporate audit,

5    IBM goes out -- I think at the time it was PWC,

6    PricewaterhouseCoopers.  And they bring them in to do

7    an audit.  And that particular audit, when it's done,

8    I believe it has to be reported all the way to the

9    chairman's office.  We had seven contracts within my

10   sector.  It was like a feast on Public Sector, of

11   doing audits across the seven individual contracts

12   within our sector, which puts a lot of stress and a

13   lot of focus within our area.

14       Q    And how did your seven contracts do, the ones

15   that got audited?

16       A    It was a lot of sleepless nights, but we

17   passed all seven.  All seven were reported back to the

18   chairman's office and to the board that we had passed

19   the seven audits successfully.

20       Q    What was the biggest challenge your team was

21   facing in 2006?

22       A    2006, as I mentioned, was the surface of the

23   Wellpoint contract and how bad it was.  We had a

24   glimpse of it in the end of 2005, but it really became

25   in focus in 2006.

182

```
 1       Q     There's something called a transition phase.
 2    Can you explain what the transition phase is in the
 3    context of the outsourcing business that you were
 4    overseeing?
 5       A     Transition is any new contract we signed,
 6    outsourcing contract -- like, for example, I was
 7    talking about -- Wellpoint, for an example, we signed
 8    that contract -- Wellpoint, by the way, is an
 9    insurance provider.  They rival -- the two leaders in
10    the industry, the Americas, at least, is United
11    Healthcare and Wellpoint.  They're the two largest.
12    By far they dwarf the Blue Cross Blue Shield, so
13    forth.  In fact, they were sweeping up Blue Cross and
14    Blue Shield.
15       Q     You were talking about transitions.
16       A     We go through this long period of time of
17    negotiating the contract and then we -- when the
18    customer signs, we go through a transition period, and
19    we say we're going to transition what you have the way
20    you're running it and the way we prefer to run it
21    within IBM.  And we do that because we feel that's our
22    core.  We perfected it and we're able to do what
23    you've been doing at a much lower cost, much more
24    stable and predictable environment than what you had
25    before.
```

1        And during transition is when we start

2    converting it over to the IBM way of doing things, and

3    that includes putting special tools out in the

4    environment, it includes changing the way they do

5    things, process type work, and it also means the

6    people that we bring over with that project to IBM, so

7    in this particular case there were a number of

8    Wellpoint employees that were running the department

9    as part of our outsourcing deal, we brought them and

10   made them IBMers, transitioning into IBM, and there

11   was like 380 or 390 people that fell into that

12   category, so we took a large population that were

13   Wellpoint employees and brought them into IBM.

14       Q    In 2006 where were you in that process, where

15   were you sequentially?

16       A    2006, there were delays in -- there were a lot

17   of delays for a number of reasons.  I won't go into

18   that.  But that was causing some of the problem.  The

19   customer was changing their mind on some things.  We

20   were beginning to transition in -- the major parts of

21   the transition -- they had a data center.  We wanted

22   to take a bunch of their data centers and move it into

23   one so they could sell those buildings off and get rid

24   of those leases and save money, and that transition

25   into that center required their center to be upgraded

1    power-wise, because they were -- you were doing more

2    in there.  So they had a major event, so there would

3    be a successful power upgrade in the beginning of the

4    year, and then later on they wanted to get out of the

5    California data center, which was built on a fault in

6    California, had severe -- a single feed of power, so

7    it was very susceptible to power outages.  They

8    couldn't deal with it, and it was a disaster.  They

9    knew it.  I'm not saying anything that they wouldn't

10   agree to.  It was a disaster.  So they were very

11   anxious to get out of there because it was a time bomb

12   ticking on them.  So we had to get this power upgrade,

13   which was -- had to happen first, and then we could go

14   out there and take that center and move it into the

15   center of Richmond, Virginia.

16       Q    We'll go into that in more detail.  I'm trying

17   to deal with high profile in 2006.  Were you able to

18   reduce any costs on the Wellpoint contract in 2006?

