UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JAMES CASTELLUCCIO,
- Plaintiff

v.                                      CIVIL NO. 3:09CV1145(TPS)

INTERNATIONAL BUSINESS
MACHINES CORPORATION,
- Defendant

## Opinion and Order

The plaintiff James Castelluccio sued the defendant Internal Business Machines Corporation ("IBM"), alleging that IBM terminated his employment on the basis of age in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 et seq., and the New York State Human Rights Law ("NYSHRL"), NY CLS Exec § 196(a).  After a nine-day trial, the jury returned a verdict for Castelluccio on his claim of age discrimination under the ADEA and NYSHRL.  The jury awarded Castelluccio $999,891.64 for back pay and benefits, $999,891.64 for liquidated damages, and $500,000 for emotional distress damages.  IBM now moves for judgment pursuant to Fed.R.Civ.P 50, or, in the alternative, for a new trial or remittitur pursuant to Fed.R.Civ.P. 59.[1]  (Doc. #202).  For the reasons set forth below, IBM's motion is DENIED.

## I. BACKGROUND FACTS

The background facts and proceedings at trial are familiar to

---

[1]Castelluccio has filed a motion for attorneys' fees and costs and supplemental motion for attorneys' fees.  (Doc. ## 197, 231).  The court addresses these motions in a separate Opinion and Order also released today.

the parties and the court will not repeat them in depth.   Mr. Castelluccio spent his entire professional career at IBM.  He began work in the data center as a computer operator in March 1968 and occupied positions of increasing responsibility and station throughout his tenure.  (Doc. #108, at 1-2; Doc. #213, at 129). His career reached its pinnacle when in 2005 he was named Vice President of Public Service Delivery ("VP PSD").  (Doc. #213, at 160).  In that capacity he oversaw the work of 2,500 employees who provided information technology services to 30 commercial accounts. (Id. at  109, 168).  As an executive, Castelluccio consistently received performance appraisals rating him as a solid or above average performer.[2] (Doc #214, at 255, 260; P. Exs. ##4, 7-10, 13-14).

The events leading up to this lawsuit began in February 2007 when Joanne Collins-Smee became Castelluccio's direct supervisor. At that time, Castelluccio was one month shy of his 60th birthday and the oldest of eight vice presidents reporting directly to Collins-Smee.  (Doc #214, at 253).  Despite his solid or above

---

[2]All employees at IBM are rated annually through a procedure called the personal business commitment ("PBC").  (Doc. #213, at 110).  Employees are rated on a scale of 1 through 4.  The PBC ratings are described as follows:  PBC 1, among the top contributors; PBC 2+, above average contributor; PBC 2, solid contributor; PBC 3, among the lowest contributors, needs to improve; PBC 4, unsatisfactory.  (Id. at 115-117; P. Ex. #1, at 7). Castelluccio received PBC's of 2 or 2+ while at IBM, although in February 2008 Joanne Collins-Smee rated Castelluccio a PBC 3 before changing his rating to a PBC 2. (Doc. #217, at 937-938).

average performance appraisals, Collins-Smee immediately took steps to reduce Castelluccio's responsibilities at IBM before terminating his employment altogether in June of 2008.

In fact, after Collins-Smee's brief sit-down meeting with Castelluccio during her first month as supervisor, she recommended that he be removed from the position of VP PSD. (Doc #214, at 258-259). By June of 2007, Collins-Smee had succeeded in removing Castelluccio from that position, and named Miguel Echavarria, a 49 year-old eleven years Castelluccio's junior, as his replacement. (Doc. #214, at 344-345). At this time, Collins-Smee demoted Castelluccio to Delivery Project Executive ("DPE") of Wellpoint, which was universally regarded as IBM's most troubled account. (Id., 345-346). In November of 2007, Collins-Smee informed Castelluccio that she was removing him from the position of Wellpoint DPE and placing him "on the bench," that is, he would remain at IBM but without a permanent work assignment. (Doc. #214, at 378). In June of 2008, Collins-Smee notified Castelluccio that he would be terminated at the end of the month unless he found another position. (Doc. #215, at 480). Castelluccio was unable to secure permanent employment and was terminated accordingly.

Prior to his last day at IBM, but after being notified by Collins-Smee of his imminent termination, Castelluccio lodged a complaint of age discrimination with IBM's Human Resources representative, Russell Mandel. Mandel conducted an internal

investigation, or as it is called at IBM, an "open door" investigation, into Castelluccio's complaint of age discrimination and concluded that management had treated him fairly with respect to his termination.[3]  (Doc. #18, at 6).

Thereafter, Castelluccio commenced the present action, which was tried to the jury over nine days in January of 2014.  After the close of Castelluccio's case, IBM moved for a directed verdict on his claim of age discrimination pursuant to Fed.R.Civ.P. 50(a), contending that the record contains no evidence that would allow a reasonable jury to conclude that Mr. Castelluccio's age was the "but for" cause of his termination from IBM.  The court took the motion under advisement in keeping with the practice of the Second Circuit.  (Doc. #217, at 1118).

On January 24, 2014, the jury returned its verdict, finding that IBM had unlawfully terminated Mr. Castelluccio on the basis of age and that the termination represented a willful violation of the law.  The jury awarded Castelluccio $999,891.64 for back pay and benefits, $999,891.64 for liquidated damages, and $500,000 for emotional distress damages.  (Doc. #187).

---

[3]IBM states the following with respect to the open door investigation process: "The Open Door process reviews actions or inactions by management which directly related to and affect an employee.  All issues, except policy decisions and operational business issues, are eligible for review under this process. . . . The intent of the process is to ensure an objective and thorough review of the issues.  The process will not make legal determinations.  It will, however, determine whether the employee was treated fairly."  (D. Ex. #109, at 4).