19       A    Yeah.  To give you an order of magnitude on

20   this, in 2006, when United Healthcare and Pacific Care

21   left, we zeroed in on Wellpoint, and Wellpoint was

22   going to lose $46 million to IBM.  Or $48 million to

23   IBM.

24           So by running that contract, we were having

25   more cost than we had revenue, and for one year alone

```
 1   we were going to lose $48 million on that contract.
 2   You don't fix that overnight.  But what we were able
 3   to do is take some of the quick paths to get fixes in.
 4            So working with my team and part of the
 5   collective team that's working on this, we were able
 6   to mitigate some of the damages from that down to $23
 7   million.
 8       Q    And was the customer satisfaction survey
 9   conducted on Wellpoint in that first year?
10       A    No, it wasn't.
11       Q    Your second year on the job, the first year of
12   the Wellpoint contract?
13       A    2006, which was the first full year of running
14   Wellpoint.
15       Q    Right, second year on the job as VP.
16       A    2006 there wasn't a Wellpoint customer Sat
17   done.
18       Q    Correct.  Okay.  Did you discuss the
19   challenges of Wellpoint with Mr. Jones, Kelton Jones?
20       A    Yes.  I mean it was so significant, you can't
21   hide something like that.  It has to be brought
22   forward to the business.  The business needs to know,
23   they have this huge contract they just signed.
24       Q    So to what extent did you find him
25   knowledgeable about the challenge they were being
```

1   faced on the Wellpoint contract?

2      A    Well, we did a couple things in 2006.  Really

3   zeroing in on what was wrong, we had a good sense of

4   what was wrong, but we needed verification.  So we

5   knew in -- going into 2006 that we had this problem.

6      Q    Did you receive an evaluation from Mr. Jones

7   at the end of 2006?

8      A    Yes.

9      Q    And that's Exhibit -- can you identify Exhibit

10  14?

11     A    Yes, that's it.  That's my 2006 performance

12  that was evaluated in January.

13     Q    And what was your rating?

14     A    I was a 2 solid contributor.

15     Q    On the bottom of the overall assessment, is

16  there a discussion of the Wellpoint contract?

17     A    Yes.

18     Q    Is there a reference to -- please review that

19  with the jury, if you would.

20     A    The highlight, "Jim had a solid year in people

21  management responsibilities.  He and his team dealt

22  with a very difficult environment around one of the

23  troubled accounts."

24     Q    What troubled account was that?

25     A    That was Wellpoint.

1    Q    Okay.  Go ahead.

2    A    "This account was under severe financial and

3    performance stress, and the workload and stress on the

4    people was significant.  He and his team were able to

5    deal with this, continue to work on options to relieve

6    the situation around the people side of the account

7    issue."

8    Q    What does that mean, "people side of the

9    account issue," what did you understand it to mean?

10    A    Well, we were so understaffed on that contract

11    based on what was negotiated, people were quitting.

12    We were working them around the clock and we were

13    losing a great deal of talent because they couldn't

14    stay in the work environment and they were quitting.

15    We also couldn't get the necessary skills in some

16    areas that we needed because they weren't available

17    within IBM.

18    Q    Okay.  The last sentence, please.

19    A    "Jim also provided sound leadership across his

20    team in dealing with the ongoing people management

21    responsibilities."

22    Q    Did you receive a raise for 2006?

23    A    Yes, I did.

24    Q    And do you happen to recall what your total

25    compensation package was at that point, at 280,000 I

1    think you said earlier?

2        A    Yes, this was the year, right.

3        Q    And who participated in determining your

4    compensation package?

5        A    Actually it starts with your manager, so it

6    would be Kelton, and then it works across the unit, so

7    I'm sure Bob Zapfel had some view in this.  Well, at

8    that time it would have been Tony Macina was involved.

9    Kelton would have looked across his organization.  He

10   would allocate developers to go with it.