On February 25, 2014, IBM timely filed a renewed motion for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure, or, alternatively, for a new trial under Rule 59(a) of the Federal Rules of Civil Procedure, contending, inter alia, that the record does not support the jury's findings with respect to (1) age discrimination, (2) willfulness, and (3) damages based on emotional distress and (4) back pay.  IBM also argues (5) that a new trial must be granted because the plaintiff's attorney made an improper remark in closing argument that prejudiced the jury. (Doc. #179).

## II. Analysis/Discussion

A. Motion for Judgment as a Matter of Law under Rule 50(b)

Pursuant to Federal Rule of Civil Procedure 50(b), the court may enter judgment as a matter of law if a jury returns a verdict for which there is no legally sufficient evidentiary basis.  The court must give deference to all credibility determinations and reasonable inferences of the jury, without weighing the evidence or assessing the credibility of the evidence.  Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir.1998).

The court may not substitute its judgment for that of the jury.  LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 429 (2d Cir.1995).  Judgment as a matter of law may only be granted if there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer

surmise and conjecture, or if there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it.  <u>Cruz v. Local Union No.3 of the Int'l Bhd. Of Elec. Workers</u>, 34 F.3d 1148, 1154 (2d Cir.1994).

The court must view the evidence in the light most favorable to the party in whose favor the verdict was rendered, giving that party the benefit of all reasonable inferences that the jury might have drawn in his favor.  <u>Norton v. Sam's Club</u>, 145 F.3d 114, 118 (2d Cir.1998).

The ADEA prohibits an employer from failing or refusing to hire, discharging, or discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).[4]  A plaintiff may obtain relief under the ADEA if the plaintiff proves by a preponderance of the evidence that age was the "but-for" cause of the challenged employment action.  <u>Gross v. FBL Fin. Servs., Inc.</u>, 557 U.S. 167, 180, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009).  A violation of the ADEA can be proven by either direct or circumstantial evidence.  <u>Carlton v. Mystic</u>

---

[4]In addition to his ADEA claim, Mr. Castelluccio brings an age discrimination claim under the NYSHRL.  Because the same legal analysis applies to age discrimination claims brought under the NYSHRL and the ADEA, <u>see</u> <u>Abdu-Brisson v. Delta Air Lines, Inc.</u>, 239 F.3d 456, 466 (2d Cir.2001), the court's analysis of the ADEA claim applies with equal force to the NYSHRL claim.

6

Transp. Inc., 202 F.3d 129, 135 (2d Cir.2000).

    1. The Jury's Finding of Age Discrimination

    IBM claims that the evidence presented at trial was insufficient to show that Castelluccio's age was the "but-for" cause of his termination.   IBM first contends that evidence of statements made by Collins-Smee to Castelluccio concerning his age and eligibility for retirement cannot be viewed as direct evidence of age discrimination because they were innocuous statements and so far removed from the termination decision as to constitute inadmissible stray remarks.[5]

      a. Direct Evidence

    Although direct evidence of discrimination is not necessary to support a finding under the ADEA, Carlton v. Mystic Tramp. Inc., 202 F.3d 129, 135 (2d Cir.2000), the jury could have reasonably found that comments made by Collins-Smee concerning Castelluccio's age and eligibility for retirement constituted direct evidence of age discrimination.  (Doc. #214, at 250-251, 386, 435; Doc. #215, at 557).  Collins-Smee denied making some or all of the comments at issue; however, the jury was not required to believe her and was free to credit Castelluccio's testimony.  On review, the court "must disregard all evidence favorable to the moving party that the

_____

    [5]In the court's order denying IBM's motion for summary judgment, the court found that evidence that Collins-Smee raised the issue of Castelluccio's retirement during her initial meeting with him, and on occasions thereafter, supported Castelluccio's prima facie case of age discrimination.  (Doc. #109, at 11-12).

jury is not required to believe."   <u>Reeves v. Sanderson Plumbing</u> <u>Products, Inc.</u>, 530 U.S. at 151, 120 S.Ct. 2097.

According to Castelluccio, the first comments occurred in February 2007, during his first meeting with Collins-Smee. (Doc. #214, at 250-251, Doc. #216, at 802).  Castelluccio testified that Collins-Smee asked, "You're old enough to retire, right"?  (Doc. #214, at 251).   Castelluccio also testified that Collins-Smee stated "How old are-" as if to ask how old he was, before stopping herself mid-sentence.  (Doc. #215, at 557).  Castelluccio testified that the second reference to his eligibility for retirement occurred in November of 2007, when Collins-Smee informed him that he was being replaced as DPE of the Wellpoint account and placed on the bench.  (Doc. #214, at 386; Doc. #217, at 928-929). Castelluccio testified that Collins-Smee mentioned his eligibility for retirement a third time in March of 2008, when he met with her to discuss his lack of meaningful work assignment and to request that she assist him in locating another position or temporary assignment at IBM.  (Doc. #214, at 435).

Prior to trial, IBM filed a motion seeking to exclude age based remarks made by Collins-Smee.  (Doc. #174).  This court denied that motion on the basis that whether the remarks were probative of age discrimination was a question of fact best left to the jury.  (Doc. #214, at 223).  At the charging conference, IBM asked this court to include the following instruction to the jury:

"Inquiries about retirement are not evidence of age discrimination. You may not rely upon them as proof of age discrimination.  It is not improper for an employer or supervisor to inquire as to its employees plans for the future." (Doc. #220, at 1571).  Again, the court declined to include IBM's proposed jury instruction. However, in an effort to meet IBM half-way, the court nevertheless instructed the jury, "[a]n inquiry about retirement is not necessarily evidence of age discrimination." (Doc. #221, at 1725). At the charging conference, IBM stated that it could "live with that" instruction.  (Doc. #220, at 1574).