11       Q    So let's talk about this in a little more

12   detail.  And I'll try to go through it quickly, if we

13   can, but there are some important numbers here.

14            So among the 30 contracts that you were

15   overseeing, as vice president of Public Sector, one

16   was the Wellpoint contract, is that correct?

17       A    Correct.

18       Q    Did you say when that contract went into

19   effect?

20       A    It was signed, I believe, in July of 2005.

21       Q    And for how many years was the contract

22   scheduled to run?

23       A    It was a seven-year contract.

24       Q    And do you recall the total revenues that it

25   was supposed to generate for IBM?

189

```
 1     A    It was $720 million.

 2     Q    And that's reflected in Exhibit 15?

 3     A    That's correct.

 4     Q    I think you said earlier that there were a

 5   number of employees that were going to be -- that were

 6   former Wellpoint employees that were going to become

 7   IBM employees as part of the transition process?

 8     A    Right.

 9     Q    And approximately how many were those?

10     A    Well, this says 380, but I think the number

11   was more like 390, but it was close enough.

12     Q    And do you recall how many locations Wellpoint

13   had?

14     A    They had four large data centers, but they

15   were in locations -- they had processing centers for

16   doing claim processing, where your administrators

17   would be seated for that, and that was across the 80

18   locations across the U.S.  I'm sorry, it was three

19   main centers, California, Missouri, Georgia, would be

20   the --

21     Q    How many locations coming -- in the aggregate?

22   Do you know?

23     A    Data centers?

24     Q    Just locations.

25     A    Locations was 80.  There were over 80
```

1    locations.

2        Q    I think you indicated that Wellpoint and

3    United Healthcare were in the same business?

4        A    The two largest companies, healthcare

5    insurers.

6        Q    What were the services that were being

7    provided by IBM to the Wellpoint account?

8        A    We were managing, again, all of their -- what

9    I call its servers.  And there are different size

10   servers.  Not to confuse anyone, but there's little

11   ones that support little departments, processing, and

12   very large ones that run a whole business unit, and

13   large ones was claim, called engine.

14            So every time when you submitted -- if you

15   were a -- Wellpoint was your insurer and you were

16   submitting a claim, because you had come from the

17   doctor, you were managing the servers that the actual

18   claim processing was taking place, and even the

19   printing of the reports that you could then mail --

20   now they do them through e-mails -- but you would get

21   a paper report as a result of that, and we were

22   managing all of that for them.  Enrollments.  Any

23   disputes we would handle.

24       Q    I think you also said there were two major

25   critical projects that needed to be accomplished early

1   on?

2       A    Yeah.  The CIO made it very clear that the two

3   most critical projects he had in 2006 was -- and it

4   was value driven by the fact that the data center --

5   his data center in California which we were now

6   managing was in a meltdown, and his two critical

7   things, which he made it very clear, was get

8   California into his Richmond center, but for that to

9   happen there had to be a major upgrade in the Richmond

10  center, and the major upgrade in the Richmond center

11  had to be done while they were still doing their

12  business processing, they were still doing claims

13  processing.  So you had to figure out -- almost like

14  the expression, you have to change the wheels on the

15  car while it's running, and that's what -- we had to

16  put a plan in place to do that, without disrupting

17  their business.

18      Q    And when did IBM really fully begin to

19  understand the magnitude of the problems with the

20  Wellpoint account?

21              MR. FASMAN:  Objection, Your Honor.

22              THE COURT:  Basis, sir?

23              MR. FASMAN:  I don't think he can testify

24  as to what IBM understood in any case.

25              THE COURT:  What do you think were the

1    reasons?

2                    THE WITNESS:  IBM knew in 2006 -- I mean

3    all levels.  You know, the financial officer in IBM

4    knew, executive level, senior executive levels in IBM

5    knew that we were troubled, one step away from --

6                    THE COURT:  The objection's sustained.

7    BY MR. CARTA:

8        Q    Mr. Castelluccio --

9                    THE COURT:  Stop.  The question may

10   stand, but the response will be stricken, because it

11   is not responsive.