"[T]he stray remarks of a decisionmaker, without more, cannot prove a claim of employment discrimination. . . ." Weichman v. Chubb & Son, 552 F.Supp.2d 271, 284 (D.Conn.2008) (quoting Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 468 (2d Cir.2001)). However, "the court should not categorize a remark as 'stray' or 'not stray' and then disregard that remark if it falls under the 'stray' category." Weichman, 552 F.Supp.2d at 284 (citing Tomassi v. Insignia Fin. Group, Inc., 478 F.3d 111, 115-26 (2d Cir.2007)). "Instead, the court must consider all the evidence in its proper context. . . . [T]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative the remark will be." Id. (quoting Tomassi, 478 F.3d at 115).

Whether certain comments were made by Collins-Smee and the

9

extent to which they reflected an ageist animus was therefore a question of fact properly submitted to the jury.  It was not a question of law by which this court was bound to render those statements inadmissible as stray remarks.  See e.g., Pasha v. William M. Mercer Consulting, Inc., 2004 WL 188077 at * 6 (S.D.N.Y.2004) (factfinder to conclude whether remarks directly manifest discriminatory attitude).  Moreover, although the court declined to adopt IBM's proposed jury instruction, it nevertheless instructed the jury that not all inquires about retirement are necessarily evidence of age discrimination.  (Doc. #221, at 1725).  Having been cautioned by the court that not all comments about age and retirement are evidence of age discrimination, the jury was left to decide for itself what weight, if any, should be given to the remarks in question.  This court cannot conclude that the remarks in question were so remote in time as to have been rendered inadmissible on that basis alone.

Neither can this court agree with IBM's position that the statements concerning age and retirement were innocuous.  The remarks at issue were not made by an individual at IBM without the authority to make personnel decisions; rather, they were made by Collins-Smee, who was Castelluccio's direct supervisor and who had the authority to terminate him.  (Doc. #217, at 955).  The comments were particularly significant when considered in the context of the personnel decisions made by Collins-Smee regarding Castelluccio.

10

For example, after their initial meeting in February 2007, when Collins-Smee allegedly made an age-related comment and the first inquiry about retirement, Collins-Smee sent an email to Keith Holmes in the Human Resources Department stating "[w]e need to replace Jim Castelluccio." (P. Ex. #29). By June of that year, Collins-Smee removed Castelluccio from his position as VP PSD and had replaced him with Miguel Echavarria who was eleven years his junior. This was a rather abrupt ending to Castelluccio's tenure as VP PSD, especially in light of the fact that he had been rated a 2 performer by Kelton Jones only a couple weeks prior to Collins-Smee's email to Holmes, and that Collins-Smee initiated the removal action with less than a month's time to evaluate his performance. (Doc. #214, at 255, 260). The next remark Collins-Smee made concerning Castelluccio's eligibility for retirement occurred in November 2007. This remark was particularly significant because it occurred during a conversation in which she told Castelluccio that he was being removed from the position of Wellpoint DPE and relegated to the bench. (Doc. #214, at 386; Doc. #217, at 928-929).[6] Collins-Smee's third reference to Castelluccio's eligibility for retirement was made in March of 2008 when

_____

[6]Although IBM's decision to remove Castelluccio from the DPE and VP SD position are not actionable in this case, the circumstances surrounding those employment decisions is background evidence relevant to whether he was terminated unlawfully. See Chin v. Port Authority of New York & New Jersey, 685 F.3d 135, 157 (2d Cir.2012). (Doc. #109, at 11-12).

Castelluccio met with her to seek her assistance in locating a new position at the company. (Doc. #214, at 435). This comment was significant in light of the fact that Collins-Smee did not locate him work she identified he might be suited for, and ultimately terminated his employment two months later. (Id. at 436-437).

All of the comments therefore occurred in the context of an adverse employment decision and were legally sufficient to sustain an inference of age discrimination. Tomassi v. Insigni Fin. Grp., Inc., 478 F.3d 111, 115 (2d Cir.2007). The comments were direct evidence that could reasonably be viewed as supporting Catelluccio's claims, and the comments were properly presented to the jury for their review. Whether those were innocuous comments, were a reflection of Collins-Smee's discriminatory intent, or fell somewhere in between was a determination to be made by the jury.

b. Circumstantial Evidence

IBM next contends that the circumstantial evidence offered by Castelluccio does not establish age discrimination. It argues that the circumstantial evidence has no legal foundation because there is no evidence that links IBM's purportedly adverse treatment of Castelluccio to corresponding evidence that younger, similarly situated employees were treated differently. This court disagrees.

There is no rigid rule for determining whether a plaintiff has demonstrated circumstances giving rise to an inference of discrimination. Chertkova v. Conn. Gen. Life Ins., 92 F.3d 81, 91

(2d Cir.1996).  "The Court must be alert to the fact that employers are rarely so cooperative as to include a notation in the personnel file that their actions are motivated by factors expressly forbidden by law."  Chambers v. TRM Ctrs. Corp, 43 F.3d 29, 37 (2d Cir.1994).  Because an employer who discriminates is unlikely to leave a "smoking gun" attesting to a discriminatory intent, a victim of discrimination is seldom able to prove his claim by direct evidence, and is usually constrained to rely on circumstantial evidence.  See, e.g., Rosen v. Thornburgh, 928 F.2d 528, 533 (2d Cir.1991).  In considering the circumstantial evidence before the jury, the court is mindful that proving unfair treatment is not the same as proving age discrimination.  See Norton v. Sam's Club, 145 F.3d 114, 120 (2d Cir. 1998) ("[t]he ADEA does not make employers liable for doing stupid or even wicked things; it makes them liable for discriminating, for firing people on account of their age") (emphasis in original).