12                   Would you either re-ask the question, Mr.

13   Carta -- I prefer that you re-ask the question rather

14   than ask the court reporter to read it back.

15                   So I wold ask you please to listen very

16   carefully to Mr. Carta's question and confine your

17   answer to just his question.

18                   Go ahead.

19   BY MR. CARTA:

20       Q    My question was in error.  I will rephrase it.

21            When did you begin to understand the magnitude

22   of the problem at Wellpoint.

23       A    In the first quarter of 2006.

24       Q    And what was -- what were the circumstances

25   under which that became apparent to you?

1       A    We were starting to look at the financials

2   associated with the account, what it was costing us to

3   deliver these services to the customer versus what our

4   contract cost model said it should cost for us to

5   deliver these services.

6       Q    And what became apparent with respect to the

7   contract itself, if anything?

8       A    There were a lot of -- I mean there were

9   errors in simple calculations.  A bad number was

10   plugged in one of the formulas.  That generated a big

11   problem for us.  The team that put together the

12   costing that went with the contract, with the terms of

13   the contract, had severely undersized the environment

14   of the customer, had severely underestimated how

15   antiquated some of the equipment was that we were

16   taking over.  There were assumptions made that were

17   false assumptions, and we were starting to discover

18   those errors and assumptions.

19       Q    Can you give an example of the last point, the

20   outdated equipment?

21       A    They had a mail system in place that -- if you

22   have an e-mail subscriber, you expect your e-mail to

23   be available, but the e-mail system that they had in

24   place was -- it was -- make sure I don't use an IT

25   term, but if you were trying to get e-mail from

1    California to someone on the east coast, it had only

2    one path to get there.  If at any point along that

3    3,000 mile path something goes wrong, your e-mail is

4    not forwarded, it's stopped, and it's not only your

5    e-mail, but everyone in your geographic area in

6    California can no longer communicate with someone on

7    the east coast.

8            And the reason for that is they had

9    implemented it -- I don't think it was designed -- I

10   think it was implemented that there was a single path,

11   a single box that everyone had to go through to get to

12   their next destination.  That single box was old.  It

13   was undersized.  The software on it was not

14   maintained.  So it was down many levels on it.  So it

15   was an old system that was undersized and

16   underpowered.

17       Q    You also said there were pricing issues with

18   respect to the contract.  Can you give an example of

19   one of those?

20       A    Just one example of that, on how it can

21   magnify, storage was a problem, and storage in this

22   business is -- all your claim information has to be

23   kept somewhere.  It's not in my cabinets anymore.

24   It's out on, you know, IT equipment where it's being

25   stored.  And we charge a price for every piece of data

1    that they want to store in that environment.

2         The price we had put out there I think was

3    calculated at -- I think it was like 86 cents a gig.

4    A gig is just a piece of information.  So it was 86

5    cents for a piece of your information to be stored in

6    their system.  When we looked at this we realized that

7    it should have been 2.45, not 86 cents, and by the

8    way, it was costing us -- that's what we should have

9    charged them, 2.45, and by the way, it was costing us

10   2.85 to deliver it, so even if we had the right price

11   for it, we had a problem with cost of delivering it.

12        And when you look at that, it was -- trying to

13   think of the size of the problem -- I think over the

14   life, it was a $56 million problem alone just going

15   from 86 to 2.45.  And that's a simple example of one

16   of the problems on the contract.

17        And that's not easy to fix.  Because what we

18   are saying is it should have been 2.45, it's costing

19   us 2.85 to do it, we need to get below 2.45, but we're

20   never going to get down to 86, it's impossible.  So

21   that's an area that came forward as a problem, and the

22   only way to solve that is you have to go back to the

23   customer and see if you can renegotiate that piece.

24   Q    Can you give an example of a contract term

25   issue that arose on the Wellpoint contract?