The circumstantial evidence in this case reasonably supported the jury's finding of age discrimination.  Perhaps the most significant evidence from which the jury could have inferred ageist animus was Collins-Smee's failure to assist Castelluccio find a new position at IBM and her failure to advise him of the availability of open positions.  Collins-Smee failure in this regard was particularly apparent in her half-hearted advocacy during the formal process through which executives are placed at IBM called

"five minute drills."  Five minute drills refer to both a document that identifies open positions and the executives available to fill them, as well as the 30 minute meeting amongst high level executives in which the positions and executives identified in the document are discussed for placement.  The five minute drills are strictly confidential at IBM, which means that not only are the executives available for placement not invited to the closed door meetings, but the open positions are not posted outside of the process itself.  (Doc. #213, at 85-86).  Consequently, it is very difficult for one to secure a position through the five minute drill process without someone in the meeting advocating their placement.

Collin-Smee's efforts, or lack thereof, to locate Castelluccio a position were so ineffectual, that after close to two months on the bench, Castelluccio complained to Garret Walker in Human Resources that he "was not made aware or considered for available positions within and outside the organization." (Doc. #214, at 428; P. Ex. 76).  The positions that Castelluccio was not considered for included the DPE role on the Quest outsourcing contract, which was in an area in which he had particular expertise.  (Id. At 428-430).  Castelluccio's belief that he was not considered for placement was in keeping with the observation of Keith Holmes who testified that Collins-Smee "rarely" mentioned Castelluccio during the five minute drills conducted in her

14

organization. (Doc. #219 at 1361-1362).  Even after Castelluccio, on the counsel of Walker, met with Collins-Smee in March of 2008 to ask for work, Collins-Smee still refused to give him a work assignment.  Instead, she unilaterally raised the issue of retirement, and did not assign Castelluccio temporary work in the area of audits and control after leading him to believe she would to so.  (Doc. #214, at 435-437).

The jury was ultimately instructed that there were 106 Band C and Band D executive job openings identified in five minute drills during the six month period that Castelluccio was on the bench. (Doc. #194, at 10).  Of the 106 openings, 16 were filled in Collins-Smee's organization.  (Id.).  The jury could have inferred ageist animus from Collins-Smee's failure to consider Castelluccio for the positions in her organization even though he had the expertise that should have qualified him for consideration. (Doc. #214, at 348; Doc. #217, at 1031, 1033, 1050, 1052, 1054).  The jury could also have drawn an inference of age discrimination from the fact that Collins-Smee did not advance Castelluccio for consideration on nearly all of the drills conducted by other executives at the company in which the remaining positions were being filled.

Collins-Smee's failure to advocate for Castelluccio during the five minute drill process was particularly significant in light of the expectations placed on supervisors to identify executives

15

without permanent work assignments and to lobby on their behalf when vacancies were being filled in the executive ranks through the five minute drill process.  Collins-Smee testified that it was her responsibility to put Castelluccio on a five minute drill, and her predecessor, Kelton Jones, testified that finding a position for an executive without a permanent assignment was a function of his managerial responsibility.  (Doc. #216, at 807; Doc. #217, at 1086).  Jones testified that it was commonplace to meet this responsibility not only through the five minute drill process, but also by advocating on the employee's behalf outside of the process. (Doc. #217, at 1073-1074).  Because Collins-Smee did not do her job and advocate for Castelluccio during five minute drills, let alone regularly list his name on a slate of candidates available for placement during the five minute drills she conducted, managers with the authority to hire him did not know of his experience and skills for the position in question, much less know that he was available in the first place.[7]  The closed nature of the five minute drills also meant that Castelluccio could not advocate on his behalf or even know what positions were available.  With a manager in Collins-Smee who left him in the lurch, Castelluccio did not stand much of chance in the five minute drill process.

The jury could have reasonably concluded that Collins-Smee's

---

[7]Collins-Smee did not list Castelluccio as available for placement on her five minute drills with one exception, which was in January of 2008.  (Doc. #214, at 350; P. Ex. 56).

failure to assist Castelluccio find a job or consider him for open positions left him comparably worse off than similarly situated younger individuals.  For example, one month before Castelluccio was fired, Collins-Smee hired seven individuals into executive positions within her organization who were younger than Castelluccio.  (P. Ex. 83).  The jury heard evidence that Castelluccio was qualified for positions in Collins-Smee's organization; however, in spite of her responsibility to find a position for a displaced employee, Collins-Smee did not consider him for those positions or even advise him that they were available. (Doc. #214, at 348).  Unlike Castelluccio, the younger employees hired to Collins-Smee's organization benefitted from being discussed in those five minute drills and identified as employees available for placement.  The jury could have therefore reasonably inferred ageist animus from Collins-Smee's decision to exclude him from the five minute drill process and to not consider him for open positions in her organization.

B. IBM's Motion for New Trial or Remittitur under Rule 59(a)(1)

IBM also claims that a new trial, or in the alternative, remittitur, is warranted because the record does not support the jury's findings with respect to willfulness and damages based on emotional distress and back pay.  IBM also claims that a new trial is warranted because Castelluccio's counsel made improper remarks in closing argument.

Pursuant to Federal Rule of Civil Procedure 59(a)(1), a new trial may be granted for "any reason for which a new trial has heretofore been granted in an action at law in federal court."  The standard for granting a new trial differs in two ways from that governing Rule 50 motions: (1) a new trial may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner.  DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133-34 (2d Cir.1998) (citation omitted).  Although a trial court is afforded considerable discretion under Rule 59(a), a motion for a new trial should be granted only when, in the opinion of the district court, "the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice."  Id. at 133, quoting Song v. Ives Labs., Inc., 957 F.2d 1041, 1047 (2d Cir.1992) (alteration in original).  Moreover, the mere fact that the trial judge disagrees with the jury's verdict is not a sufficient basis to grant a new trial.  Mallis v. Bankers Trust Co., 717 F.2d 683, 691 (2d Cir.1983).