1      A      An example of that is where they interpreted

2     that we had agreed to take over a piece of their

3     business that we never had figured -- we never

4     expected to take over that piece of the business.  We

5     had priced it, considered it.  It was something we

6     didn't want.  Not that we didn't want, we just didn't

7     put it in the contract.

8      Q      What was that piece of business?

9      A      There was one area called FileNet, another

10    area called the Blackberry services.  And those two

11    areas we just -- it wasn't in the contract.  You look

12    at the contract, there was no reference in there at

13    all, but they expected us to deliver it.  And believe

14    me -- Blackberry in particular -- because Blackberry

15    was their mobile device that every -- the CIO, at

16    least, I know at his level, he used that every day to

17    communicate with his Blackberry and use it for e-mail,

18    and voice, obviously.  And we didn't have any

19    support -- we didn't have skill in that area to

20    provide that support.  And the problem was every time

21    he couldn't send a message, he got on the phone and he

22    would be screaming about, I've lost access.

23            And it was a big -- it was fair, it was a big

24    impact to him.  The problem was, he expected that we

25    had signed up for it, and we didn't sign up for it, so

1    we weren't ready for it, and we didn't have a great

2    deal of knowledge in IBM, didn't know how to do that.

3    We did staff up for it, but it caused problems.

4              MR. FASMAN:  I have to make the same

5    objection.  I mean Mr. Castelluccio's speaking on

6    behalf of IBM.  There's no evidence he negotiated the

7    contracts, no evidence of any of this.

8              THE COURT:  Okay.  Your objection's

9    noted, and it is not unmeritorious.  But I think the

10   better way to handle it is to not give a narrative of

11   everything that went on, but rather to confine

12   yourself to answering Mr. Carta's question.  He knows

13   what to ask and where he's going.  Just answer his

14   questions, we'll move things along a little better.

15             So the answer will stand, but again, your

16   objection, Mr. Fasman, is not unmeritorious.

17             MR. FASMAN:  Thank you, Your Honor.

18   BY MR. CARTA:

19   Q    What role did you perform in due diligence in

20   connection with the negotiation of the agreement

21   between IBM and Wellpoint?

22   A    None.  I didn't have any involvement in that.

23   Q    What role did you perform, if any, in

24   connection with the pricing of the Wellpoint contract?

25   A    I didn't perform any role in that.

1    Q    Did you have any role in setting the terms and

2    conditions of the Wellpoint contract?

3    A    No, I did not.

4    Q    What group had that responsibility?

5    A    That was the GTS organization, the sales side.

6    Q    Is that -- can you see that on your chart?

7    A    That's a different organization.

8    Q    Let's pull that up.  Do we have the chart,

9    please?

10              MR. FASMAN:  I'm sorry, what exhibit is

11   that?

12              MR. CARTA:  It's 11.  I think there's two

13   exhibits.

14              MR. FASMAN:  Thank you.

15   BY MR. CARTA:

16   Q    Can you point out what you referred to as the

17   GTS service organization on that chart?

18   A    Yes.  That's this organization right here,

19   beginning from the senior level to the Americas level

20   to the Public Sector level.

21   Q    And where is the ITDelivery group relative to

22   that?

23   A    In this line of reporting.  So this is where I

24   would be, and this is where Kelton Jones and Joanne

25   would be.

1     Q     Is that Mr. Zapfel right above in green?

2     A     That's -- yes.

3     Q     So it's an independent group within IBM to

4     handle the contract negotiations and due diligence?

5     A     Yes.

6     Q     And what is the -- your group is in charge of

7     delivery.  What is the GTS group, what's their

8     responsibility?

9     A     They actually sell the contract to the

10    customer.  They target whoever the customer may be.

11    They negotiate the contract with them, and they sell

12    it to them.  So they were like the sales side.

13    Q     And what position at IBM was specifically

14    responsible for the work of GTS on the Wellpoint

15    contract?