1. Willfulness

IBM first contends that a new trial is warranted because the jury improperly found that IBM willfully violated the law when it terminated Castelluccio's employment.  IBM argues that the court contributed to this error by precluding the results of its

internal, "open door" investigation of Castelluccio's complaint of age discrimination.  This court disagrees.

As a general rule, the question of willfulness is properly left to the jury, and a reviewing court is "not permitted to substitute [its] judgment for that of the jury" even if it "might have resolved the issue differently had [it] been the finder of fact." Grant v. Hazelett Strip-Casting Corp., 880 F.2d 1564, 1572 (2d Cir.1989).  Well-established precedent recognizes that the willfulness necessary to support liquidated damages under the ADEA can be established either by proof that a defendant actually knew that his conduct violated federal law or by reckless disregard of that fact.  See Hazen Paper Co. V. Biggins, 507 U.S. 604, 614, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993).  Here, if Collins-Smee terminated Castelluccio's employment because of his age and knew that doing so was a violation of the ADEA, or showed reckless disregard for that fact, then the jury could have reasonably concluded that she willfully violated the law.

The court cannot conclude that the jury reached a seriously erroneous result in finding that IBM willfully terminated Castelluccio's employment.  The jury heard testimony from Collins-Smee that she received training on discrimination laws on a regular basis, including laws pertaining to age discrimination.  (Doc. #216, at 810).  Not be deterred by her knowledge of the law, Collins-Smee nevertheless made employment decisions that adversely

affected Castelluccio based on his age.

Collins-Smee testified that she believed that it was not appropriate to ask an employee his age. She did so anyway at her first meeting with Castelluccio in February of 2007, and removed him from the VP PSD position shortly thereafter. (Doc. #215, at 557). Collins-Smee also testified that she knew it was improper to ask an employee if he wanted to retire after the employee made it clear he had no interest in doing so. She nevertheless raised the issue of retirement with Castelluccio on at least three occasions despite his indication that he had no interest in leaving IBM. (Doc. #214, at 250-251, 386, 435; Doc. #215, at 557; Doc. #217, at 928-929, 963-964). She even brought up the issue of retirement in March of 2008 when Castelluccio came to her asking for work or her assistance in locating a new position. (Doc. #214, at 435). Collins-Smee also testified that she new it was not appropriate to base employment decisions on age. Yet the record supports a finding that Collins-Smee's employment decisions were motivated by age bias. She removed Castelluccio from two positions in spite of his PBC 2 performance appraisals, she abandoned her responsibility to find him work, she placed him on the bench in spite of an abundance of work available, she failed to advance his name for over 100 open executive positions in other organizations, and she did not even consider him for positions in her own organization but instead considered, and ultimately hired, younger employees.

20

The jury could have concluded that Collin-Smee's treatment of Castelluccio was driven less by indifference than by a calculated desire to remove an older employee from her organization.  While she did almost nothing for him in the way of job placement,  she went out of her way to exclude him from relevant emails, certain professional development opportunities, and to thwart his ability to effectively communicate with the customer.  For example, in February 2008, Collins-Smee invited all of her vice presidents and directors to participate in a seminar in Lexington, Kentucky, except for Castelluccio, who was the oldest vice president in her organization.  (Doc. #214, at 413-414).  Not only was Castelluccio not invited, Collins-Smee denied his request for a copy of the literature discussed at the conference.  (Id. at 415-415).  IBM never  even offered an explanation for Collins-Smee's actions in this respect.

Likewise, Castelluccio's repeated requests for a Blackberry to communicate with the CIO of Wellpoint, IBM's most troubled account, were also denied.  (Id. at 313-314, 360-361).  Not only was Castelluccio not given the technology to effectively communicate with the client, evidence adduced at trial revealed that Collins-Smee meant for him to hold the position of Wellpoint DPE only on a temporary basis.  At the time, Collins-Smee did not so much as do Castelluccio the courtesy of informing him that the position was temporary.  (Id. at 363).  Instead, six months into his tenure, she

abruptly notified him that he was being replaced as Wellpoint DPE and placed on the bench.  At no point did she notify him that the customer had any problem whatsoever with his work performance.  In a rather festive spirit, she chose the day before Thanksgiving to notify Castelluccio of her decision to remove him from the position.  (Id. at 375, 378).

Not only did Castelluccio not know at the time that his position as Wellpoint DPE was temporary, he learned later that Collins-Smee was proposing replacements to the client behind his back.  (Id. at 363).  In fact, she provided a total of five candidates to Wellpoint during Castelluccio's tenure as DPE, who were on average twelve years younger than Castelluccio.  (Id. at 368).  At no point was Castelluccio ever presented to the client as a permanent DPE candidate.  (Id. at 361).  Indeed, it was only after Wellpoint had rejected the five younger candidates, that Collins-Smee resigned to offer Gordon Crawford, who was roughly the same age as Castelluccio, the position on a permanent basis.  (Id. at 373-374).  One can only imagine how difficult it must have been for Castelluccio to service the Wellpoint account with a boss in Collins-Smee who regularly auditioned his replacement to the client, and would not so much as provide him with a Blackberry so that he could adequately communicate with the Wellpoint CIO.