16    A     That was Dave Liederbach.

17    Q     Take a second and look at Exhibit 16.  You

18    referred to Mr. Zapfel on a number of occasions.  Did

19    Mr. Zapfel, the general manager of the Global

20    Technology Systems, did he request an overview of the

21    Wellpoint contract?

22    A     Yes, he did.

23    Q     And who contributed to that overview?

24    A     It was led by -- the actual gathering of

25    putting the presentation together was led by Dave

1    Liederbach, and then we had members who were involved

2    with the account assist in getting the data together

3    for him.

4        Q    And was that review reduced to writing?

5        A    Yes, it was.

6        Q    And would you please review quickly the

7    summary, the situation summary that appears on page 2

8    of that document?

9        A    The highlight.  "The current contract

10   represents a great deal for Wellpoint."

11       Q    What does that mean, "a great deal"?

12       A    It was a great deal for them because we would

13   improve the way they were running their business.  So

14   we could bring our expertise into their environment,

15   and deliver that a little -- theoretically deliver at

16   a lower cost than what they were capable of doing.

17       Q    Continue, please.

18       A    "IBM has made improvements in delivery and in

19   the overall leadership."

20       Q    That's Mr. Zapfel's point of view.  And when

21   was this report prepared?

22       A    June 2nd, 2006.

23       Q    Okay.  And the last highlighted point?

24       A    "The current relationship is stressed,"

25   meaning between IBM and Wellpoint.

```
 1      Q    On page 18 is there reference to projected

 2   losses?

 3      A    The same 2006 report?

 4      Q    Yes.

 5                MR. FASMAN:  I'm sorry, is there a number

 6   on the bottom?

 7                MR. CARTA:  Lower left-hand corner.

 8                MR. BAILEY:  5619.

 9                MR. FASMAN:  Thank you.

10                THE COURT:  This is Exhibit 16, Mr.

11   Carta?

12                MR. CARTA:  Yes, Exhibit 16, Bates number

13   far right lower corner 5619.

14                THE COURT:  Thank you.

15   BY MR. CARTA:

16      Q    So my question is, did the Zapfel report

17   summarize the annual negative impact of the various

18   variables that were analyzed?

19      A    Yes.  That's represented by the 44.5 million

20   in the first column.  That was a division figure.

21   That's the -- that would total $44.5 million for IBM.

22      Q    And did Mr. Zapfel's group also project the

23   total amount of the negative impact of those problems

24   over the seven-year term of the contract?

25      A    Yeah.  The summary of that for seven years is
```

```
 1    the total on that column down on the right, and the

 2    total is -- these mistakes were going to cost IBM

 3    210.2 million.

 4        Q    Okay.  And the next page of the report, does

 5    Mr. Zapfel's report discuss the relationship again

 6    with the client?

 7        A    Yes, it does.

 8        Q    And what does the report indicate?

 9        A    It says "CIO with the screw-the-vendor

10    attitude."

11        Q    And who's that a reference to?

12        A    The CIO at that point in Wellpoint was Mark

13    Boxer.

14        Q    So that was Mr. Zapfel's assessment of the

15    person he was dealing with at IBM?  I mean at

16    Wellpoint?

17             MR. FASMAN:  It's labeled as Zapfel.  I

18    don't know whose report it actually is.

19             THE COURT:  Okay.  Let's take a break

20    here.  My exhibits in my folder don't seem to coincide

21    with your numbering, Mr. Carta.  Maybe you could --

22             MR. CARTA:  It's Bates 5620.  It's the

23    next page.

24             THE COURT:  5620?

25             MR. CARTA:  Are the last digits.
```

1          THE COURT:  One second.  I have 95620,

2     says "relationship".

3          MR. CARTA:  Yes.

4          THE COURT:  "Building relationships and

5     partnerships with the business has been difficult, CIO

6     with the screw-the-vendor attitude."