Collins-Smee's tacit acknowledgment of her own wrongdoing was revealed in the surreptitious way in which she announced the seven

individuals younger than Castelluccio whom she hired into her organization in May of 2008.  As if to hide the fact that she had not even considered Castelluccio for these openings, she sent an email to her team announcing the new hires, but made sure to exclude Castelluccio from the correspondence.  (P. Ex. 83).

Perhaps the most egregious example of Collins-Smee's willful conduct were notes from a five minute drill immediately preceding Castelluccio's termination, in which she asked that his name be added to a slate of candidates "for the record," even though someone else's selection for that position had been all but finalized.  (Doc. #216, at 848-49).  Collins-Smee was aware of her wrongful conduct, and in this instance directed others to create a paper trail in order to insulate herself from scrutiny in the future.  Based on this evidence, the jury could have concluded that Collins-Smee acted in a purposeful, deliberate and calculated fashion, and that her treatment of Castellucio was downright bully-ish.  See Benjamin v. United Merchs. & Mfrs., Inc., 873 F.2d 41, 44 (2d Cir.1989) (upholding liquidated damages "when the proof shows that an employer was indifferent to the requirement of the governing statute and acted in a purposeful, deliberate, or calculated fashion").

a. Open Door Evidence

IBM contends that this court's preclusion of evidence related to its "open door" investigation deprived it of the opportunity to

demonstrate that its actions were not willful.  The evidence related to the "open door" investigation included: the report of IBM's consulting human resources professional, Russell Mandel, which summarized the findings of his investigation into Castelluccio's report of discrimination (Doc. #156-3); hand-written notes prepared by Mandel during interviews with IBM employees (Doc. #156-2); and Mandel's testimony regarding the findings of the "open door" investigation (Doc. #133, at 11)(collectively, the "open door evidence").  IBM argues that it should have been allowed to not only present evidence concerning the open door investigation in full, but also to demonstrate that Mandel, not Collins-Smee, had the final authority to terminate Castelluccio's employment.

Whether IBM terminated Castelluccio because of his age was a question to be decided by the jury over the course of a nine day trial rather than a question decided by IBM's ex parte investigation before the trial began.  In considering whether to preclude the "open door" investigation, this court found that the "open door" investigation represented only the findings and conclusions of IBM, as opposed to Castelluccio's account of the circumstances that lead to his termination.  The investigation was not conducted by a neutral party, but by Mandel, who decided which parties to interview and what evidence to consider.  Castelluccio was not offered the opportunity to present his own evidence, cross examine the witnesses or respond to criticisms leveled against him.

The court also found that the investigation focused more on Castelluccio's job performance than on his complaint of age discrimination and that there was reason to suspect that the investigation was designed more to exonerate IBM than to determine if Castelluccio was treated fairly. (Doc. #163, 5-7). Accordingly, prior to trial, the court granted Castelluccio's motion to preclude the "open door" evidence on the basis that its prejudicial effect on the jury would outweigh its probative value. (Id.). Doing so was not improper.

Nevertheless, the court later determined that IBM should be allowed to present evidence that it carried out the "open door" investigation in order to demonstrate to the jury that it did not act in a willful fashion in terminating Castelluccio. Consequently, the court modified its order precluding the open door evidence and allowed Mandel to testify for the limited purpose of establishing that a thorough investigation was conducted into Castelluccio's complaint of age discrimination. (Doc. #219, at 1440-1449, 1468). The parties agreed prior to Mandel's testimony that he would not reveal the findings of his open door investigation. (Doc. #218, at 1292-1297). The court also understood the parties to agree that Mandel would not reveal that he had the authority to reinstate Castelluccio, since doing so would allow the jury to deduce the findings of the investigation. (Id. at 1464).

The court therefore allowed Mandel to testify that he conducted a four- to six-week long investigation of Castelluccio's complaint of age discrimination that included interviews of 21 of Castelluccio's coworkers.  (Id. at 1452-1453).  Mandel testified that this investigation was conducted because IBM understands the law with respect to discrimination, and believes that it is important, serious and should be obeyed.  (Id. at 1468).  IBM was therefore given opportunity to demonstrate that its actions were not willful.  In spite of this evidence, the jury still found that IBM had willfully terminated Castelluccio because of his age.  Its finding in this respect is an acknowledgment of Collins-Smee's willful termination of Castelluccio's employment and IBM's failure to undue her unlawful action thereafter.

IBM's more narrow argument that this court erred by improperly precluding evidence that Mandel had the power to reinstate Castelluccio also fails.  Despite the understanding between the parties, IBM ultimately solicited testimony from Mandel, which revealed that he did in fact have the power to reinstate Castelluccio if he found in his favor.  Mandel stated:

> If I found . . . in Jim's favor, we would
> bring him back to the business; and if not, he
> would – the package that had been offered
> would still be available to him, because the
> last date that the package would be available
> would have been June 30th.  And it wouldn't be
> fair for him not to have that package
> available to him; so therefore, he would have
> 48 hours to review the package if I did not
> find in his favor.  (Id. at 1458)

26

Immediately thereafter, Castelluccio moved to strike this testimony on the basis that it violated the agreement that IBM would not testify as to Mandel's authority to reinstate Castelluccio if he found in his favor. (Id. at 1458). Although the court excused the jury at this point, the court did not sustain counsel's objection and specifically declined plaintiff's counsel's request to strike Mandel's testimony from the record. (Id. at 1467). The record therefore contains evidence that Mandel had the power to reinstate Castelluccio if he concluded that Castelluccio was not treated fairly. Ultimately, the court did not preclude Mandel's testimony in this respect as IBM now claims.[8]

On balance, IBM introduced evidence that it conducted an internal investigation into Castelluccio's complaint of age discrimination and that it had the power to reinstate him if it determined that his complaint was meritorious. In light of the evidentiary record, this court cannot conclude that IBM was