7          Precisely what's your question, sir?

8          MR. CARTA:  I asked him to -- what's what

9     CIO that was referring to.

10         THE WITNESS:  It was WellPoint's CIO, and

11    at the time it was Mark Boxer.

12    BY MR. CARTA:

13    Q    In your experience working on the Wellpoint

14    account both as a vice president and then later on as

15    the DPE, to what extent did you experience that

16    attitude?

17    A    I'm not sure how to answer that.  I mean there

18    were times that were very difficult, very

19    unreasonable, and it was for the purpose of -- you

20    know, they viewed us as a vendor rather than a

21    partner.  We like to be called a partner.  We were a

22    vendor.  They felt that by taking a very aggressive

23    approach with us, we would do things, whether it was

24    in the contract or not in the contract.

25    Q    Let's move on.  Did IBM also conduct the

1    independent assessment of the Wellpoint contract in

2    June of 2006?

3        A    Yes.

4        Q    And is there a term that was used for that

5    investigation?

6        A    Yes.  It's called the Red Team Review.

7        Q    And let's step back for a second.  What --

8    before we get into the specific Red Team Review of

9    Wellpoint, are you familiar with the purposes and

10   procedures followed with respect to Red Team Reviews?

11       A    Yes, I am.

12       Q    What's the purpose?

13       A    It's used very infrequently, and the purpose

14   of it is to go for an independent team, take a look

15   at -- and it's really targeting contracts.  It's an

16   independent team that can come in and do an assessment

17   of the state of the contract and how we're doing, all

18   aspects of the contract and how we are performing

19   against that contract.

20       Q    When you say "independent," what do you mean?

21   Can you be more specific, please?

22       A    It's a group that has no allegiance to any one

23   of the sectors.  They're independent of that.  They're

24   IT, finance, contract, expertise that are brought in

25   to look at, like I said, one of these contracts, which

1    aren't many, to take a look at, so they try to stay

2    neutral, so they can't be part of the actual delivery

3    component.

4         Q    And in what instances would a Red Team Review

5    be initiated?

6         A    It could happen, I believe, two ways.  One is

7    it could be requested by an executive.  In my case it

8    could have been requested by any one of the

9    executives.  Liederbach, Joanne Collins-Smee.  Any

10   exec can call it, but it has to be justified.  There

11   has to be a valid reason for it.

12        Q    And what would be a valid reason, in your

13   experience?

14        A    Serious financial problems, major customer Sat

15   issues, major delivery problems, contract terms.  So

16   it's all of them.  Sometimes unfortunately you wind up

17   with one contract that has all of them.

18        Q    Was a Red Team Review initiated of the

19   Wellpoint contract?

20        A    Yes, it was.

21        Q    By whom?

22        A    Actually I looked forward to Kelton, and I

23   needed some clarification, because I was getting

24   arguments that it was not as bad as I was portraying

25   it.  So I went to Kelton, who had to authorize it as

1    the executive, and he felt it was time to come in and

2    take a look at this.

3        Q    So you initiated the request, he approved it?

4        A    Yes.

5        Q    What role, if any, did you perform in the

6    actual Red Team Review itself?

7        A    Well, it's designed to be an independent

8    review, so I was available to answer any questions,

9    but I did not participate or try to influence it in

10   any way.

11       Q    In terms of getting some perspective of the

12   frequency of Red Team Reviews, did any of your other

13   30 contracts have Red Team Reviews?

14       A    No.  There wasn't a need to.

15       Q    At the conclusion of this independent analysis

16   did the Red Team Review also generate a summary of its

17   conclusions?

18       A    Yes, they did.

19       Q    Can you identify Exhibit 17, please.

20       A    Oh, I'm sorry, yes.  That's the summary of the

21   Red Team Review for Wellpoint, on the Wellpoint

22   contract.

23       Q    And at that point how would you characterize

24   the internal dynamic between the employees working to

25   deliver the required services to Wellpoint and the

1    employees who had sold that business?