---

[8]Even assuming _arguendo_ that the court erred by not allowing IBM to admit the open door evidence in full or belabor the fact that Mandel had the authority to reinstate Castelluccio, the court concludes that any error is harmless. First W. Bank, N.A. v. Hotz. Corp., CIV. N-84-619 WWE, 1990 WL 150450 (D. Conn. Sep. 28, 1990) ("[T]he burden of showing harmful error rests with the moving party."). The purpose of an investigation conducted by a human resources department is defeated if the investigator does not have the authority to reinstate an employee after determining that the employee has been discriminated against. This fact was self-evident to the jury; the fact that Mandel could have reinstated Castelluccio if he determined that Castelluccio was terminated because of his age was not lost on them. Consequently, this court cannot conclude that IBM was prejudiced by not being allowed to further develop at trial what was already apparent to the jury.

27

prejudiced.

2. Damages based on emotional distress

IBM next argues that a new trial or remittitur is warranted because the jury's award of $500,000 in emotional distress damages is not supported by the record.

Under federal law, an award will not be disturbed unless it is "so high as to shock the judicial conscience and constitute a denial of justice." Ismail v. Cohen, 899 F.2d 183, 186 (2d Cir.1990); accord Kirsh v. Fleet St., Ltd., 148 F.3d 149, 165 (2d Cir.1998).  In calculating remittitur, the court must use the "least intrusive"- and "most faithful to the jury's verdict" method of "reduc[ing] the verdict only to the maximum that would be upheld by the trial court as not excessive." Earl v. Bouchard Transp. Co., Inc., 917 F.2d 1320, 1328-30 (2d Cir.1990).

Meritorious garden-variety emotional distress claims in federal courts in this Circuit have typically commanded awards between $30,000 and $125,000. See Patterson v. Balsamico, 440 F.3d 104, 120 (2d Cir.2006) (affirming $100,000 award where the plaintiff had no evidence of medical treatment, but offered testimony of humiliation, embarrassment, loss of self-confidence, sleeplessness, headaches, stomach pains, and other physical pain); Cross v. N.Y. Transit Auth., 417 F.3d 241, 258 (2d Cir.2005) (affirming $50,000 award where plaintiff testified to experiencing anger, humiliation, and frustration, but did not seek medical

28

treatment); <u>Meacham v. Knolls Atomic Power Lab.</u>, 381 F.3d 56, 78 (2d Cir. 2005), <u>vacated on other grounds</u>, 544 U.S. 957 (2005) (affirming $125,000 award where plaintiffs offered no proof other than testimony establishing shock, nightmares, sleeplessness, humiliation, and other subjective distress); <u>Watson v. E.S. Sutton, Inc.</u>, 02 CIV. 2739 (KMW), 2005 WL 2170659 at *16 (affirming $120,000 award where plaintiff experienced depression and visited a therapist but had no permanent psychological injury).

Although Castelluccio's emotional distress is garden-variety inasmuch as he presented no corroborating testimony or evidence of medical treatment, the court concludes that the specific circumstances of this case, including IBM's egregious treatment of Castelluccio, justify an upward departure from the typical emotional distress damages award. Castelluccio offered testimony of the physical effects of emotional distress including mood swings, sleepless nights, weight loss, and hair loss; however, the physical effects that Castelluccio suffered represent only a fraction of the emotional distress the jury could reasonably have concluded he suffered (Doc. #216, at 676-678). The jury's award reflects a recognition that the actions of Collins-Smee weighed especially heavy on Castelluccio. Castelluccio's countenance, gentle bearing, and heartfelt testimony suggested a man that was particularly sensitive and whose very nature invited being marginalized in the workplace by the likes of Collins-Smee.

29

Collins-Smee did more than simply terminate Castelluccio's employment; she shattered the very foundation of his identity as an IBMer. The jury bore witness to a man who was utterly devastated by the termination of his employment from a company at which he spent over 40 years, who was reduced to pleading for work during his final months on the bench, and who, at 61 years of age, struggled in vain to secure employment after he had been finally ousted from the company. The jury's award reflects an understanding of the magnitude of Castelluccio's emotional distress. Based on the evidence adduced at trial this court concludes that the jury's award does not shock the conscience and accordingly will not adjust it downward.

3. Damages based on back pay

IBM next claims that the jury's back pay award is inconsistent with Castelluccio's sworn testimony. It argues that Castelluccio's testimony indicates, one, that he planned to retire at 65, not 66 as the jury found, and, two, that Castelluccio was receiving a certain amount in pension benefits, not the smaller figure found by the jury. This court disagrees. The jury's back pay and benefits figure was properly calculated and is not inconsistent with the record.

"When confronted with a potentially inconsistent jury verdict, the court must 'adopt a view of the case, if there is one, that resolves any seeming inconsistency.'" Turley v. Police Dep't of the

City of N.Y., 167 F.3d 757, 760 (2d Cir.1999) (citation omitted). "A Court's role is to reconcile and preserve whenever possible a seemingly inconsistent jury verdict. Densberger v. United Technologies, Corp., 125 F.Supp.2d 585, 598 (D. Conn.2000) (quoting Indu Craft, Inc. v. Bank of Baroda, 46 F.3d 490, 497 (2d Cir.1995) (citations omitted).