2        A    Well, there was confrontation constantly.  I

3    mean you had two major problems.  You had the delivery

4    side struggling to get what it needs to fix it, and

5    you had the sales side that sold it trying to stem the

6    financial problems on it.  And with that you just

7    battled over -- battled constantly, and some pretty

8    ugly battles occurred.  It just happens when it's like

9    this.

10       Q    Mr. Castelluccio, did you work with others to

11   create a recovery plan to address the problems at

12   Wellpoint?

13       A    Yes, I did.

14       Q    And so the Wellpoint contract became effective

15   in July, the Red Team Review was then conducted in

16   June.  Approximately when did you begin those plans

17   and when, if ever, did those plans actually get

18   created, reduced to a formal plan?

19       A    We actually started the work on the plan and

20   it was in the second quarter of, if I get the years

21   right here, the second quarter of 2006, we started

22   developing the plan.  We were very anxious to see the

23   output from the Red Team Review to make sure that what

24   we -- we were taking action against were the biggest

25   problems.  I mean we had a pretty good handle on where

```
 1    it was, but we used this as validation against that.

 2    And it was a joint effort.  It was not only the

 3    delivery side, but these only work if you work with

 4    the sales side as well, so we were working jointly

 5    together to figure out what we can do to try to

 6    address these issues.

 7         Q    And who developed the plan?

 8         A    Well, I actually led the plan from initiating

 9    it from the delivery side, but we had my peers on the

10    sales side as well working with it.

11         Q    And can you identify Exhibit 19, please.

12         A    That is the Wellpoint staffing and

13    restructuring program.

14         Q    This is the one that you oversaw?

15         A    Yes.

16              THE COURT:  Before we get into that, Mr.

17    Carta, I look at the clock up there, and that says

18    that it's almost 5 o'clock.  It says about 4:58, but

19    the watch that my wife gave me for a milestone

20    birthday, which I celebrated a while ago, says it's 5

21    o'clock, and --

22              MR. CARTA:  I know well enough to defer

23    to your wife, Your Honor.

24              THE COURT:  I do, too.  And so I suggest

25    that the witness step down, and if defense counsel
```

1    have no objection and plaintiff's counsel have no

2    objection, we will adjourn court for today, and I will

3    be in this room in this chair tomorrow at 9:45.  I

4    will be in my chambers probably quarter to 9 onward in

5    case I have to resolve any issues that may exist, and

6    you're welcome to walk up if you want to.  But I'm

7    going to be here at 9:45.

8              And members of the jury, you have to

9    check in to just this room.  You don't have to go to

10   the clerk's office.  You check in here.  And you'll

11   have the same room.  Hopefully there'll be coffee and

12   refreshments of some kind.

13             Don't talk about the case.  Don't think

14   about it.  Go home, have a pleasant evening, drive

15   safely, and we will see you here tomorrow at 10

16   o'clock.

17             THE CLERK:  9:45.

18             THE COURT:  They will be here -- they

19   will see this place, but they won't see me until 10,

20   but at 10 you'll see me.  Okay?  Have a pleasant

21   evening.

22                  (Jurors excused)

23             THE COURT:  All right.  Nothing from

24   counsel?  We're going to lock the door and the

25   documents will be safe.

1                   MR. CARTA:  Thank you.

2                   THE COURT:  So have a good evening.

3                        (Court adjourned)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                  CERTIFICATE OF REPORTER

 2

 3         I Hereby certify that the foregoing 210 pages

 4    are a complete and accurate computer-aided

 5    transcription of my original stenotype notes taken in

 6    the Matter of James Castelluccio VS International

 7    Business Machines Corporation, which was held before

 8    The Honorable Thomas P. Smith, U.S.M.J., at U.S.

 9    District Court, 450 Main Street, Hartford,

10    Connecticut, on January 13, 2014.

11

12

13            Wendy Allen, RMR, CRR

14            Notary Public

15

16

17    My commission expires:  April 15, 2015

18

19

20

21

22

23

24

25
```