The record supports the jury's finding that Castelluccio planned to retire at age 66. IBM points to two statements in the record that indicate that Castelluccio planned to retire at age 65, not age 66. First, when asked at what age he planned to retire, Castelluccio stated: "I would be 65, 66 would be the age." (Doc. #213, at 108). Based on this statement, the jury could have reasonably concluded that Castelluccio planned to retire at 66. The second statement IBM argues establishes that Castellucio planned to retire at 65 is, when asked what age he turned in 2013, the year in which he ended his job search, he answered: "Last year, 65." (Doc. #215, at 532). The record before the jury, however, reflects that Castelluccio actually turned 66 in 2013, not 65. (P. Ex. #59). The jury could have reasonably concluded that Castelluccio misstated the age he turned in 2013 and was not bound to conclude otherwise. The jury also heard testimony from Castelluccio's damages expert, Dr. Crakes, who stated, "[Castelluccio] intended to work to age 66." (Doc. #218, at 1161). In addition, the evidence before the jury included Dr. Crakes's

notes indicating that Castelluccio planned to retire at 66 and an exhibit of Dr. Crakes's damages calculations of Castelluccio's economic loss through his 66th birthday.  (P. Exs. ##201, 213).  The record amply supports the jury's finding that Castelluccio planned to retire at age 66.

IBM next argues that, with respect to the pension and benefits that Castelluccio would not have received had he remained at IBM, his testimony indicates that he was receiving $78,000 in pension benefits annually, not the lower figure determined by the jury. The jury found that Castelluccio would have received $1,345,042 in back pay and benefits had he retired at 66.  (Doc. #187, at 1). From this figure, the jury was instructed to deduct the amount of retirement pay that Castelluccio received, but would not have received, had he remained at IBM.  The figure that the jury arrived at, $345,150.36, is the same figure calculated by Dr. Crakes. (Id.).  That figure assumed that Castelluccio would have worked for an additional 4.67 years had he not been terminated and that he was receiving $73,908 in annual pension benefits.  IBM argues that because Castellucio testified that his annual pension benefit was "78,000 or something like that," that the jury should have used the $78,000 figure in determining the amount to deduct from the back pay and benefits figure.  (Doc. #216, at 676).  Obviously, the jury was not bound to use Castelluccio's off-the-cuff estimation of his pension benefits, and properly relied on the figure arrived at by

32

the damages expert in this case.

IBM next claims that the jury's findings with respect to mitigation of damages were not supported by the record. IBM argues that it was entitled to a deduction from the back award based on Castelluccio's failure to mitigate damages because it had proven by a preponderance of evidence that suitable work existed for Castelluccio after his termination. It also argues that the record does not support the jury's findings that Castelluccio made reasonable efforts to seek employment. This court disagrees.

Victims of employment discrimination are required to mitigate their damages. See Dailey v. Societe Generale, 108 F.3d 451, 455 (2d Cir.1997). A discharged employee must "use reasonable diligence in finding other suitable employment," which need not be comparable to their previous positions. Ford Motor Co. v. EEOC, 458 U.S. 219, 231-32 & n. 15, 102 S.Ct. 3057, 3065-66 & n. 15, 73 L.Ed.2d 721 (1982). Typically, the employer has the burden to demonstrate (1) that suitable work existed in the marketplace and that (2) its former employee made no reasonable effort to find it. See Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 53 (2d Cir.1998) (citing Dailey, 108 F.3d at 456).

Here, the jury found that IBM met only one of these requirements, that is, it concluded that suitable work existed for Castelluccio, but also concluded that Castelluccio made reasonable efforts to seek employment. (Doc. #187, at 2). Consequently, the

33

jury was not required to deduct a value from the back pay award simply because IBM proved that there was suitable work for Castelluccio in the marketplace.

Moreover, the jury's finding that Castelluccio made reasonable efforts to seek employment was overwhelmingly supported by the record.  For example, Castelluccio testified that he continued his efforts to find a job full time, for six days a week over a period of four and a half years.  (Doc. #216, at 516-525).  During this period, Castelluccio maintained records of his efforts to secure a job, which included lists chronicling 300 jobs he applied to or networking events he attended, 250 meetings or web seminars he attended to maintain and update his skills, and over 100 internet based resources he utilized to locate work.  (P. Exs. ##103, 104, 105).  Castelluccio testified that he relied heavily on online sources that advertised jobs for executives, including NetShare, ExecuNet and Health Care IT, that he searched for jobs in various print publications, and hired a consultant and worked with numerous executive recruiters in order to find a new position.  (Doc. #216, at 519, 521, 523-525).  Based on the weight of this evidence the court will not disturb the jury's finding that Castelluccio made reasonable efforts to seek employment.

4. Improper Remarks

Finally, IBM argues that a new trial is warranted because Castelluccio's counsel called IBM's attorney an exceptionally able

New York trial lawyer.[9]  The court is confident that the jury understood this comment as praise for IBM's attorney and that the statement was not designed to invoke in the jurors feelings of regional prejudice.  Consequently, this court cannot conclude that this statement so prejudiced the jury as to warrant a new trial, let alone that the statement was even improper on its face.  See Patterson v. Balsamico, 440 F.3d 104, 119 (2d. Cir.2006) ("Not every improper or poorly supported remark made in summation irreparably taints the proceedings."); Reilly v. Natwest Mkts. Group Inc., 181 F.3d 253, 271 (2d Cir.1999) ("Rarely will an attorney's conduct so infect a trial with undue prejudice or passion as to require reversal.") (internal quotations marks omitted).  A new trial is not warranted on this basis.

For the reasons stated herein, IBM's renewed motion for a judgment as a matter of law, or in the alternative, new trial or remittitur, is DENIED.

**IT IS SO ORDERED.**

**Dated at Hartford, Connecticut this 23ʳᵈ  day of July, 2014.**

**/s/  Thomas  P.  Smith**
**Thomas P. Smith**
**United States Magistrate Judge**

---

[9]Plaintiff's counsel actually referred to IBM's counsel as an "*extraordinarily* able New York trial lawyer"). (Doc. #220, at 1710) (emphasis added).